EA27CLA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4               v.                           13 CR 420(GBD)

5   MESSIAH CLARK,

6               Defendant.

7   ------------------------------x

8
                                             October 2, 2014
9                                            10:00 a.m.

10
    Before:
11
                    HON. GEORGE B. DANIELS,
12
                                             District Judge
13

14                         APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  BROOKE CUCINELLA
17       MARGARET GARNETT
         Assistant United States Attorneys
18
    DONALD YANNELLA
19       Attorney for Defendant

20

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Is there anything we need to address

3     before we bring in the jury?

4          MR. YANNELLA:  Yes, I need to address something.

5          THE COURT:  Yes?

6          MR. YANNELLA:  Your Honor, I accidentally was trying

7     to consult with the prosecutors five minutes ago, and previous

8     days they had been in the jury room, so I knocked on the jury

9     room door, and when a juror answered all I said was "oh," and

10    turned on my heel and walked away.  It was a mistake.  I did

11    not speak to them, and they did not speak to me.

12         THE COURT:  You are supposed to take door number one,

13    not door number two.

14         MR. YANNELLA:  Exactly.

15         THE COURT:  All right.  Then let's go ahead and get

16    the witness then, and then we will bring in the jury.

17         (Jury present)

18         THE COURT:  Good morning, ladies and gentlemen.

19         OK, ladies and gentlemen, as I indicated yesterday, I

20    think we probably have two to three more days of testimony.  We

21    will keep trying to move efficiently, and possibly we might

22    even finish the witnesses by tomorrow.  So, we will see how we

23    move along today and tomorrow.

24         You can continue.

25

1    ROBIN LAHIRI, resumed.

2    DIRECT EXAMINATION (Continued)

3    BY MS. GARNETT:

4    Q.  Mr. Lahiri, I am going to ask you if you have any trouble

5    hearing me or defense counsel, you can ask for us to repeat the

6    questions or speak more loudly.

7    A.  Yes, ma'am.

8    Q.  So, we talked yesterday generally about how FEIN Search

9    works, and now I want to ask you about one particular customer

10   of FEIN Search.  Are you familiar with a FEIN Search account in

11   the name of Messiah Clark?

12   A.  Yes, ma'am.

13   Q.  And have you reviewed the FEIN Search records related to

14   that account before you came to court today?

15   A.  Yes, I have.

16   Q.  In front of you, Mr. Lahiri, is what has been marked for

17   identification as Government Exhibit 303.  Are you familiar

18   with this document?

19   A.  Yes, ma'am, I am.

20   Q.  And what is that document?

21   A.  This is simply the user registration information created by

22   our account management system.

23   Q.  For which customer?

24   A.  One more time, ma'am.

25   Q.  For which customer?  For which customer is this the account

EA27CLA1                    Lahiri – direct

1    information?

2    A.  This is for Messiah Clark, Bronx, New York,

3    MSMtaxservices@yahoo.com.

4    Q.  And is this the kind of customer information you maintain

5    for all of our customers in the regular course of your business

6    with FEIN Search?

7    A.  Yes, ma'am, all 500,000.

8    Q.  And do you rely on this information in conducting your

9    business at FEIN Search?

10   A.  Yes, ma'am, every day.

11           MS. GARNETT:  Your Honor, we offer Government Exhibit

12   303.

13           MR. YANNELLA:  No objection.

14           THE COURT:  It will be admitted into evidence.

15           (Government's Exhibit 303 received in evidence)

16           MS. GARNETT:  May we show it to the jury, your Honor?

17           THE COURT:  Yes.

18   Q.  Mr. Lahiri, I think you said the customer name here is

19   Messiah Clark.  Is that right?

20   A.  That's correct, ma'am.

21   Q.  And what company is identified as the customer here?

22   A.  The company is MSM Tax Services, and they list themselves

23   as the owner.

24   Q.  And what address is provided for this account?

25   A.  2018 Story Avenue, Bronx, New York 10473.

EA27CLA1                    Lahiri – direct

1    Q.  And what about the primary e-mail address where this

2    customer can be contacted?

3    A.  MSMtaxservices@yahoo.com.

4    Q.  And all of this information that you just described, is

5    that information that the customer provides when they register

6    for the account?

7    A.  Yes, ma'am, the customer inputs that at the registration

8    time.

9    Q.  Now, you told us yesterday that FEIN Search is a pay

10   service, a subscription service, right?

11   A.  That's correct, ma'am.

12   Q.  And how did MSM Tax Services pay for its membership at FEIN

13   Search?

14   A.  MSM Tax had two different credit cards on file:  A

15   Mastercard and a Visa; the Mastercard expiring 11/2015 and the

16   Visa expiring 7/2016.

17   Q.  And in whose name were those credit cards?

18   A.  Messiah Clark.

19          MS. GARNETT:  Ms. Chen, could you please display the

20   second page of this exhibit.

21   Q.  Mr. Lahiri, if you could look at page 2.  This large box at

22   the top where it says "order history," what is the information

23   that's contained in that section of the document?  What is that

24   information where it says "order history".

25   A.  This is the customer history that shows every order he has

EA27CLA1                    Lahiri - direct

1    placed in the history of his account, and it includes the

2    dates, the order amounts and the number of searches, the start

3    date of the order, the end date of the order.

4    Q.  And what is the date that MSM Tax Services and Messiah

5    Clark first registered as a member of FEIN Search?

6    A.  The first order was on February 21, 2009.

7    Q.  And what was the amount of that order?

8    A.  $19.95.

9    Q.  And how many searches did that order allow?

10   A.  That purchase, ten searches.

11   Q.  Is that sort of a trial subscription with your company?

12   A.  One more time, ma'am.

13   Q.  That level of subscription, is that kind of a trial

14   subscription that you offer?

15   A.  Yes, ma'am, that's the entry level.  At that time it was.

16   Q.  And after that order, what is the next order placed by this

17   customer?

18   A.  The next order?

19   Q.  Yes, the next order in time.

20   A.  Ma'am, it looks like 2009, March 24, 2009.  It looks like

21   an order for $139.99, 300 searches.

22   Q.  And did this customer again renew their subscription in

23   2010?

24   A.  Yes, ma'am, he did.

25   Q.  Is that the last entry there on the chart?  Does that

EA27CLA1                      Lahiri - direct

1    reflect an order in 2010?

2    A.  Yes, ma'am, that's correct.

3    Q.  And in 2011 did the customer again renew their

4    subscription?

5    A.  On February 28, 2011 there was a purchase for $149.99, and

6    that purchased 300 searches.

7    Q.  What about in 2012?

8    A.  2012 there was a purchase on March 19, 2012 for $479.52,

9    and that one purchased 1200 searches.

10   Q.  And in 2013 was there another order placed by this

11   customer?  In 2013 did this customer place another order?

12   A.  It was a manual order.

13   Q.  And that's the box that's highlighted there, right, 479.52?

14   A.  I misunderstood the question.  You asked if that was a

15   manual order?

16   Q.  No, I said was that another order placed in 2013?

17   A.  Yes, ma'am, that's correct, March 19, 2013, another order

18   for $479.52 for another 1200 searches.

19   Q.  And, Mr. Lahiri, the columns that say "max search" and

20   "used search" there in the center of the chart, do you see

21   those two columns?

22   A.  Yes, ma'am.  It shows the maximum number of searches that

23   they are allowed to purchase under max search.  Then the column

24   to the right under "used search," that explains how many

25   searches they actually used out of the allotted amount.

EA27CLA1                        Lahiri - direct

1   Q.  And am I reading this correctly that for each subscription

2   purchased by this customer, that customer used the full amount

3   of searches they were permitted to make?  Correct?

4   A.  Yes, ma'am, that's correct.

5   Q.  Now, Mr. Lahiri, the subscriptions purchased in 2010, 2011,

6   2012, were those automatic renewals, or did the customer have

7   to take some action to renew?

8   A.  No, ma'am, the customer had to take action to buy those

9   particular plans.  The only one that was an automatic renewal

10  is the purchase in 2013 for $479.52 for 1200 searches; all the

11  rest were manually entered.

12  Q.  And the 2013 order that automatically renewed, did anyone

13  from MSM Tax Services ever complain about that charge or ask to

14  have it refunded?

15  A.  No, ma'am, on the contrary, somebody called in.  There is a

16  CRM note where a customer, Messiah Clark, called in and spoke

17  to our customer service manager.

18          MR. YANNELLA:  Objection.

19          THE COURT:  Overruled.  You can cross-examine.

20  Q.  And for that 2013 order, did the customer use all the

21  searches that had been paid for?

22  A.  Yes, ma'am, that's correct.

23  Q.  Now, I just want to go --

24          Ms. Chen, can you zoom back out and highlight the

25  bottom, CRM notes at the bottom of the page.

EA27CLA1                    Lahiri - direct

1              Mr. Lahiri, can you explain this notation in the

2     customer records?  Can you explain what it means?

3     A.   So, CRM is basically customer record management system.

4     And we have several customer service people, and we keep notes

5     every time there is a call-in, so that the next customer

6     service person can help the customer.

7              In this case there was a call in to Juliann who works

8     for Liberty Data.  It says that the customer called in on 3/19.

9     This entry was made at 7:30 p.m.

10    Q.   And it says "called in to verify."

11             The 2012 order you said was for $479.52, correct?

12    A.   That's correct, ma'am.

13    Q.   And would it be common practice at FEIN Search to do

14    something to verify an order of that amount?

15             MR. YANNELLA:  Objection, your Honor, as to common

16    practice.

17             THE COURT:  No, overruled.  He can answer.

18             You can answer.

19    A.   Yes, ma'am, we verify all orders that are big amounts, and

20    we try to speak to all customers that order over $49.

21    Q.   And do you know -- just yes or no, do you know whether

22    Juliann was able to speak to the customer that registered for

23    this account on March 19, 2012?

24    A.   The CRM notes indicate that the customer called in to

25    verify that order.

1  Q.  And in terms of your business practices at FEIN Search, if
2  no one had been able to reach the customer for an order of that
3  size, what would have happened to the order?
4  A.  The --
5          MR. YANNELLA:  Objection as to what would happen.
6          THE COURT:  Overruled.  He can answer that.  You can
7  cross-examine.
8  A.  If no one had been able to reach a larger account for
9  verification, then the order would go into like a hold basket,
10 and the card would not be charged, it wouldn't be activated
11 until it was confirmed.
12 Q.  Mr. Lahiri, does FEIN Search keep records of the particular
13 searches that its customers do?  The specific searches that
14 your customers do, do you keep records?
15 A.  Yes, ma'am, we keep search logs.
16 Q.  And is that in part because that's your pricing structure,
17 to charge by search?
18 A.  That's our business practice, ma'am.
19 Q.  Mr. Lahiri, in front of you is another document that's been
20 marked for identification as Government Exhibit 302.  Are you
21 familiar with this document?
22 A.  I have it here in front of me, ma'am.
23 Q.  And have you seen it before you came to court today?
24 A.  Yes, ma'am.
25 Q.  What is this document?

EA27CLA1                    Lahiri – direct

1    A.  This document is a search history related to this account.

2    Q.  The account that we have been talking about so far today?

3    A.  The MSM tax account.

4    Q.  And is this the kind of search information that you

5    maintain for each customer at FEIN Search?

6    A.  Yes, ma'am, on every account.

7    Q.  And do you rely on it in conducting the business of FEIN

8    Search?

9    A.  One more time, ma'am.

10   Q.  Do you rely on this kind of information in conducting your

11   business at FEIN Search?

12   A.  Yes, ma'am, with every account.

13            MS. GARNETT:  Your Honor, we offer Government Exhibit

14   302.

15            THE COURT:  Any objection?

16            MR. YANNELLA:  No, your Honor.

17            THE COURT:  It will be admitted into evidence.

18            (Government's Exhibit 302 received in evidence)

19            MS. GARNETT:  Ms. Chen, can you display the first page

20   of 302 for the jury, please.  And can you just zoom in on the

21   column headings maybe in the first couple of rows.

22   Q.  So, Mr. Lahiri, can you just explain what each of these

23   column headings means?  Starting from search type, what does

24   that mean?

25   A.  Yes, ma'am.  So, starting with search type column on the

1    left, the default search for all our EIN searches is EIN plus

2    business, so that references the two databases that are being

3    searched as the EIN database and the business database.

4         The next column is search option.  The default is set

5    to search by company name.  So, the first few characters of the

6    company would be entered, so it indicates by company.

7         The next column is company look-up and the default

8    query is "starts with," which means that the company name

9    starts with the first few characters as opposed to a contains

10   query.

11   Q.  Mr. Lahiri, I am just going to stop you for a second.  This

12   notion of look-up with starts with, is that what you were

13   explaining yesterday with Exxon Mobil, where if you just type

14   in the first few letters you get that drop-down menu?

15   A.  Yes, ma'am, that starts-with query.

16   Q.  So the next column it says company name.  What is contained

17   within that column?

18   A.  So, this column, company name, records the first few

19   characters that began the search or where he clicked on a

20   selected record.

21   Q.  And the information that's in the company name column, is

22   that the actual letters that the customer typed into that

23   search box?  Like is that what the customer typed into the

24   search box?

25   A.  Yes, ma'am.

EA27CLA1                    Lahiri - direct

1    Q.  And then the next column that's headed state.

2    A.  The next column is state, so that he can narrow down from

3    nationwide to the state of New York.

4    Q.  And if an entry in the column that's leaded state is empty,

5    what does that mean?

6    A.  Which column, ma'am?

7    Q.  So the column that's headed state, you see --

8              Ms. Chen can you highlight that one.  Thank you.

9    A.  Yes, ma'am, the blank field would be nationwide; there is

10   no state selected.

11   Q.  And the next column is headed reverse look-up value.  What

12   does that mean?

13   A.  Reverse look-up means that the customer would be searching

14   by a known TIN number or EIN number and looking for the company

15   name to return.  So where you see that column blank, it means

16   they did not enter an EIN; they were doing a forward company

17   search.

18   Q.  And the next column says result count.  What does that

19   mean?

20   A.  The results count shows how many records were returned for

21   that particular query and the number of results that they could

22   have taken a look at, or the number of result options that the

23   customer could take a look at.

24   Q.  And the last column is called time stamp.

25   A.  Yes, ma'am.

EA27CLA1                    Lahiri - direct

1   Q.  What's reflected there?

2   A.  So the time stamp basically records the exact time and

3   minute of the search starting with the month, the day, the

4   year, followed by a 24-hour time stamp.

5   Q.  And, Mr. Lahiri, do you know what time zone your data

6   server maintains?

7   A.  Yes, ma'am, our servers are set to Eastern Standard Time.

8   Q.  So the time stamps that are on this document, these search

9   records, is Eastern Standard Time.

10  A.  That's correct, ma'am.

11  Q.  Now, Mr. Lahiri, I think this was clear at the beginning,

12  but this entire document, Government Exhibit 302, is the

13  searches that were conducted by the account MSM Tax Services,

14  correct?

15  A.  That's correct, ma'am.

16  Q.  And can you look at the last page of the document, Mr.

17  Lahiri.  What is the first day that this customer starts

18  searching?

19  A.  So on the very bottom, on February 19, 2009, at 9:14 p.m.

20  the first search was conducted, a forward search by company,

21  starts with, and then he entered the company named AJA Tax

22  Services, Inc., in the state of New York.

23  Q.  And was that the very first search that this customer

24  conducted once they had paid for their membership?

25  A.  One more time, ma'am.

EA27CLA1                    Lahiri – direct

1    Q.  That search, is that the very first search that this

2    customer conducted once they had paid for their membership?

3    A.  Yes, ma'am, that was the very first search on the account.

4    Q.  And under result count it says zero, no results were

5    returned.

6    A.  That's correct.

7    Q.  And what does that mean?

8    A.  That simply means that we were unable to find a result for

9    that record.

10   Q.  Meaning no EIN number was found for that record?

11   A.  No data found for that record, yes, ma'am.

12   Q.  And the next search that's done less than a minute later,

13   can you just describe what that search is.

14   A.  This looks like a reverse EIN search, where the customer

15   simply entered the nine digit TIN number trying to identify who

16   that belongs to, and again there was no result there.

17   Q.  Mr. Lahiri, can you just count up and identify for the jury

18   how many pages Government Exhibit 302 is.  How many pages is

19   this document?

20   A.  I show 11 pages of searches, ma'am.

21   Q.  Mr. Lahiri, I want to draw your attention now to searches

22   that took place on March 31, 2011.  Have you found that date?

23   A.  Yes, ma'am, I'm there.

24          MS. GARNETT:  Ms. Chen, if you could just highlight

25   the bottom five rows.

EA27CLA1                    Lahiri - direct

1    Q.  So, Mr. Lahiri, beginning with the bottom search here on

2    March 31, 2011 at 15:18 hours or 3:18 in the afternoon, can you

3    just walk us through these five entries in order and explain

4    what the customer is doing.

5    A.  Sure, yes, ma'am.  So, on March 31, 2011 at 15:18 or 3:18

6    p.m. there was a forward search conducted by company name,

7    starts with query, and the name entered is Exxon --

8    E-X-X-O-N -- Mobil, M-O-B-I-L.  That was a nationwide search,

9    and that returned 1,795 results.

10   Q.  And the large number of results there, is that due to the

11   fact that in part Exxon Mobil is a very large company?

12   A.  Yes, ma'am, exactly.

13   Q.  And what's the next search conducted?

14   A.  The next search was conducted at 15:19 p.m., one minute

15   later, and it was a company search, starts with, and it's even

16   broader, E-X-X-O-N, but this is a nationwide query, so the

17   number of results is larger at 2,454 results.

18   Q.  And what is the next search?  What is the next search

19   conducted by this customer?

20   A.  The next search says the company name, starts-with search.

21   The company entered is Exxon, E-X-X-O-N, and this time it's

22   limited to the state of Utah, but there are zero results found.

23   And that search was conducted at 3:21 p.m.

24   Q.  And the next one?

25   A.  The next one is a company name search, starts-with query.

EA27CLA1                    Lahiri - direct

1    Company named entered is Exxon, E-X-X-O-N, Mobil, M-O-B-I-L,

2    limited to the state of Utah, and again zero results.

3    Q.  And then the next one, the last one that's highlighted

4    there at the top.

5    A.  The next one is a company, starts-with query for Exxon

6    Mobil, in the state of Texas.  There are 496 results.  That

7    search was done at 15:22.

8              MS. GARNETT:  Ms. Chen, can you just highlight the

9    next two rows right above that.

10   Q.  For these two searches that are highlighted, Mr. Lahiri,

11   can you just explain what the customer is doing in each of

12   those two searches.

13   A.  Explain what, ma'am?

14   Q.  Explain what the customer is doing on your website for each

15   of these two searches.

16   A.  It looks to me like he is searching for various public

17   companies, and the search that's highlighted is for Pepsi both

18   nationwide and then the state of Utah.  So, it looks to me like

19   he is searching large public companies.

20             MS. GARNETT:  Ms. Chen, can you please highlight now

21   the entry on March 7, 2013.

22             And, Mr. Lahiri, it's going to be on the second page

23   of your paper document.

24             And can you highlight the row at 11:33 a.m., Ms. Chen.

25   Q.  So, Mr. Lahiri, the entry at 11:33 a.m. on March 7, 2013

EA27CLA1                    Lahiri - direct

1    for NFI Industries, what is the customer MSM Tax Services doing

2    in this search?

3    A.  He is searching for a company starts-with query on NFI

4    Industries in the state of New York.

5    Q.  And how many results did he get?

6    A.  There is one result, ma'am.

7              MS. GARNETT:  Ms. Chen, can you please highlight the

8    entry on February 17, 2013 at 22:08. the two entries there.

9    Q.  This is on the same page were you on, Mr. Lahiri, the

10   seconds page, just a little farther down.

11   A.  I'm there now.

12   Q.  So starting with the lower one, Altru Health Services Corp.

13   Can you explain the relationship between these two searches,

14   what the customer is doing.

15   A.  So the customer is doing a company starts-with query on

16   Altru Health Care Services Corp. at 22:08 in the state of North

17   Dakota.  And the second search on top, the customer is doing

18   the same query but shortens it, and this time it's Altru Health

19   System in the state of North Dakota, and he gets 22 results

20   just two minutes later at 22:10.

21             MS. GARNETT:  May I just have a moment?

22             THE COURT:  Yes.

23             MS. GARNETT:  Nothing further.

24             THE COURT:  Cross-examination.

25

EA27CLA1                          Lahiri - direct

1    CROSS EXAMINATION

2    BY MR. YANNELLA:

3    Q.  Good morning.

4    A.  Good morning, sir.

5    Q.  So, what is your position at -- how do you pronounce?  FEIN

6    or FEIN Search?

7    A.  The company is Liberty Dat, sir, and FEIN Search is our

8    website, and I am the owner and the president.

9    Q.  Of Liberty Data.

10   A.  Yes, sir.

11   Q.  OK.  And how many employees do you have?

12   A.  We have four, sir.

13           MR. YANNELLA:  Can we put Exhibit 303 up on the board,

14   page 2, and could you zoom in where it says "called to verify."

15   A.  Let me get there.  OK, I'm there, sir.

16   Q.  Now, Juliann is one of your employees?

17   A.  Juliann?

18   Q.  Yes.

19   A.  Juliann is our customer service manager.

20   Q.  So she is an employee.

21   A.  Yes, sir.

22   Q.  OK.  And she had a telephone conversation, according to

23   this record, on March 19, 2012, correct?

24   A.  That's correct, sir.

25   Q.  And do you know if she called someone or someone called

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EA27CLA1                    Lahiri - cross

1    her?

2    A.  It doesn't say, but the entry was made at 7:30 p.m.

3    Q.  Do you know if she spoke to a man or a woman?

4    A.  Excuse me.  I'd like to modify that answer.  Under the CRM

5    notes, Juliann says that the customer called in to verify.

6    Q.  Do you know if a man or a woman called in?

7    A.  It doesn't say, sir.

8    Q.  Do you know the name of the person who called in?

9    A.  According to the CRM notes, it would have to be Messiah

10   Clark, but the note in particular doesn't say.

11   Q.  Well, where in the notes does it say it would have to be

12   Messiah Clark?

13   A.  Sir?

14   Q.  Where in the notes does it say it would have to be Messiah

15   Clark?  It doesn't, does it?

16   A.  Well, sir, if a customer called in referring to an account,

17   they have to give all their account information.

18   Q.  So you are assuming that that occurred, right?  It's not

19   noted in the notes, is it?

20   A.  No, sir, we are not assuming.  We are looking for the same

21   phone number to call in, and we are looking for the real

22   customer to call in.

23   Q.  Do you know who called in?

24   A.  Well, we believe Messiah Clark called in.

25   Q.  You weren't on the telephone call, right?

1    A.  One more time, sir.

2    Q.  You weren't on the telephone call, right?

3    A.  No, sir, it was Juliann.

4    Q.  And you just testified you don't know whether it was a man

5    or a woman who called in, correct?

6    A.  No, sir, we don't know that.

7          MR. YANNELLA:  You can take that down, please.

8          Page 1 of Exhibit 303, can we put that up, please.

9    And could you zoom into the top where it says first and last

10   name and company.

11   Q.  Now, since you are -- you are the owner of Liberty Data?

12   You are the owner of the company, sir?

13   A.  Yes, sir.

14   Q.  Are you the one who recruits new customers or signs up new

15   customers, or do you have an employee who does that?

16   A.  No, sir, customers find us on Google.

17   Q.  When a customer finds you on Google, are you the one who

18   interacts with them to sign them up, or do you have an

19   employee?

20   A.  This is automatic, sir.  This is done by a website.

21   Q.  OK.  So when this was done by a website, all we know is

22   that someone typed in the first name Messiah with a lower case

23   M and the last name Clark with a lower case C, correct?

24   A.  Yes, sir, that's correct.

25   Q.  And when that was entered, it was done by somebody who was

EA27CLA1                    Lahiri - cross

1    on a computer or some type of smart phone somewhere entering

2    the data, correct?

3    A.  Yes, sir, that's correct.

4    Q.  It wasn't done by one of your employees.

5    A.  No, sir, that's correct.

6    Q.  And the address below that, 2018 Story Avenue, that was

7    also entered by some individual, correct?

8    A.  Yes, sir.

9    Q.  And did you or any of your employees ever visit 2018 Story

10   Avenue to see if in fact there was MSM Tax Services there?

11   A.  No, sir.

12   Q.  What was the user name for this particular account,

13   customer ID 113121?

14   A.  The user name, sir?

15   Q.  Yes.

16   A.  The account is titled under the e-mail address

17   MSMtaxservices@yahoo.com, first and last name Messiah Clark,

18   company name MSM Tax Services.

19   Q.  The question is is there a user name and a password for a

20   log-in?  Do you understand?

21          JUROR:  I'm sorry.  Can I please go use the restroom?

22          THE COURT:  Oh, sure.

23          MS. GARNETT:  Your Honor, can we all take five

24   minutes?

25          THE COURT:  Sure.  We will take a break.  Take a five

1    minute break.  Don't go beyond the jury room.  Just stretch.

2              (Recess)

3              THE COURT:  You can continue, Mr. Yannella.

4              MR. YANNELLA:  Can we please put Exhibit 310 up on the

5    board.

6    ROBIN LAHIRI, resumed.

7    CROSS-EXAMINATION (Continued)

8    BY MR. YANNELLA:

9    Q.  Drawing your attention to this, I had asked you about a

10   user name and password.  FEIN Search actually uses an e-mail

11   and a password, correct, for logging in?

12   A.  Yes, sir, e-mail address as a log-in, but they have to

13   choose their own password.

14   Q.  Do you know what the password was for this particular

15   account?

16   A.  No, sir, it's encrypted.

17   Q.  Do you know how many different individuals had access to

18   the password for this account?

19   A.  According to the user terms, only the signed-up user is

20   permitted use that ID and password.

21   Q.  So according to the terms, only one user is permitted to

22   use that password?

23   A.  That's correct, sir.

24   Q.  But in reality you would have no way of knowing whether

25   someone violated their agreement with you?

EA27CLA1                    Lahiri - cross

1   A.  But the account is tied to the e-mail address so that it

2   can be verified before it's activated.

3   Q.  Can you answer the question?  You would have no way of

4   knowing, yes or no, whether someone violated their agreement

5   with you to have only one person use it.  You couldn't know

6   that, could you?

7   A.  If someone gave their user ID out to somebody else, then

8   they are violating our terms.

9   Q.  Exactly.  But you don't know -- how many customers do you

10  have?

11  A.  More than 500,000, sir.

12  Q.  So of those 500,000, you don't know what percentage of

13  those people, if any, violate that rule.

14  A.  Well, every e-mail address is verified upon activation.

15  Q.  OK.  So if the user then gives his e-mail address and

16  password -- or forget user -- if the subscriber then gives his

17  e-mail address and password to, for example, his friend, or a

18  secretary, or a family member, you would have no way of knowing

19  that, correct?

20  A.  No, sir, but we track every search and every IP address.

21  Q.  Now, the IP address --

22          Could we put Exhibit 303 up on the board, the second

23  page.

24  A.  303?

25  Q.  Yes.  Maybe you can use the screen in front of you instead

1   of flipping the pages.  Does the screen in front of you have

2   what's on the board?

3   A.  That's not 303.  Oh, that's the second page of 303.

4   Q.  Yes.

5   A.  Yes, sir.

6          MR. YANNELLA:  Could we zoom in where it says IP

7   address.

8   A.  Yes, sir, I'm there.

9   Q.  OK.  Now, that's FEIN Search's records of what IP address

10  was used to access the database, correct?

11  A.  No, sir.  This is the record of where the search was placed

12  from.  These are order history.  These are the order history

13  logs.

14  Q.  OK.  So this IP log tells you where the order was placed

15  from, from what IP address, correct?

16  A.  Yes, sir, it shows the IP address that the order was placed

17  from.

18  Q.  Now, do you know if this IP address relates to any

19  particular computer, or hand-held device, or tablet or iPad?

20  A.  No, sir, we can't track the device, but it is tracking the

21  geo distance.

22  Q.  You can't track the device though, yes or no?

23  A.  I'm sure it's technically possible, but we aren't doing it

24  in this particular record.

25  Q.  And it's not done here, correct?

1    A.  Correct, sir.

2             MR. YANNELLA:  Can we put up Exhibit 302, please.  Can

3    we go just to the very top to see what the labels are on each

4    of these different columns.

5    Q.  OK.  So what we have here, sir, is a search type, correct?

6    A.  Search type, yes, sir.

7    Q.  Search option, correct?

8    A.  Yes, sir.

9    Q.  Company look-up, correct?

10   A.  Correct.

11   Q.  Company name?

12   A.  Yes, sir.

13   Q.  State?

14   A.  Right.

15   Q.  Reverse?

16   A.  Yes, sir.

17   Q.  Result count?

18   A.  Yes, sir.

19   Q.  Time stamp?

20   A.  Yes, sir.

21   Q.  Does it go any further to the right?  This does not have an

22   IP address, correct?

23   A.  No, sir.

24            MR. YANNELLA:  No further questions.

25            THE COURT:  Any further questions?

EA27CLA1                    Lahiri - cross

1              MS. GARNETT:  Just briefly, your Honor.

2              THE COURT:  Sure.

3    REDIRECT EXAMINATION

4    BY MS. GARNETT:

5    Q.  Mr. Lahiri, I just want to go back.

6              Ms. Chen, can you show Government Exhibit 303, the

7    second page.  Highlight the CRM note entry at the bottom of the

8    page.

9              Mr. Lahiri, defense counsel asked you a number of

10   questions about what this entry means on cross.  Do you

11   remember those questions?  Can you describe what your normal

12   business practices are at FEIN Search when you have to do a

13   customer verification by phone?

14             MR. YANNELLA:  Objection.

15   A.  So normally --

16             MS. GARNETT:  Rule 406.

17             THE COURT:  Overruled.  He can answer.

18   A.  It's typical practice, ma'am, for an account that is newly

19   registered and places an order that has to be verified, they

20   receive an activation link, and the account isn't active until

21   the link is clicked.  Once the link is clicked, they can log in

22   and they get their search option, and they can go to the

23   shopping cart and make a purchase on the shopping cart.

24             MR. YANNELLA:  Move to strike as nonresponsive.

25             THE COURT:  No, overruled.

EA27CLA1                        Lahiri - redirect

1    Q.  You can continue, sir.

2    A.  So once they make a purchase on the shopping cart, if an

3    order has to be verified, or if they have a search question,

4    they would normally call in, and the account is searched within

5    our system using that e-mail address, so in this case MSM Tax

6    Services.

7            So, on this date, March 19, Juliann received a call

8    from the customer who provided that e-mail address.  Once that

9    e-mail address is provided, Juliann would go into our account

10   management system and pull up the entire account.  What she is

11   looking for is a legitimate customer verification.  She wants

12   to close down anything that doesn't look like it's the right

13   person, so she is going to ask him to verify his credit card

14   and verify the address on the account.  And that would have had

15   to have happened on March 19th in order for that $479 order to

16   get verified.

17   Q.  Now, I know that you, Mr. Lahiri, did not participate in

18   that phone call with Juliann and the customer, right?

19   A.  That's correct.

20   Q.  So what you are describing is what your normal business

21   practices at FEIN Search would be, right?

22   A.  That's correct, ma'am.

23   Q.  And do you have any reason to think that Juliann didn't

24   follow those practices on March 19, 2012?

25   A.  No, ma'am.

1           MS. GARNETT:  Nothing further, your Honor.

2           THE COURT:  Mr. Yannella?

3           MR. YANNELLA:  Nothing further.

4           THE COURT:  Thank you, sir.  You can step down.

5           (Witness excused)

6           THE COURT:  Government call its next witness.

7           MS. CUCINELLA:  The government calls Richard Minott.

8    RICHARD MINOTT,

9        called as a witness by the government,

10       having been duly sworn, testified as follows:

11          MS. CUCINELLA:  Your Honor, may I inquire?

12          THE COURT:  Just a second.  We will have Mr. Minott

13   step a little closer to the mike.

14          THE WITNESS:  Is that good?

15          THE COURT:  That's fine, yes.

16          You may inquire.

17   DIRECT EXAMINATION

18   BY MS. CUCINELLA:

19   Q.  Good morning, Mr. Minott.  Where do you work?

20   A.  New York City Health and Hospitals Corporation.

21   Q.  For how long have you worked at New York City Health and

22   Hospitals Corporation?

23   A.  Approximately 27 years.

24   Q.  Do you work in a particular unit or group?

25   A.  Yes, I work in the finance division, revenue management

EA27CLA1                        Minott - direct

1    department.

2    Q.  Do you have a title?

3    A.  Yes, senior director.

4    Q.  Does New York Health and Hospitals Corporation maintain a

5    database or a system that stores records relating to its

6    current and former patients?

7    A.  Yes.  We have a patient management and billing system

8    that's used to capture patient registrations, admissions,

9    discharges and also billing.  The company is Siemens Health

10   Care.  It's a system that has been outsourced by the

11   corporation.

12   Q.  Does that system cover every hospital in the New York City

13   Health and Hospitals network?

14   A.  Yes, it does.

15   Q.  Do you know what hospitals that network includes?

16   A.  Yes, I do.

17   Q.  What hospitals are those?

18   A.  OK.  There is 22 of them:  Bellevue Hospital, Metropolitan

19   Hospital, Harlem Hospital, Renaissance Diagnostic and Treatment

20   Center, Queens Hospital, Elmhurst Hospital, Lincoln Hospital,

21   Morrisania Diagnostic and Treatment Center, North Central

22   Bronx, Jacobi Hospital.  Let's see if I missed any.  Woodhall

23   Hospital.  Cumberland Diagnostic and Treatment Center.  Susan

24   Smith McKinney Longterm Care Center, Kohler Longterm Care,

25   Goldwater Longterm Care, which has been transitioned to a new

EA27CLA1                          Minott – direct

1    facility and name, Henry J. Carter.  Susan Smith McKinney,

2    Kings County.  I'm not sure if I missed any there.

3               (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. CUCINELLA:

2    Q.  But there are 22 in total?

3    A.  There are 22.  I said Lincoln, yeah.  Okay.

4    Q.  Are all of the hospitals in New York City Health and

5    Hospitals Corporation network public hospitals?

6    A.  Yes.  They are municipalities that are governed by the City

7    of New York.  The president is a -- is a board approved but

8    selected by the Mayor.

9    Q.  What does it mean to be a public hospital?

10   A.  For New York City, it's a hospital that's nonprofit.

11   Again, it's a municipality, so it's governed not by private

12   concerns but by public concerns.  New York City Health and

13   Hospitals has a commitment and a charter to treat just about

14   anyone that appears at our door, regardless of whether they

15   have insurance or not.  If they don't have insurance, we make

16   efforts to get insurance for them.

17   Q.  Going back to that system or the database of patient

18   information that you mentioned, what type of information is

19   kept in that database?

20   A.  Primarily information that is captured for the purposes of

21   reporting clinical care and for treatment, but basically it's

22   demographic information and billing and financial information.

23   Q.  Is some of that information gathered from patients at the

24   time they register?

25   A.  Yes, they are.  Yes.

Ea2ecla2                          Minott - direct

1    Q.   Is a patient expected to provide a Social Security number

2    at the time that they register?

3    A.   They are -- we request it, but it's not required for care.

4    Q.   Did there come a time when you were asked to confirm

5    whether certain individuals were ever patients at New York City

6    Health and Hospitals Corporation?

7    A.   Yes.

8    Q.   In connection with that, were you provided with three lists

9    of names and Social Security numbers from the US Attorney's

10   Office?

11   A.   Yes.

12   Q.   And did you, in fact, conduct searches to determine whether

13   the individuals on those lists were, in fact, patients at New

14   York City Health and Hospitals Corporation's hospitals?

15   A.   Yes.

16   Q.   I believe you have a binder up there.  In that binder are

17   what's been marked for identification as Government

18   Exhibits 951, 952, 953 and 954.  Do you recognize these

19   documents?

20   A.   Yes.

21   Q.   What are they?

22   A.   They're output from the reports that, or the information

23   that was requested of me.

24   Q.   Did you create those charts?

25   A.   Yes.  They were created from a spreadsheet.

1    Q.  Have some of the columns from the original spreadsheet that

2    you created been removed?

3    A.  Yes.

4    Q.  Do the charts reflect information derived from business

5    records kept by New York City Health and Hospitals Corporation?

6    A.  Yes.

7    Q.  And are those business records records that you rely on in

8    the regular course of your duties at New York City Health and

9    Hospitals Corporation?

10   A.  Yes.  The database that this information derives from is

11   used for billing, for reporting both state, federal, regulatory

12   agencies, as well as for clinical care.

13           MS. CUCINELLA:  The government offers Exhibits 951,

14   952, 953 and 954.

15           THE COURT:  Any objection?

16           MR. YANNELLA:  No.

17           THE COURT:  They'll be admitted.

18           (Government's Exhibits 951, 952, 953 and 954 received)

19   BY MS. CUCINELLA:

20   Q.  Mr. Minott, I'm going to direct your attention to

21   Government Exhibit 951.

22           MS. CUCINELLA:  Your Honor, may we have permission to

23   publish 951 to the jury?

24           THE COURT:  Yes.

25           MS. CUCINELLA:  Ms. Chen, would you please put it on

Ea2ecla2                     Minott - direct

1    the big screen.

2    Q.  Mr. Minott, what is this document?

3    A.  This is one of -- this is an output from one of the

4    requests that we had to query whether or not these specific

5    individuals were seen at any of our hospitals.

6    Q.  And can you walk the jury through what each column on this

7    chart represents?

8    A.  Yes.  On the first column identifies the patient's Social

9    Security number, and the next column is the last name, and of

10   course the first -- next column is the patient's first name.

11   The column labeled number HHC location is when we did the

12   query, we wanted to identify, or basically identified, if the

13   patient -- how many hospitals the patient was encountered in

14   within the HHC group of hospitals.  So in this case of

15   Victoria, she had -- she was seen at two locations of the 22

16   locations that we have.

17          Also, the minimum visit date is the earliest date we

18   can find of an encounter by -- with Victoria, as well as the

19   last date of an encounter with Victoria, that being the last

20   column.

21   Q.  And that's their most recent --

22   A.  That's their most recent, I'm sorry.  Yeah.

23   Q.  And by "most recent," it's their most recent visit at any

24   New York City Health and Hospitals Corporation facility, is

25   that right?

1    A.   That's correct.

2    Q.   In order to get a positive result based on your search, did

3    you search by name and Social Security number, or did you

4    search by name individually and Social Security number

5    individually?

6    A.   We do both, but we do -- we look for combinations of both

7    and try to generate as accurately as we can.  So if we don't

8    have a Social Security number, there's a possibility we don't

9    get a match.  We want to be very careful about what we report

10   on.

11   Q.   And looking at this form, are there individuals for whom

12   you did not have a Social Security number at the time that you

13   did this search?

14   A.   Yes.

15   Q.   How many individuals were there?

16   A.   I believe there was three.

17   Q.   Other than the three individuals for whom you did not have

18   a Social Security number, were all of the other individuals on

19   the list you were provided seen at New York City Health and

20   Hospitals Corporation facilities?

21   A.   Yes.

22   Q.   And were all of the individuals on this list seen before

23   the year -- either during or before the year 2007?

24   A.   Yes.

25   Q.   And the three individuals for whom you did not have Social

1    Security numbers, what were their names?

2    A.   Dexter Thomas, Glenn Womack -- I believe there was another.

3    Q.   I'll direct your attention to page two, Pizzatola.

4    A.   We didn't find any visits for that patient, Joseph

5    Pizzatola.

6    Q.   For the two that you didn't have Social Security numbers

7    for, does it mean that those individuals definitely weren't

8    seen at New York City Health and Hospitals?

9    A.   Not necessarily, no.  It's just that it's the possibility

10   that either we didn't -- we weren't provided those numbers or

11   that the relationship between the name and the Social Security

12   number did not match.

13   Q.   I'm going to direct your attention now to Government

14   Exhibit 952.  What is this document?

15   A.   This document provides additional detail based off of the

16   prior document where we identified the number of locations that

17   a specific patient was captured in.

18              So, for example, in the first case of Victoria, you

19   see that Victoria, at least on the first page, was seen -- if

20   you go across the columns to the one that says LKUP, which

21   means lookup, organizational short name, organization short

22   name, you can see that the patient had encounters both at Coler

23   and Goldwater.  The information of the date and time relates to

24   the -- to a -- actually, it's basically just an identification

25   of when we checked into the account.  But the reason why you

Ea2ecla2                        Minott - direct

1    see so many there is that as you are treated in a facility, and

2    what we capture in the billing system is the actual procedures

3    that are done because they're needed for billing.  So

4    typically, if you know you'll go to a doctor or to a clinic,

5    and they may have a -- ask you to -- or give you a blood test

6    and a urinalysis and other exams, consider that each one of

7    these that you see represents some type of procedure that was

8    done on the date identified.

9    Q.  So the reason that this name appears so many times could be

10   either individual visits or multiple procedures during the same

11   visit?

12   A.  Correct.  That's how it's billed, yes.

13   Q.  And looking at the second column from the right, what does

14   that column represent?

15   A.  The one that says VST type CD?

16   Q.  That's correct.

17   A.  That is the designation of whether this treatment was done

18   as the patient was an inpatient.  If you see an I or if you see

19   an O, it will be an outpatient.  So consider that the patient

20   was admitted while these treatments occurred as an inpatient,

21   and an O typically identifies that they were an outpatient.

22   That's also required.  That's one of the identifiers from a

23   billing perspective and a reporting perspective that's

24   required.

25   Q.  Based on your review of these records, with the exception

Ea2ecla2                        Minott - direct

1   of -- withdrawn.

2         Based on your review of this document, how many

3   individuals from the list provided to you by the US Attorney's

4   Office were patients at Coler Goldwater?

5   A.  I think the majority of the patients were Coler Goldwater.

6   Q.  The majority of the patients?

7   A.  Yes.  Yes.

8   Q.  And they were all seen either during or before the year

9   2007?

10  A.  Yeah.  There is some reflection of those dates, yes.

11  Q.  I'm now going to turn your attention to Government

12  Exhibit 953.  What is this document?

13  A.  Similar to the prior document, it identifies patients that

14  we were asked to query to see if they were seen at our

15  hospitals.

16  Q.  And can you go through and explain, there are a couple

17  different columns on this sheet than there were on the one for

18  the 2008 query.

19  A.  Sure.  Again, you have the Social Security number of the

20  patients' first and last names, the number of locations that

21  patient was seen that we were able to pick out.  The number of

22  units is referenced similar to the prior report, the detail

23  report where you identify the number of procedures that it had

24  done.  A unit could be a unit of a procedure or an encounter.

25         So, for example, you can go to the hospital and as an

Ea2ecla2                      Minott - direct

 1    outpatient, and in our system every encounter can be identified
 2    as a unit.  So within the seven HHC locations, we have
 3    identified in our billing system about 125 encounters or units
 4    associated with those seven locations.
 5         Again, you have the first time we have a record in our
 6    database of the encounter of '97 for this patient, and the last
 7    visit that we encountered in the database of 2012.
 8  Q.  And looking at the end of this document, were there some
 9    names on the list from the US Attorney's Office that you did
10    not find a match for?
11  A.  Yes.
12  Q.  And turning to page three of this document, does the name
13    Carmen Lajara appear on this document?
14  A.  Yes, at the bottom.
15  Q.  Turning to Government Exhibit 954.  What does this document
16    represent?
17  A.  This represents the detail associated with the summary of
18    the prior report.
19  Q.  And so does this document reflect all of the specific
20    locations that these patients were seen at?
21  A.  Yes, it does.
22  Q.  Do all of the -- do the majority of the patients on this
23    list, were they --
24         MR. YANNELLA:  Objection to leading.
25         MS. CUCINELLA:  Withdrawn.

Ea2ecla2                          Minott - direct

1    Q.  You testified previously in connection with a 2008 list

2    that the majority of the patients were seen at Coler Goldwater.

3    Is that true of this list?

4              MR. YANNELLA:  Objection.  Leading.

5              THE COURT:  Overruled.  You can answer yes or no.

6    A.  I believe so, but they're all over.  They're --

7    Q.  Is there more of a variety?

8    A.  Yeah, there is more of a variety.

9    Q.  Are there any hospitals on this list that appear more often

10   than others?

11   A.  I believe that most of them are Goldwater and Coler,

12   typically Goldwater.

13   Q.  Does Coler and Goldwater -- does Coler Goldwater have any

14   affiliations with any other hospitals in the New York City

15   Health and Hospitals Corporation network?

16   A.  Yes.  Goldwater and Coler are part of the South Manhattan

17   Regional Network, and it is administrated -- although each

18   facility is independent, it's administrated as a single unit.

19   The systems -- although the systems create instances for each

20   facility, the administration and management of both the system

21   and of the organization is done centrally.  Typically the

22   patients that are seen or treated within the long-term care

23   facilities, if they need special care, would typically get sent

24   to their associated hospitals.  In the case of Coler and

25   Goldwater, both in terms of demographics and administration,

Ea2ecla2                        Minott – direct

1    many of those patients you would see a common process of seeing

2    them in either Gouverneur or Bellevue for treatment.  So, you

3    know, long-term care facility, if there's some special needs

4    that can't be taken care of there, they may go to a hospital,

5    or if there's an emergent need, they would be sent to Bellevue.

6    Q.  And so if there was an inpatient at Coler Goldwater, they'd

7    be transported to one of these other hospitals?

8    A.  Right.  So let's say there is some critical care that's

9    needed and they need to get to the emergency room.  More than

10   likely they'd end up as an outpatient in EED at Bellevue

11   Hospital.

12           MS. CUCINELLA:  Nothing further.

13           THE COURT:  Cross-examination, Mr. Yannella?

14           MR. YANNELLA:  Yes, your Honor.

15   CROSS EXAMINATION

16   BY MR. YANNELLA:

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  Could you please tell me your position again at New York

20   City Health and Hospitals.

21   A.  I'm a senior director within the finance division, regular

22   management.

23   Q.  Can you tell us when you were connected -- contacted in

24   connection with testifying in this case?

25   A.  When I was connected -- when I was --

Ea2ecla2                        Minott - cross

1    Q.   Contacted.

2    A.   I think on and around September 5th.

3    Q.   And in order to testify here today, you were given a list

4    by the US attorneys of names and then asked to see if they were

5    patients at New York City Health and Hospitals facilities?

6    A.   Yes.  The document was provided to me through our HHC legal

7    department, originating from the US attorneys.

8    Q.   And are you the one who actually did this computer search?

9    A.   I have a database administrator that's part of the

10   outsourcing agreement we have with Siemens Healthcare that we

11   use for all of our queries in data mining.

12   Q.   And they did the search in this case?

13   A.   Yes, they did.

14   Q.   And provided you with this information?

15   A.   Yes.

16   Q.   Now, in order to access information such as this, would

17   someone need authority to access a computer?

18   A.   Yes, they do.

19   Q.   And would all employees of the New York City Health and

20   Hospitals Corporation be able to access data such as this

21   that's in Exhibit 952?

22   A.   No.

23   Q.   What factors would come into play?

24   A.   The access to the system is role based.  It's based off

25   your role within the facility.  Provisioning is done by

Ea2ecla2                    Minott - cross

1    specific and admin, people who have administrative rights to

2    provide those services to you.  As an employee of New York City

3    Health and Hospitals, you are also -- you also sign agreements

4    to not disclose patient care information.  In terms of who has

5    access, again, it's done by your role within the facility or

6    within your role at health and hospitals.  So a registration

7    clerk may have specific rights, whereas a nursing clerk may

8    either have greater rights or not, based off the information

9    that they need to do their job with.

10   Q.  Would a community assistant have access to this type of

11   computer data?

12   A.  The role of -- I'm not overly familiar with the role of a

13   community assistant, but it sounds that unless they are

14   encountering the patient, no.

15   Q.  If someone were to drive somebody from one hospital to

16   another, would they need access to this type of data?

17   A.  No.

18   Q.  Now, the people who do have access to this type of data,

19   are they given a login and a password?

20   A.  Yes.

21   Q.  Could we please put Exhibit 952 up on the board.

22           Now, you've already testified that there are many

23   instances in which Coler and Goldwater are referenced in this

24   document, correct?

25   A.  Mm-mm, yes.

Ea2ecla2                    Minott - cross

1    Q.  Now, isn't it a fact that a lot of other hospitals are also

2    referenced in Government Exhibit 952?

3    A.  Yes.

4    Q.  Such as Bellevue, Lincoln, Harlem, Metropolitan, Elmhurst,

5    Gouverneur, just to name a few?

6    A.  Yes.

7    Q.  For example, could we please put up page seven and zoom in,

8    perhaps, if we can, at least to the middle column, where we can

9    show on page seven this particular page has entries for Lincoln

10   Hospital, correct?

11   A.  Correct.

12   Q.  Page eight, can we look at that.  Same way.

13          Now, this has a whole variety; Metropolitan, Bellevue,

14   Harlem, Queens?

15   A.  Yes.

16   Q.  Page eleven, same thing.  These are almost all Elmhurst

17   except for some Metropolitan and Bellevue at the top, correct?

18   A.  Correct.

19   Q.  Page 19.  This is Bellevue, Gouverneur, correct?  And just

20   one more page, 21.  This is Coney Island and Bellevue, correct?

21   A.  Correct.

22   Q.  Now, do you have any knowledge of whether the people who

23   are contained in this list had their personal data compromised?

24   A.  No.

25          MR. YANNELLA:  No further questions.

Ea2ecla2                        Minott - cross

1             THE COURT:  Any further questions?

2             MS. CUCINELLA:  Nothing further.

3             THE COURT:  Thank you, sir.  You can step down.

4             (Witness excused)

5             THE COURT:  Would the government call its next

6    witness.

7             MS. CUCINELLA:  The government calls Carmen Lajara.

8             And there's an interpreter coming.

9             THE COURT:  Do you have the interpreter available?

10            MS. CUCINELLA:  Your Honor, may we approach before the

11   witness takes the stand?

12            THE COURT:  Sure.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (At side bar)

2              MS. GARNETT:  Your Honor, we just wanted to let you

3    know, our next witness, Ms. Lajara, is illiterate.  She cannot

4    read.  So Ms. Cucinella is going to have to read off the

5    entries on the tax return to her and just confirm orally that

6    that's her information.

7              THE COURT:  The tax return's already in evidence?

8              MS. GARNETT:  Yes.  We've told Mr. Yannella, and he's

9    fine with it.  We wanted your Honor to know what's going on.

10             THE COURT:  Okay.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ea2ecla2                     Minott - cross

1              (In open court; jury present)

2              (Interpreter sworn)

3    CARMEN LAJARA,

4         called as a witness by the Government,

5         having been duly sworn, testified through the interpreter

6         as follows:

7    DIRECT EXAMINATION

8    BY MS. CUCINELLA:

9    Q.  Good morning, Ms. Lajara.

10   A.  Good morning.

11   Q.  How old are you?

12   A.  I'm 82 years old.

13   Q.  In what county do you live?

14   A.  I was born in Puerto Rico.

15   Q.  Where do you live now?

16              I'm going to withdraw the question.

17              Ms. Lajara, do you live in the Bronx?

18   A.  Yes.

19   Q.  How long have you lived in the Bronx?

20   A.  I live in the Bronx for over 40 years.

21   Q.  Do you live with anyone?

22   A.  I live by myself.

23   Q.  Ms. Lajara, do you work?

24   A.  No.

25   Q.  Why don't you work?

Ea2ecla2                    Lajara - direct

1    A.   Because I came to live with my family, and I was taking

2    care of my aunt's children.

3    Q.   Do you recall the last time you worked?

4    A.   No.

5    Q.   In the calendar year 2012 did you make approximately

6    $54,000 working for the Exxon Mobil company in Irving, Texas?

7    A.   No.

8    Q.   Have you ever worked for the Exxon company?

9    A.   No.

10   Q.   Have you ever been to Texas?

11   A.   No.

12   Q.   In 2011 did you file a federal income tax return for the

13   year 2010?

14   A.   No.

15   Q.   Did you ask anyone to file a federal income tax return for

16   you?

17   A.   No.

18   Q.   Ms. Lajara, can you read?

19   A.   No.

20   Q.   Ms. Chen, would you please place Government Exhibit 1173,

21   which is already in evidence, on the big screen.

22        Ms. Lajara, are the last four digits of your Social

23   Security number 6727?

24   A.   Yes.

25   Q.   And is your full name Carmen Lajara?

Ea2ecla2                       Lajara – direct

1    A.  Carmen Lajara.

2    Q.  Ms. Lajara, in 2010 did you live at 3357 Cerrillos Road,

3    apartment 176 in Santa Fe, New Mexico, zip code 87507?

4    A.  No.

5    Q.  Ms. Chen, if you'll display the last page of this exhibit.

6         Ms. Lajara, were you born in 1932?

7    A.  I was born December 22, 1932.

8    Q.  You can take that down.

9         Ms. Lajara, have you ever met anyone named Messiah

10   Clark?

11   A.  No.

12   Q.  Do you know anyone named Lamont Kemp?

13   A.  No.

14   Q.  Did you authorize Messiah Clark to file a tax return on

15   your behalf?

16   A.  No.

17   Q.  Did you ever authorize Lamont Kemp to file a tax return on

18   your behalf?

19   A.  No.

20   Q.  Did you ever authorize anyone to accept a $4,100 tax refund

21   on your behalf?

22   A.  No.

23   Q.  No one ever provided you with $4,100, did they, Ms. Lajara?

24   A.  No.

25         MS. CUCINELLA:  Nothing further.

Ea2ecla2                        Lajara - direct

1              THE COURT:  Cross-examination, Mr. Yannella?

2              MR. YANNELLA:  Yes, your Honor.

3    CROSS EXAMINATION

4    BY MR. YANNELLA:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Could you please tell us whether you've ever been to Coler

8    Goldwater Hospital.

9              INTERPRETER:  Interpreter requests repetition of the

10   name of the hospital, please.

11             MR. YANNELLA:  Coler, C-O-L-E-R, Goldwater.

12   A.  No.

13   Q.  Have you been to any hospital on Roosevelt Island?

14   A.  No.

15             MR. YANNELLA:  Nothing further.

16             THE COURT:  Any further questions?

17             MS. CUCINELLA:  No, your Honor.

18             THE COURT:  Thank you, ma'am.  You can step down.

19             (Witness excused)

20             MS. CUCINELLA:  The government calls Jessica Rivera.

21    JESSICA RIVERA,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MS. CUCINELLA:

Ea2ecla2                      Rivera - direct

1    Q.  Good morning, Ms. Rivera.

2              How old are you?

3    A.  Thirty-seven.

4              THE COURT:  You'll have to speak a lot louder than

5    that.  Just step a little closer.

6    A.  Thirty-seven.

7    Q.  Do you live in the Bronx?

8    A.  Yes.

9    Q.  How long have you lived there?

10   A.  Practically my whole life.

11   Q.  Ms. Rivera, are you currently working?

12   A.  No.

13   Q.  In 2007 were you working?

14   A.  No.

15   Q.  Was there a time between 2007 and today where you were

16   working?

17   A.  I only worked 2013.

18   Q.  And did you file a tax return in 2013?

19   A.  Yes.

20   Q.  In the calendar year 2007 did you make approximately

21   $25,000 working for New York City Health and Hospitals

22   Corporation in New York?

23   A.  No.

24   Q.  Have you ever worked for New York City Health and Hospitals

25   Corporation?

Ea2ecla2                         Rivera - direct

1   A.  No.

2   Q.  In the year 2007 were you enrolled as a student anywhere?

3   A.  No.

4   Q.  In the year 2008 did you file a federal income tax form

5   for --

6   A.  No.

7   Q.  -- 2007?

8   A.  No.

9   Q.  Was that because you weren't working?

10  A.  Yes.

11  Q.  Did you authorize anyone to file a federal income tax

12  return on your behalf?

13  A.  No.

14          MS. CUCINELLA:  Your Honor, may I approach.

15          THE COURT:  Yes.

16  Q.  Ms. Rivera, I'm showing you what's been -- excuse me,

17  what's already in evidence, Government Exhibit 1388.  Did you

18  file that form with the IRS?

19  A.  No.

20  Q.  Have you seen that form before?

21  A.  No.

22  Q.  I'm going to draw your attention to the top of the

23  document.  Is that your name?

24  A.  Yes.

25  Q.  And drawing your attention to the right-hand side, are

Ea2ecla2                       Rivera - direct

1   those the last four digits of your Social Security number?

2   A.  Yes.

3   Q.  I'm now going to draw your attention to the address.  758

4   Dumont Avenue, Apartment 4G in Brooklyn, New York.

5   A.  No.

6   Q.  Have you ever lived there?

7   A.  No.

8   Q.  Have you ever been to that address?

9   A.  No.

10  Q.  Turning to the last page of the document, is that the year

11  of your birth date?

12  A.  Yes.

13          MS. CUCINELLA:  May I just have one moment.

14          THE COURT:  Yes.

15  Q.  Turning to the second page of the document, do you see an

16  account number at the bottom of the page?

17  A.  No.

18          MS. CUCINELLA:  Your Honor, may I approach?

19          THE COURT:  Yes.

20  Q.  Do you see an account number about two-thirds of the way

21  down for a checking account?  Is that your checking account

22  number?

23  A.  No.

24  Q.  You can put that document to the side.

25          Ms. Rivera, have you ever met someone named Messiah

Ea2ecla2                    Rivera – direct

1   Clark?

2   A.  No.

3   Q.  Do you know anyone named Lamont Kemp?

4   A.  No.

5   Q.  Did you authorize Messiah Clark to file a tax return --

6   A.  No.

7   Q.  -- in your name?

8   A.  No.

9   Q.  Did you authorize Lamont Kemp to file a tax return in your

10  name?

11  A.  No.

12  Q.  Did you authorize anyone to accept a $2,200 tax refund on

13  your behalf?

14  A.  No.

15  Q.  Has anyone ever provided you with a $2,200 tax refund?

16  A.  No.

17          MS. CUCINELLA:  Nothing further.

18          THE COURT:  Mr. Yannella?

19  CROSS EXAMINATION

20  BY MR. YANNELLA:

21  Q.  Good morning.

22  A.  Good morning.

23  Q.  Have you ever been a patient at a hospital on Roosevelt

24  Island?

25  A.  No.

Ea2ecla2                         Rivera - cross

1    Q.  Have you ever been to Coler Hospital or Goldwater Hospital?

2    A.  No.

3             MR. YANNELLA:  Nothing further.

4             THE COURT:  Anything further?

5             MS. CUCINELLA:  No, your Honor.

6             THE COURT:  Thank you, ma'am.  You can step down.

7             MS. GARNETT:  Your Honor, at this time we have another

8    stipulation.

9             THE COURT:  Sure.  You can go, go ahead.

10            (Witness excused)

11            MS. GARNETT:  Your Honor, the stipulation is marked

12   for identification Government Exhibit 1507.

13            It is hereby stipulated and agreed, by and among the

14   United States of America, by Preet Bharara, United States

15   Attorney for the Southern District of New York, Brooke E.

16   Cucinella and Margaret Garnett, United States Attorneys of

17   counsel, and Messiah Clark, the defendant, by and with the

18   consent of his attorney, Donald Yannella, Esquire, that:

19            One, if called to testify, a representative of TD Bank

20   would testify that Government Exhibits 400, 400A, 400B, 400C

21   and 400D, including all subdivisions thereof, contain true and

22   accurate copies of the records of TD Bank from on or about

23   December 27, 2007, through on or about September 26, 2012,

24   pertaining to an account held by Messiah Clark, which account

25   was opened and maintained by Messiah Clark, beginning on or

Ea2ecla2                    Rivera - cross

1    about August 1, 2006; that the original records were made at or

2    near the time, by or from information transmitted by a person

3    with knowledge of the matters set forth in the records; that

4    they were kept in the course of regularly conducted business

5    activity, and it was the regular practice of that business

6    activity to make the records.

7         Two, if called to testify, a representative of TD Bank

8    would further testify that Government Exhibits 410, 410A, 410B,

9    410C and 410D, including all subdivisions thereof, contain true

10   and accurate copies of records of TD Bank pertaining to an

11   account held by Messiah Clark on behalf of MSM Tax Services;

12   that the original records were made at or near the time, by or

13   from information transmitted by a person with knowledge of the

14   matters set forth in the records; that they were kept in the

15   course of a regularly conducted business activity; and it was

16   the regular practice of that business activity to make the

17   records.

18        Three, if called to testify, a representative of

19   TD Bank would further testify that Government Exhibit 415,

20   including all subdivisions thereof, contains true and accurate

21   copies of certified checks issued by TD Bank, and that the

22   original records were made at or near the time, by or from

23   information transmitted by a person with knowledge of the

24   matters set forth in the records; they were kept in the course

25   of the regularly conducted business activity; and it was the

Ea2ecla2                          Rivera - cross

regular practice of that business activity to make the records.

          Four, if called to testify, a representative of Bank
of America, or B of A, would testify that Government
Exhibit 420, 420B and 420C, including all subdivisions thereof,
contain true and accurate copies of records of B of A
pertaining to an account held by Messiah Clark on behalf of MSM
Tax Services; that the original records were made at or near
the time, by or from information transmitted by a person with
knowledge of the matters set forth in the records; that they
were kept in the course of a regularly conducted business
activity; and it was the regular practice of that business
activity to make the records.

          Five, if called to testify, a representative of
Santander Bank, formerly known as Sovereign Bank, would testify
that Government Exhibit 430, including all subdivisions
thereof, contains true and accurate copies of records of
Santander pertaining to an account held by Messiah Clark; that
the original records were made at or near the time, by or from
information transmitted by a person with knowledge of the
matters set forth in the records; that they were kept in the
course of a regularly conducted business activity; and it was
the regular practice of that business activity to make the
records.

          Six, if called to testify, a representative of Center
State Bank would testify that Government Exhibit 440, including

Ea2ecla2                    Rivera - cross

all subdivisions thereof, contains true and accurate copies of

the records of Center State Bank pertaining to an account held

by Messiah Clark; that the original records were made at or

near the time, by or from information transmitted by a person

with knowledge of the matters set forth in the records; that

they were kept in the course of a regularly conducted business

activity; and it was the regular practice of that business

activity to make the records.

It is further stipulated that this stipulation and

Government Exhibits 400, 400A, 400B, 400C, 400D, 410, 410A,

410B, 410C, 410D, 415, 420, 420B, 420C, 430 and 440 may be

received in evidence as government exhibits at the trial of the

above referenced matter.  It's dated today, October 2, 2014,

signed by Ms. Cucinella on behalf of United States Attorney and

Mr. Yannella on behalf of Messiah Clark.

Your Honor, at this time we would offer into evidence

Government Exhibit 1507 and the other government exhibits that

I just read.

THE COURT:  They'll be admitted into evidence.

(Government's Exhibit 1507 received in evidence)

(Government's Exhibits 400, 400A - 400D, 410, 410A -

410D, 415, 420, 420B, 420C, 430 and 440 received)

MS. CUCINELLA:  The government calls Mary Riverso.

- - - - -

Ea2ecla2                         Rivera - cross

1    MARY RIVERSO,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. CUCINELLA:

6    Q.  Good morning, Ms. Riverso.

7    A.  Good morning.

8    Q.  Where do you work?

9    A.  I work at the US Attorney's Office.

10   Q.  How long have you worked there?

11   A.  Since December of 2011.

12   Q.  Do you have a title?

13   A.  Yes.

14   Q.  What is your title?

15   A.  Paralegal specialist.

16   Q.  What are some of the responsibilities as a paralegal

17   specialist at the US Attorney's Office?

18   A.  Some of them include assisting the attorneys in preparation

19   for trial.

20   Q.  As part of those duties, were you asked to review bank

21   records in connection with an investigation into Messiah Clark?

22   A.  Yes.

23   Q.  For how many accounts did you review records?

24   A.  Four accounts.

25   Q.  Was one of the bank accounts you reviewed a business

Ea2ecla2                          Riverso - direct

1   account for MSM Tax Services?

2   A.  Yes.

3   Q.  I'm going to direct your attention to the binder that's

4   been placed next to you, which contains government

5   exhibits that are already in evidence.  I'm going to direct

6   your attention to Government Exhibit 410A.

7           Did you review these documents in preparation for your

8   testimony today?

9   A.  Yes.

10  Q.  What do these documents reflect?

11  A.  410A specifically is a business signature card.

12  Q.  Ms. Chen, will you please publish 410A for the jury, with

13  the Court's permission.

14          Can you please explain to the jury what this

15  represents.

16  A.  This is the signature card that goes along with the bank

17  account that was opened on 7/22/08 for the account holder MSM

18  Tax Services, Inc.

19  Q.  And what are the last four digits of the account number for

20  this account?

21  A.  7795.

22  Q.  And is there a signature of an authorized individual

23  reflected here?

24  A.  Yes.

25  Q.  And below that, is there someone listed as the president of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ea2ecla2                    Riverso - direct

 1    MSM Tax Services?

 2    A.   Yes.

 3    Q.   And who is that?

 4    A.   Messiah Clark.

 5    Q.   Looking at the top, is there a business address provided

 6    for MSM Tax Services?

 7    A.   Yes.

 8    Q.   What is that?

 9    A.   2018 Story Avenue, Bronx, New York, 10473.

10    Q.   And is there an address provided for Messiah Clark as

11    president of MSM Tax Services?

12    A.   Yes.

13    Q.   And what is that address?

14    A.   2018 Story Avenue, Bronx, New York 10473.

15    Q.   Ms. Chen, you may take that down.

16            I believe you also have in front of you, Ms. Riverso,

17    what's been marked for identification as Government

18    Exhibits 510, 510A and 510B.  Do you recognize these documents?

19    A.   Yes, I do.

20    Q.   What are they?

21    A.   These are summary charts that I prepared in looking at this

22    underlying bank account.

23            MS. CUCINELLA:  One moment.

24    Q.   Directing your attention to what's been marked for

25    identification as Government Exhibit 520 and 530, also in that

Ea2ecla2                    Riverso - direct

1    binder.  Do you see those documents?

2    A.  Yes.

3    Q.  And what are those?

4    A.  These are additional summary charts that I prepared in

5    looking at additional bank records for different accounts.

6    Q.  And looking also at what's been marked for identification

7    as Government Exhibit 500.  Do you recognize that document?

8    A.  Yes.

9    Q.  And what is that?

10   A.  Another summary chart prepared in analyzing additional bank

11   account records.

12   Q.  And are all of these summary charts prepared by -- with

13   information derived from the government exhibits in the binder

14   next to you, all of which are already in evidence?

15   A.  Yes.

16          MS. CUCINELLA:  The government offers Government

17   Exhibit 500, 510, 510A, 510B, 520 and 530.

18          MR. YANNELLA:  No objection.

19          THE COURT:  They'll be admitted into evidence.

20          (Government's Exhibits 500, 510, 510A, 510B, 520 and

21   530 received)

22          MS. CUCINELLA:  Your Honor, we have copies for the

23   jury.  May we hand them out?

24          THE COURT:  Can we take a break, first?

25          Ladies and gentlemen, I'll give you a break for about

Ea2ecla2                         Riverso – direct

1    ten minutes.  Don't discuss the case.  Keep an open mind.

2    We'll adjourn for lunch in about an hour.

3              (In open court; jury not present)

4              MS. CUCINELLA:  Your Honor, we don't anticipate this

5    being an issue, but this witness needs to finish before the

6    lunch break because of some travel issues.

7              THE COURT:  So are you going to talk for hours?

8              MS. CUCINELLA:  It may not be hours.  Hopefully not,

9    so we'll wrap it up.  Mr. Yannella doesn't anticipate a long

10   cross, but if it does go long --

11             THE COURT:  How long do you anticipate further on

12   direct?

13             MS. CUCINELLA:  Thirty minutes.  We should be fine.

14             THE COURT:  Why don't you save us some time by putting

15   your exhibits either on the jurors' chairs or under their

16   chairs so we can be ready to go right away.

17             MS. CUCINELLA:  Absolutely.

18             THE COURT:  Let's take a short break.

19             (Recess)

20

21

22

23

24

25

EA27CLA3                    Riverso – direct

1          (Jury present)

2          THE COURT:  Ms. Cucinella, you can continue.

3     MARY RIVERSO, resumed.

4     DIRECT EXAMINATION (Continued)

5     BY MS. CUCINELLA:

6     Q.  Ms. Riverso, I am going to direct your attention to

7     Government Exhibit 510.

8     A.  OK.

9     Q.  Can you remind the jury when the MSM Tax Services business

10    checking account was opened?

11    A.  July 22, 2008.

12    Q.  Was there an initial deposit made into that account?

13    A.  Yes.

14    Q.  How much for that deposit for?

15    A.  $1,000.

16    Q.  Following that transfer, were there additional deposits

17    made into the account?

18    A.  Yes.

19    Q.  What types of deposits were made?

20    A.  Check and cash deposits.

21    Q.  I am going to direct your attention to Government Exhibit

22    510A --

23    A.  OK.

24    Q.  -- which Ms. Chen has put on the big screen.  What does

25    this chart represent?

EA27CLA3                    Riverso - direct

1    A.  One of the sources of deposits into this bank account.

2    Q.  Specifically, what was the source of deposit that's

3    reflected on this chart?

4    A.  Treasury checks.

5    Q.  And when you reviewed the bank records, were there images

6    of the Treasury checks contained within the bank records?

7    A.  Yes.

8            MS. CUCINELLA:  Ms. Chen, would you please put the

9    page labeled Clark 002803 of Government Exhibit 410B on the

10   screen, and can you zoom in on one of the checks.

11   Q.  Ms. Riverso, is this page demonstrative of what you just

12   referred to as images of the Treasury checks?

13   A.  Yes.

14           MS. CUCINELLA:  Can you zoom in on one of those

15   checks.

16   Q.  Can you explain to the jury, Ms. Riverso, what you see

17   here.

18   A.  This is an image of the check deposited into this TD Bank

19   account.

20   Q.  And what is the address that appears on that check?

21   A.  758 Dumont Avenue, Brooklyn, New York.

22   Q.  What's the name?

23   A.  Gary Akst.

24   Q.  Can you tell based on this record when that check was

25   presented?

EA27CLA3                          Riverso - direct

1    A.  Yes, date presented is October 7, 2008.

2    Q.  And zooming out, were there multiple images like this

3    included in this bank record?

4    A.  Yes, lots of pages like this.

5    Q.  And these all represent individual Treasury checks?

6    A.  Yes.

7    Q.  And turning back to Government Exhibit 510A, how was this

8    chart compiled?

9    A.  Every time I came across a check image similar to the ones

10   we just looked at, I itemized it in this list.  I included the

11   first and last name of the person the check was made out to,

12   the amount of the check, and the date presented.

13   Q.  And how many checks in total were deposited into this

14   account?

15   A.  Of Treasury checks there were 127.

16   Q.  And what was the total amount of Treasury checks deposited

17   into this account?

18   A.  The total was $175,290.99.

19   Q.  Is there a check deposited in the name of Albert Regan on

20   this chart?

21   A.  Yes.

22   Q.  Do you know what page that appears on?

23   A.  The first page, the bottom half.

24   Q.  And what date was a Treasury check in Albert Regan's name

25   deposited into this account?

EA27CLA3                    Riverso - direct

1    A.  October 20, 2008.

2    Q.  And was there also a check for an individual named Glenn

3    Womack deposited into this account?

4    A.  Yes.

5    Q.  And what page does that appear?

6    A.  The second page.

7    Q.  Approximately where on the page?

8    A.  Eight from the bottom.

9           MS. CUCINELLA:  Thank you.  You can take that down

10   now, Ms. Chen.

11   Q.  Along with the Treasury checks, were there other sources of

12   deposits into the MSM Tax Services account at TD Bank?

13   A.  Yes.

14   Q.  Turn your attention now to Government Exhibit 510B.

15          Ms. Chen just put it up on the big screen.

16          What does this chart reflect?

17   A.  This reflects other sources of deposits into MSM Tax

18   Services, Inc.'s TD Bank account.

19   Q.  And can you walk the jury through what the categories that

20   appear on this chart are.

21   A.  Sure.  I made an itemized list of transfers from another TD

22   Bank account into this one.  I made an itemized list of the

23   checks deposited from New York City Health and Hospitals

24   Corporation, and then a listing of other sources of deposits

25   into the account.

EA27CLA3                         Riverso - direct

1    Q.  Let's start with the first column, the transfers from TD

2    account 0509.  Based on your review of bank records, whose

3    account is TD account 0509?

4    A.  That was an individual checking account in the name of

5    Messiah Clark.

6    Q.  And these reflect transfers into the MSM bank account from

7    that personal account?

8    A.  Yes.

9    Q.  Or individual account?

10   A.  Yes.

11   Q.  And turning to the second column, these are all checks

12   deposited into this account?

13   A.  Yes.

14   Q.  And where were the checks from?

15   A.  From New York City Health and Hospitals Corporation.

16   Q.  A total of how many checks from New York City Health and

17   Hospitals Corporation were deposited into this account?

18   A.  45 checks.

19   Q.  For a total of how much money?

20   A.  $22,036.78.

21   Q.  And how often were the checks deposited?

22   A.  It varied.  Sometimes several checks were deposited at one

23   time; sometimes it was every few weeks.

24   Q.  And for what period of time?  When was the first New York

25   City Health and Hospitals Corporation check deposited and when

1    was the last?

2    A.   The first was deposited on August 28, 2008, and the last

3    was on June 21, 2010.

4    Q.   And approximately how much was each of those checks worth?

5    A.   It varied again.  The lowest one was $151.60; the highest

6    one I believe was $860.28.

7    Q.   Turning to the third column on your chart, what does this

8    column reflect?

9    A.   Other sources of deposits into the account.

10   Q.   And what were the four categories that you saw?

11   A.   Checks from AJA Tax Services, checks from the State of New

12   York Department of Taxation and Finance, checks from The

13   Bridge, and then miscellaneous other deposits.

14   Q.   And were images of these checks included in the bank

15   records?

16   A.   Yes.

17            MS. CUCINELLA:  Ms. Chen, will you please pull up the

18   page labeled Clark 002819 of Government's Exhibits I believe

19   it's 410B.

20   Q.   Ms. Riverso, does this page reflect images of the AJA

21   checks that you were describing?

22   A.   Yes.

23   Q.   And these are checks from AJA Tax Services?

24   A.   Yes.

25            MS. CUCINELLA:  Ms. Chen, can you zoom in on one of

EA27CLA3                     Riverso - direct

1  those checks.

2  Q.  Who is this check made out to?

3  A.  Lamont Kemp.

4  Q.  How much is it for?

5  A.  $5,400.

6  Q.  Is there an address associated with AJA Tax Services?

7  A.  Yes.

8  Q.  What is that address, to the best that you can read it?

9  A.  It's Dumont Avenue in Brooklyn, New York.

10  Q.  Can you tell who this check is signed by?

11  A.  I cannot.

12  Q.  Were the majority of the checks you saw in this account

13  that weren't Treasury checks and weren't New York City Health

14  and Hospitals Corporation --

15          MR. YANNELLA:  Object to the leading.

16  Q.  Other than the Treasury checks and the New York City Health

17  and Hospitals Corporation, where were the majority of the

18  checks in this account from?

19  A.  Most of them were from the other sources.  And among those

20  other sources, AJA Tax Services had the most checks that I saw.

21  Q.  You testified that there was money transferred into this

22  account from the personal account at TD Bank held by Messiah

23  Clark, is that right?

24  A.  Yes.

25  Q.  Was there also money transferred out of this account?

EA27CLA3                    Riverso - direct

1   A.  Yes, into that personal account.

2   Q.  Directing your attention to Government Exhibit 510, what

3   does this document reflect?

4   A.  This document reflects the transactions that the MSM Tax

5   Services, Inc. bank account underwent.  All the transactions of

6   $200 or more are accounted for on this chart.

7   Q.  And does this chart reflect the transfers from the MSM Tax

8   Services account into the individual account held by Messiah

9   Clark?

10  A.  Yes, those transactions are highlighted in gray.

11          MS. CUCINELLA:  Ms. Chen, can you zoom out.

12  Q.  So, on this page there are three transfers, is that right?

13  A.  Yes.

14  Q.  And turning to the second page, approximately how many

15  transfers are there?

16  A.  Nine.

17  Q.  And on the third page?

18  A.  22.

19  Q.  And on the fourth page?

20  A.  17.

21  Q.  So there are approximately 50 transfers in total from the

22  MSM tax account to Messiah Clark's personal account?

23  A.  Yes, that are $200 or more.

24  Q.  Ms. Riverso, based on your review of the account, were

25  there also checks written from the MSM Tax Services account?

EA27CLA3                          Riverso – direct

1    A.  Yes.

2    Q.  I am going to direct your attention to Government Exhibit

3    410D.  Are these checks written from the MSM bank account?

4    A.  Yes.

5    Q.  How many checks are reflected in 410D?

6    A.  Seven checks.

7    Q.  To whom were these checks written?

8    A.  There are four different recipients.

9    Q.  Who are the majority of the checks written to?

10   A.  EMC Mortgage Corp.

11   Q.  And what dates were the EMC Mortgage Corp. checks written?

12   A.  October 26, 2008; December 15, 2008; May 11, 2009 and July

13   20, 2009.

14   Q.  Ms. Riverso, do you know approximately when the MSM

15   business account was closed?

16   A.  Yes.

17   Q.  When was that?

18   A.  November 26, 2010.

19   Q.  And to what are you referring to look at that date?

20   A.  The transactions summary chart.

21   Q.  Is that Government Exhibit 510?

22   A.  Yes.

23   Q.  Turning now to the defendant's personal account, was this

24   account also opened at TD Bank?

25   A.  Yes.

EA27CLA3                    Riverso - direct

1   Q.  And did you review records associated with this account?

2   A.  Yes.

3   Q.  Was the defendant's personal account opened before or after

4   the MSM business account was opened?

5   A.  Before.

6   Q.  Approximately how long before?

7   A.  2006 it opened.

8   Q.  And the MSM business account was opened in 2008?

9   A.  Yes.

10  Q.  Turning your attention to Government Exhibit 400, which is

11  already in evidence, what is this document?

12  A.  This document is the itemized statements for this personal

13  account ending in 0509 for Messiah Clark.

14  Q.  And as of December 2007, what was the amount in Messiah

15  Clark's personal bank account?

16  A.  The balance on December 27, 2007 was $19,478.33.

17  Q.  Beginning in January of 2008, based on your review of the

18  records, were there any additional deposits made into this

19  account?

20  A.  Yes.

21  Q.  What types of deposits were there?

22  A.  There were a variety of deposits.

23  Q.  Did those include transfers from other accounts?

24  A.  Yes.

25  Q.  And did they also include checks?

1    A.   Yes.

2    Q.   You testified earlier about transfers from the MSM business

3    account to a personal account.  Is this the account to which

4    you were referring?

5    A.   Yes.

6    Q.   Based on your review of the records, were you able to tell

7    generally what the money in Messiah Clark's personal account

8    was spent on?

9    A.   Yes.

10   Q.   What types of things were those?

11   A.   Living expenses.  So his was mortgage paid out of this

12   account, cablevision bills, EZ-Pass, shopping, just general

13   things.

14   Q.   Drawing your attention to page that's labeled Clark 002734

15   of Government Exhibit 400C which is already in evidence,

16   looking at the check on the bottom of the page, what is this

17   document, or what does this check show?

18   A.   This check was paid from the personal account, made out to

19   a woman Shavanda Vaughn.

20   Q.   And how much is the check for?

21   A.   $9,000.

22   Q.   And what does it say in the memo line?

23   A.   "To my wife enjoy."

24   Q.   Turning now to Government Exhibit 400.

25            Ms. Chen, can you pull up page labeled Clark 2543, and

EA27CLA3                          Riverso - direct

1    zooming in on the individual transactions.

2              Looking at the last transaction, what does that

3    transaction represent?

4    A.  A payment to an establishment called Spiegel & Utrera.

5    Q.  And how much was that payment for?

6    A.  $705.85.

7    Q.  Ms. Riverso, in your review of the bank records, did you

8    come across the name Spiegel & Utrera in another place?

9    A.  Yes.

10   Q.  Directing your attention back to Government Exhibit 410C, I

11   believe.

12   A.  Yes.

13   Q.  Did you see that entity anywhere in Government Exhibit

14   410C?

15   A.  Yes.

16   Q.  Where?

17   A.  On the certificate of incorporation.

18   Q.  What page number of that exhibit?

19   A.  It's the page labeled Clark 002790.

20   Q.  What is that document?

21   A.  It's the certificate of incorporation of MSM Tax Services

22   Inc.

23   Q.  And was this certificate of incorporation included with the

24   signature card for MSM Tax Services' account?

25   A.  I don't think it was with the signature card but with the

EA27CLA3                      Riverso - direct

1  corporate banking resolution.

2  Q.  For when the MSM account was opened?

3  A.  Yes.

4  Q.  Turning your attention back to Government Exhibit 400.

5          Ms. Chen, will you please pull up the page labled

6  Clark 2543.

7          And directing your attention to the line item -- oh,

8  apologies, I have the wrong page number.  We will move on.

9          Ms. Riverso, in your review of the records, did you

10 see any line items related to ThemeSearch.com?

11 A.  Yes.

12 Q.  Were there payments from the personal account made to

13 ThemeSearch.com?

14 A.  Yes.

15 Q.  Based on your review of the accounts, were you able to tell

16 when Messiah Clark's personal account was closed?

17 A.  Yes.

18 Q.  And when was that?

19 A.  November 26, 2010.

20 Q.  You can set that to the side.  Along with the records from

21 TD Bank, did you also review records from Bank of America and

22 Sovereign Bank?

23 A.  Yes.

24 Q.  Starting with Bank of America and directing your attention

25 to Government Exhibit 420C which is already in evidence, what

EA27CLA3                        Riverso - direct

1    do these documents show?

2    A.   420C is the corporate signature card for the Bank of

3    America account.

4    Q.   And what corporation is this account opened in?

5    A.   The name of the corporation is MSM Tax Services, Inc.

6            MS. CUCINELLA:   And, Ms. Chen, if you can blow that

7    back up.

8    Q.   Is there a signature on this document?

9    A.   Yes.

10   Q.   And does that signature appear to be the signature of

11   someone named Messiah Clark?

12           MR. YANNELLA:   Objection to the leading.

13   Q.   Withdrawn.   What name does that signature appear to show?

14   A.   It's somewhat hard to read, but in looking at the next page

15   of the document there is a driver's license attached, and the

16   driver's license is in the name of Messiah Clark.

17   Q.   Is there an address on that driver's license?

18   A.   Yes.

19   Q.   And to the extent that you can read the address, what can

20   you make out?

21   A.   The word Story, in the Bronx, New York.

22   Q.   Turning your attention to Government Exhibit 420, are these

23   the records that you reviewed for transactions relating to the

24   Bank of America account opened for MSM Tax Services?

25   A.   Yes.

EA27CLA3                        Riverso – direct

1   Q.  Compared to Clark's TD accounts, the MSM Tax Services

2   account of TD Bank and his personal account at TD Bank, was

3   this account very active?

4   A.  No.

5   Q.  Directing your attention to Government Exhibit 520.  What

6   is this document?

7   A.  This reflects the transactions in the Bank of America

8   account that were $100 or more.

9   Q.  And this is based off of the records in Government Exhibit

10  420?

11  A.  Yes.

12  Q.  I am going to direct your attention to a transaction that

13  appears to have occurred on October 20th of 2011.

14  A.  Yes.

15  Q.  What is that transaction?

16  A.  A counter credit of $5,000, a deposit into the account.

17  Q.  Do you have an understanding of what a counter credit is?

18  A.  Yes.

19  Q.  And is that based on your review of records in Government

20  Exhibit 420?

21  A.  Yes.

22          MS. CUCINELLA:  Ms. Chen, I am going to ask you to

23  pull up pages 123 and 124 of Government Exhibit 420.

24  Q.  Ms. Riverso, can you explain to the jury what is reflected

25  on pages 123 and 124.

EA27CLA3                            Riverso - direct

1    A.  The deposit ticket for this transaction on October 20,

2    2011.

3    Q.  And does it indicate how much is being deposited into this

4    account?

5    A.  It does.

6    Q.  How much is that?

7    A.  $5,000.

8    Q.  And does it say whether or not this deposit is in cash?

9    A.  Yes.  The top line says cash, and that's where 5,000 is

10   entered.

11   Q.  And is there a time stamp that reflects at what time of day

12   this deposit was made?

13   A.  Yes.

14   Q.  What time of day?

15   A.  On that second page, 124, it says 10/20/2011 at 10:35.

16   Q.  Is it 10:35 or 10:36, or can you not tell?

17   A.  On the previous page it definitely says 10:36.  Yeah,

18   there.

19   Q.  So this transaction occurred on October 20, 2011 at 10:36?

20   A.  Yes.

21   Q.  You can set that to the side.  Turning to the Sovereign

22   Bank records you reviewed, directing your attention to

23   Government Exhibit 430A, when was the Sovereign Bank account

24   opened?

25   A.  The date opened was December 2, 2010.

EA27CLA3                    Riverso - direct

1   Q.  And in whose name was this account opened in?

2   A.  The name of the owner/signer was Messiah Clark.

3   Q.  Is there an address provided?

4   A.  Yes.

5   Q.  What is that address?

6   A.  2018 Story Avenue, Bronx, New York 10473.

7   Q.  And is there an e-mail address associated with this

8   account?

9   A.  Yes.

10  Q.  What is that e-mail address?

11  A.  Messiah74@netzero.net.

12  Q.  Directing your attention now to Government Exhibit 530.

13  A.  Yes.

14  Q.  What is this document?

15  A.  This is a chart reflecting the transactions, the deposits

16  and withdrawals specifically, from this Sovereign Bank account.

17  Q.  And is this document based on the records you reviewed in

18  Government Exhibit 430?

19  A.  Yes.

20  Q.  What is the most common type of transaction in this

21  account, based on your review?

22  A.  I can't say.

23  Q.  Looking at the bottom half of the chart --

24  A.  Yes.

25  Q.  -- what is reflected there?

EA27CLA3                         Riverso - direct

1   A.   The itemized statements of the deposits and withdrawals.

2   Q.   And whenever it says cash deposit, what does that reflect?

3   A.   When there was cash deposited into the account.

4            MS. CUCINELLA:  Nothing further.

5            THE COURT:  Cross-examination, Mr. Yannella.

6            MR. YANNELLA:  No cross, your Honor.

7            THE COURT:  Thank you.  You can step down.

8            (Witness excused)

9            MS. GARNETT:  Your Honor, we have one other witness

10   who is about five minutes, if we could just do that.

11            THE COURT:  Sure.

12            MS. GARNETT:  Your Honor, the government calls

13   Ms. Dulce Marroquin.

14    DULCE MARROQUIN,

15        called as a witness by the government,

16        having been duly sworn, testified as follows:

17            THE COURT:  You can be seated.  Just state and spell

18   your name for the court reporter.

19            THE WITNESS:  Dulce, D-U-L-C-E, Marroquin,

20   M-A-R-R-O-Q-U-I-N.

21            THE COURT:  You can inquire, Ms. Garnett.

22   BY MS. GARNETT:

23   Q.   Ms. Marroquin, where do you work?

24   A.   Bank of America.

25   Q.   Where what is your job there?

1    A.  Custodian of records.

2    Q.  And as part of that job as custodian of records for Bank of

3    America, are you familiar with the kinds of records that are

4    kept by the retail branches of Bank of America?

5    A.  Yes.

6         MS. GARNETT:  Your Honor, may I approach?

7         THE COURT:  Yes.

8    Q.  Ms. Marroquin, I am showing you what has been marked for

9    identification as Government Exhibit 420A.  Have you seen that

10   document before?

11   A.  Yes.

12   Q.  What is it?

13   A.  This is a snapshot of a video surveillance video at a

14   banking center.

15   Q.  A banking center of Bank of America?

16   A.  Yes.

17   Q.  And is it the regular practice of Bank of America to have

18   surveillance cameras in its retail branches?

19   A.  Yes.

20   Q.  And does Bank of America maintain for some period of time

21   those surveillance photographs as part of its regular course of

22   business?

23   A.  Yes.

24   Q.  Do you know, Ms. Marroquin, if there is a company-wide

25   retention time for surveillance video from retail branches?

EA27CLA3                    Riverso - direct

```
 1   A.  Yes.
 2   Q.  What is that time?
 3   A.  180 days.
 4   Q.  And who sets that policy?
 5   A.  It's our bank policy.
 6   Q.  So for all Bank of America retail branches nationwide
 7   that's the retention policy?
 8   A.  Yes.
 9        MS. GARNETT:  Your Honor, we offer Government Exhibit
10   420A.
11        THE COURT:  Any objection?
12        MR. YANNELLA:  No, your Honor.
13        THE COURT:  It will be admitted into evidence.
14        (Government's Exhibit 420A received in evidence)
15        MS. GARNETT:  Ms. Chen, could you please show that to
16   the jury.
17   Q.  Now, Ms. Marroquin, the surveillance video system in Bank
18   of America's retail branches, is it a continuous video or does
19   it take snapshot photographs?
20   A.  It's capable of both.
21   Q.  And are you able to tell, Ms. Marroquin, looking at this
22   snapshot photograph the date and time that this photograph was
23   taken?
24   A.  Yes.
25   Q.  And what was the date and time that this photograph was
```

EA27CLA3                    Riverso - direct

1   taken?

2   A.  This happened on October 20, 2011 at 10:36.

3   Q.  And can you tell from the notations on this photograph

4   which Bank of America branch the photograph was taken in?

5   A.  Yes, this occurred at our Parkchester banking center.

6   Q.  And do you know where generally speaking where the

7   Parkchester branch of Bank of America is located?

8   A.  That would be located in the Bronx.

9   Q.  Ms. Marroquin, do you know the person who is depicted in

10  this surveillance photograph?

11  A.  No.

12  Q.  And do you know whether this person is depicted in any

13  other surveillance photographs maintained by Bank of America?

14  A.  Not that I know of, no.

15          MS. GARNETT:  One moment, your Honor.

16          Nothing further.

17          THE COURT:  Any questions, Mr. Yannella?

18          MR. YANNELLA:  No, your Honor.

19          THE COURT:  Thank you, ma'am.  You can step down.

20          (Witness excused)

21          THE COURT:  Can we take our lunch break at this time?

22          MS. GARNETT:  Yes.

23          THE COURT:  All right.  Ladies and gentlemen, we are

24  ahead of schedule.  We are moving very efficiently.  I am very

25  confident that we will finish the witnesses no later than

EA27CLA3                        Riverso – direct

1    tomorrow, but I will give you further instructions as you come

2    back after lunch.  I am going to ask you to be inside the jury

3    room before 2:05 so we can start promptly at 2:05.  Don't

4    discuss the case; keep an open mind.  Just leave the material

5    on your seat.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  So approximately how many more witnesses

3    might you have and how long might they take?

4              MS. CUCINELLA:  Ten more witnesses.

5              THE COURT:  OK.

6              MS. CUCINELLA:  Given the pace, there is a chance that

7    we will finish them today.

8              THE COURT:  There is still that possibility?  OK.  All

9    right, then let's see how far we get, and then we will see how

10   we use the jury's time tomorrow.  So let's take a lunch break.

11   We will start up before 2:05.

12             MR. YANNELLA:  2:05?

13             THE COURT:  Yes.

14             MS. CUCINELLA:  Thank you, Judge.

15             (Luncheon recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

EA27CLA3                         Riverso – direct

 1                        AFTERNOON SESSION

 2                           2:09 p.m.

 3          THE COURT:  Are we ready to continue?

 4          MS. CUCINELLA:  Yes, your Honor.

 5          THE COURT:  Do we have anything to address before we

 6   bring in the jury?

 7          MS. CUCINELLA:  Why don't we do it after we've had a

 8   chance to talk on the break, and then we'll bring it up, if we

 9   need to.

10          (Continued on next page)

Ea2ecla4

```
1                    (In open court; jury present)
2                    THE COURT:  Will the government call its next witness.
3                    MS. CUCINELLA:  The government calls Lisa Green.
4     LISA GREEN,
5          called as a witness by the Government,
6          having been duly sworn, testified as follows:
7     DIRECT EXAMINATION
8     BY MS. CUCINELLA:
9     Q.  Good afternoon, Ms. Green.
10                   Where do you work?
11    A.  At an organization called The Bridge.
12    Q.  What is The Bridge?
13    A.  It's a nonprofit organization that provides services and
14    housing to homeless individuals with serious mental illness.
15    Q.  Where is The Bridge located?
16    A.  Our main office is on 108th Street and Broadway in
17    Manhattan, but we have offices and programs throughout the
18    city.
19    Q.  What is your role at The Bridge?
20    A.  I'm the senior vice president for residential services.
21    Q.  How long have you been with The Bridge?
22    A.  Exactly a year.
23    Q.  What are some of your duties and responsibilities -- excuse
24    me.
25                   What are the duties and responsibilities associated
```

1    with your role at The Bridge?

2    A.  I oversee all of The Bridge's housing programs.  We have

3    about 800 units of housing throughout the city, and I have a

4    large staff under me who actually operates the housing

5    programs.

6    Q.  Are you familiar with the staff of The Bridge?

7    A.  Yes.

8    Q.  Do you know whether an individual named Shavanda Vaughan

9    worked -- is employed by The Bridge?

10   A.  Yes, she is.

11   Q.  For approximately how long has Shavanda Vaughan been

12   employed by The Bridge?

13   A.  I'm not exactly sure because I've only been there a year,

14   but it's longer than I've been there.

15   Q.  What is Shavanda Vaughan's position with The Bridge?

16   A.  She's a supervisor of supported housing case managers.

17   Q.  Did there come a time when the IRS asked The Bridge to

18   confirm whether certain individuals had received The Bridge's

19   services?

20   A.  Yes.

21   Q.  And was a list provided to The Bridge by the IRS?

22   A.  Yes.

23   Q.  Was there more than one list provided?

24   A.  There were two separate lists.  One had the date of 2010 at

25   the top of it, and the second list had the date of 2013.

Ea2ecla4                         Green – direct

1    Q.  Did you, in fact, conduct a search for those individuals?

2    A.  Yes.

3    Q.  And were individuals on either the 2010 or 2013 list

4    provided to you found to have received services from The

5    Bridge?

6    A.  Yes.

7    Q.  Were there individuals on both lists or one list?

8    A.  Just on the list that said 2013.

9         MS. CUCINELLA:  Your Honor, may I approach?

10        THE COURT:  Yes.

11   Q.  I'm showing you what's been marked for identification as

12   Government Exhibit 553.  Do you recognize the names on this

13   list?

14   A.  Yes.

15   Q.  Are these the names that were on the list provided to you

16   by the IRS that was labeled 2013?

17   A.  Some of them, yes.

18        MS. CUCINELLA:  The government offers 553.

19        THE COURT:  Any objection?

20        MR. YANNELLA:  May I see it for a moment, please.

21        THE COURT:  Yes.  (Pause)

22        MR. YANNELLA:  No objection, your Honor.

23        THE COURT:  It will be admitted into evidence.

24        (Government's Exhibit 553 received in evidence)

25                              - - - - -

Ea2ecla4                    Green - direct

1   BY MS. CUCINELLA:

2   Q.  Ms. Green, how many individuals from the government's 2013

3   list were found to have received services from The Bridge?

4   A.  We found six of these names to be clients of ours, who are

5   receiving services.

6   Q.  And did you search by name and Social Security number?

7   A.  We did it both ways, just in case the names weren't quite

8   correct.

9           MR. YANNELLA:  Your Honor, I object to "we."  The

10  witness has personal knowledge of this.

11  Q.  How were the searches conducted, Ms. Green?

12  A.  We have a database, client database called the works, and

13  those of us who have access to the database are able to go in

14  and I am able to go in and search clients by name, by Social

15  Security number, by address, any variety of demographics.

16  Q.  And were you involved in the search for these names?

17  A.  Yes.

18          MS. CUCINELLA:  Nothing further.

19          THE COURT:  Any questions, Mr. Yannella?

20          MR. YANNELLA:  Yes.

21  CROSS EXAMINATION

22  BY MR. YANNELLA:

23  Q.  So you worked at The Bridge for approximately one year?

24  A.  Yes.

25  Q.  And when did you have contact with the government first

Ea2ecla4                    Green - cross

1  about testifying here today?

2  A.  Monday morning.

3  Q.  Of this week?

4  A.  Yes.

5  Q.  And you were asked to go through a list of approximately

6  40, 50 people to see if any of these individuals had been

7  clients of The Bridge?

8  A.  Yes.

9  Q.  Did you personally conduct that check?

10  A.  Yes.

11  Q.  Did you do it with other individuals?

12  A.  Several of us did it, yes.

13          MR. YANNELLA:  Nothing further, your Honor.

14          THE COURT:  Any further questions?

15          MS. CUCINELLA:  No, your Honor.

16          THE COURT:  Thank you.  You can step down.

17          (Witness excused)

18          MS. GARNETT:  Your Honor, the government calls Tyrone

19  Hill.

20   TYRONE HILL,

21      called as a witness by the Government,

22      having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MS. GARNETT:

25  Q.  Good afternoon, Mr. Hill.

Ea2ecla4                        Hill – direct

1              Where do you work, sir?

2   A.  Dancy auto group.

3   Q.  Is that a car dealership?

4   A.  Yes.

5   Q.  What kinds of cars are sold there?

6   A.  All makes and models.

7   Q.  What is your position at Dancy Automotive?

8   A.  Vice president, co-owner.

9   Q.  And how long have you been the co-owner and vice president

10  of Dancy Automotive?

11  A.  Since the inception.

12  Q.  Which was when?

13  A.  About 2005.

14  Q.  And what are some of your duties and responsibilities as

15  the vice president and co-owner of Dancy Automotive?

16  A.  Facilitating, overseeing sales, back office, accounting,

17  etc.

18  Q.  And in that role are you familiar with the kinds of records

19  that your dealership creates when you sell a car?

20  A.  Correct.

21  Q.  Mr. Hill, I just want to ask you, in August of 2009 your

22  company, Dancy Automotive, was it affiliated with an entity

23  known as Dancy Power Automotive?

24  A.  Yes.

25  Q.  And in August of 2009 where was the physical dealership for

Ea2ecla4                         Hill - direct

1   Dancy Power Automotive?

2   A.   380 Lennox Avenue, New York, New York.

3   Q.   And that's in Manhattan, right?

4   A.   Correct.

5   Q.   And can you just describe for the jury, generally speaking,

6   what types of records your dealership creates when you sell a

7   car?

8   A.   Purchase orders, bill of sales, receipts, photo ID.

9   Q.   And you mentioned a photo ID.  Whose photo ID is included

10  in the records when you sell a car?

11  A.   The actual customer's license, passport, etc., etc.

12  Q.   And in addition to a photo ID, are there any other records

13  that you would typically ask for from a customer when you sell

14  them a car?

15  A.   Correct.  Proof of insurance.

16  Q.   And are those records of a particular sale then maintained

17  at the dealership as part of your business?

18  A.   Yes.

19          MS. GARNETT:  Your Honor, may I approach the witness.

20          THE COURT:  Yes.

21  Q.   Mr. Hill, I'm showing you what's been marked for

22  identification as Government Exhibit 600.  Can you just flip

23  through those pages for me, please.

24          Mr. Hill, are you familiar with the documents that are

25  contained within Government Exhibit 600?

Ea2ecla4                    Hill - direct

1    A.   Yes.

2    Q.   Generally speaking, what are these documents as a group, as

3    a set?

4    A.   Docs that would be enclosed in a deal transaction.

5    Q.   For the sale?

6    A.   For the sale of a vehicle.

7    Q.   And with this set of deal documents, they are for the sale

8    of what vehicle?

9    A.   2007 Bentley Flying Spur.

10             MS. GARNETT:  Your Honor, we offer Government

11   Exhibit 600.

12             THE COURT:  Any objection?

13             MR. YANNELLA:  No, your Honor.

14             THE COURT:  It will be admitted into evidence.

15             (Government's Exhibit 600 received in evidence)

16   BY MS. GARNETT:

17   Q.   So, Mr. Hill, I just want to go through some of the

18   documents contained in this record.  First, let's begin with

19   the page that's identified as Clark 003582.

20   A.   Okay.

21   Q.   Can you just explain to the jury what this document is.

22   A.   It's a purchase agreement.

23   Q.   And it's a purchase agreement between your dealership, is

24   that right?

25   A.   Yes.

Ea2ecla4                        Hill – direct

1    Q.   And who is the customer?

2    A.   Messiah Clark.

3    Q.   In the information at the top -- can you blow up the top

4    portion, Ms. Chen.

5             Where it has the buyer's name and address and phone

6    number, where does that information come from?  Like when

7    you're preparing a purchase order, how do you get that

8    information?

9    A.   From the customer's driver's license, or it's asked upon

10   the customer to provide their current address.

11   Q.   Do you see where it says salesperson, Keith W?

12   A.   Correct.

13   Q.   Do you know who that person is?

14   A.   Yes.

15   Q.   Who is it?

16   A.   Keith Williams.

17   Q.   Was he one of your employees in 2009?

18   A.   Correct, at the time.

19   Q.   And were you one of the people responsible for supervising

20   Mr. Williams?

21   A.   Yes.

22   Q.   Do you see just below that, Mr. Hill, where it says the

23   vehicle?

24   A.   Yes.

25   Q.   What is the information that's displayed there?

Ea2ecla4                        Hill - direct

1    A.  Year, make, model.

2    Q.  And so this is the specific car that this transaction is

3    for?

4    A.  Yes.

5    Q.  And, Ms. Chen, if you can just move down to the middle

6    portion.

7            Can you tell from this purchase order, Mr. Hill, what

8    was the agreed upon sales price for the car?

9    A.  $132,100.

10   Q.  Ms. Chen, if you can show the bottom of this document.

11           Mr. Hill, there at the bottom, it may be kind of an

12   obvious question, but where it says buyer's signature, whose

13   signature would typically go there?

14   A.  Messiah Clark.

15   Q.  And that's the customer who's buying the car?

16   A.  Correct.

17   Q.  And what is the date that this purchase order was filled

18   out?

19   A.  August 15, 2009.

20   Q.  Ms. Chen, if you could show the second page of this

21   document, which is 3583.

22           So, Mr. Hill, this is just the second page of the

23   purchase order, right?

24   A.  Yes.

25   Q.  And at the very bottom -- Ms. Chen, can you zoom in to the

Ea2ecla4                    Hill - direct

1   signatures -- again, we have a buyer's signature.  And do you

2   see at the bottom there, Mr. Hill, where it says seller

3   approved by?

4   A.  Yes.

5   Q.  Whose signature is that?

6   A.  That's mine.

7   Q.  And would that be typical in your capacity as vice

8   president?

9   A.  Yes.

10  Q.  And when you put your signature on there, what does that

11  mean?

12  A.  I approve of the sale.

13  Q.  Ms. Chen, can you show the page that is Clark 3584, please.

14  And are you able to orient that?

15          Mr. Hill, can you explain to the jury what this

16  document is that is Clark 3584?

17  A.  Yes.  It's the bill of sale.

18  Q.  And at what point in the transaction is the bill of sale

19  prepared?

20  A.  Once the deal is consummated and prices are agreed upon and

21  the customer takes delivery of the vehicle, prior to.

22  Q.  And when you say "customer takes delivery of the vehicle,"

23  does that basically mean you give them the keys and they drive

24  off with the car?

25  A.  Correct.  They would acknowledge the finalized numbers.  It

1    was signed and keys would begin to exchange hands.

2    Q.   And before you give a customer the keys to the car, is

3    there anything that you need to get from them?

4    A.   Yes, COD, which we call cash on delivery, and proof of

5    insurance.

6    Q.   So they have to provide proof of insurance and they have to

7    have paid for the car, is that it?

8    A.   Correct.

9    Q.   And in this case is this bill of sale for the same car that

10   we've been talking about up to now, right?

11   A.   Correct.

12   Q.   Ms. Chen, if you could just zoom in on the right-hand side,

13   the numbers.

14           Mr. Hill, what was the total amount of payment that

15   Messiah Clark as the customer had to give your dealership for

16   this car before he could drive it off the lot?

17           MR. YANNELLA:  Objection to the leading question.

18   Compound question.

19           THE COURT:  I'm sorry?

20           MR. YANNELLA:  Objection to the compound question.

21           THE COURT:  Do you want to restate it?

22   BY MS. GARNETT:

23   Q.   What was the total amount of money that this customer,

24   Messiah Clark, had to give your dealership before he could

25   drive that car off the lot?

Ea2ecla4                          Hill - direct

1          MR. YANNELLA:  There's been no testimony about driving

2     off the lot, your Honor.

3     Q.   Before you would give him the keys, Mr. Hill?

4     A.   According to the bill of sale, $144,143.88.

5     Q.   Now, you mentioned, Mr. Hill, that there's some documents

6     that your dealership collects from the customer, right?

7     A.   Yes.

8     Q.   Ms. Chen, can you please show the first page of this

9     document.  It's Clark 3576.

10          So, Mr. Hill, what are we looking at here?

11    A.   Customer's driver's license.

12    Q.   And would it be the normal practice of your dealership to

13    make a copy of the customer's identification?

14    A.   Yes.

15    Q.   Why do you do that?

16    A.   Proof of identity.

17    Q.   And has it ever happened in the course of your ownership of

18    Dancy Automotive that a would-be customer has presented

19    identification that is not satisfactory to you?

20    A.   Yes.

21    Q.   If that happens, do you sell them the car?

22    A.   No.

23    Q.   So is it important to you in your business to verify that

24    the person who is -- that a customer is the person they say

25    they are?

1    A.   Correct.

2    Q.   Ms. Chen, can you please show the page that's identified as

3    Clark 3578.

4         Mr. Hill, can you explain what this document is that

5    we're looking at.

6    A.   Proof of insurance.

7    Q.   And is this a document that is provided by the customer at

8    the time you're negotiating the deal?

9    A.   Yes.

10   Q.   And I know this may seem like a silly question, but the

11   insurance proof that's provided is car insurance for the car

12   they want to purchase, right?

13   A.   Yes.

14        MR. YANNELLA:   Objection to the leading.

15        THE COURT:   Overruled.  He can answer.

16   Q.   Ms. Chen, can you please show the page that is marked as

17   Clark 3580.

18        Mr. Hill, can you explain to the jury what these

19   documents are.

20   A.   Receipt for moneys that was given to us, "us" being Dancy

21   Power Automotive.

22   Q.   These are moneys given for the same car purchase

23   transaction we've been talking about today, correct?

24   A.   Yes.

25   Q.   So the first one at the top of the page, can you zoom in,

Ea2ecla4                    Hill - direct

1    Ms. Chen.

2            This receipt reflects how much money was given to the

3    dealership?

4    A.   Twenty-seven twenty.

5    Q.   By whom?

6    A.   Messiah Clark.

7    Q.   And was that in the form of cash or a check?

8    A.   Cash.

9    Q.   Can you show the next one, Ms. Chen.

10            And this next receipt, Mr. Hill, what's reflected

11    here?

12    A.   $20,000.

13    Q.   And who gave $20,000 to your dealership?

14    A.   Messiah Clark.

15    Q.   In what form?

16    A.   Certified funds.

17    Q.   I'm sorry.  Can you repeat that answer?

18    A.   Certified check.

19    Q.   A certified check.  Does your dealership accept personal

20    checks?

21    A.   No.

22    Q.   And a certified check, is that basically the same as cash

23    from your perspective as a business owner?

24    A.   Yes, as good as.

25    Q.   It's as good as cash.

Ea2ecla4                    Hill - direct

1              Ms. Chen, can you show page 3581.

2              And this last receipt, Mr. Hill, can you describe what

3    is reflected on this receipt?

4    A.   Ninety dollars cash transaction and a certified check for

5    124,059.37.

6    Q.   Ms. Chen, you can take that down.   Thank you.

7              Mr. Hill, as the owner and vice president of Dancy

8    Automotive, are you familiar with the kinds of cars that you

9    sell?

10   A.   Yes.

11             MS. GARNETT:   Your Honor, may I approach?

12             THE COURT:   Yes.

13   Q.   Mr. Hill, I'm showing you what's been marked for

14   identification as Government Exhibits 830, 831 and 832.   Do you

15   recognize these photographs, Mr. Hill?

16   A.   Yes.

17   Q.   And what are they photographs of?

18   A.   Of a Bentley.

19   Q.   Can you tell from those photographs what kind of Bentley?

20   A.   It's a four-door Bentley Flying Spur.

21   Q.   Four-door Bentley Flying Spur?

22   A.   Correct.

23   Q.   Do these photographs, 830, 831 and 832, do they fairly and

24   accurately represent the appearance of a 2007 Bentley Flying

25   Spur?

Ea2ecla4                          Hill – direct

1    A.  Yes.

2              MS. GARNETT:  Your Honor, we offer Government

3    Exhibit 830, 831 and 832.

4              THE COURT:  Any objection?

5              MR. YANNELLA:  No, your Honor.

6              THE COURT:  They'll be admitted into evidence.

7              (Government's Exhibit 830, 831 and 832 received in

8    evidence)

9              MS. GARNETT:  Ms. Chen, can you display those to the

10   jury, please.

11   BY MS. GARNETT:

12   Q.  So, Mr. Hill, 830, this is just a view of the exterior of

13   the car, correct?

14   A.  Correct.

15   Q.  Ms. Chen, can you show 831, please.  And 832.

16             What are we looking at here, Mr. Hill?

17   A.  The interior.

18             MS. GARNETT:  No further questions, your Honor.

19             THE COURT:  Mr. Yannella?

20             MR. YANNELLA:  Yes, your Honor.

21   CROSS EXAMINATION

22   BY MR. YANNELLA:

23   Q.  Good afternoon.

24   A.  How are you?

25   Q.  So you said you are the vice president and part owner?

Ea2ecla4                    Hill - cross

1    A.  Correct.

2    Q.  And how long have you been with the company?

3    A.  Since 2005.

4    Q.  Ms. Chen, could we please put 3582 up on the board.  It's

5    one of the same pages we just had a few moments ago.  And could

6    you please focus on the upper right-hand corner, when you get

7    there, on Keith W.

8         Mr. Hill, so Keith W. is one of the salesmen?

9    A.  Was.

10   Q.  Was, okay.  And he was back in 2009?

11   A.  Correct.

12   Q.  How many salesmen did you have back in 2009 around the time

13   this sale was made?

14   A.  Four, I believe.

15   Q.  And this suggests that he's the individual who negotiated

16   with the purchaser, correct?

17   A.  Correct.

18   Q.  Can we please put 3583 up on the board and focus on the

19   bottom part, where it says seller approved by.

20        Now, sir, you're saying that that's your signature

21   where -- next to seller approved by?

22   A.  Correct.

23   Q.  What does that mean, that you approved of the sale?

24   A.  I agreed to move forward on this purchase, on this purchase

25   agreement, based on the sale and price of the vehicle.

Ea2ecla4                    Hill - cross

1    Q.   So you're approving the deal that was negotiated by your

2    salesperson, correct?

3    A.   Correct.

4    Q.   Does it have anything to do with approving the -- approving

5    of the customer himself?  Is there a background check on the

6    customer that you do that goes into seller approved by?

7    A.   My sales guy would do all the due diligence prior to me.

8    Q.   Okay.

9    A.   Approving the sale.

10   Q.   But when you approve it, do you do any background check on

11   the customer?

12   A.   No.

13   Q.   You rely on the salesperson and whatever background check

14   that the salesperson did?

15   A.   Correct.

16   Q.   How much time would you have spent with the individual who

17   purchased the car on that day?  Would you meet him personally?

18   A.   If there was a need to be involved, it probably was a hi,

19   congratulations; very cordial introduction.

20   Q.   But at times you wouldn't even need to meet the customer;

21   it could be done by the salesperson coming in to your office

22   and showing you the paperwork?

23   A.   Correct.

24   Q.   And on this occasion do you know by looking at this

25   paperwork or from your memory whether you met the purchaser?

Ea2ecla4                          Hill - cross

1   A.  No recollection on that.

2   Q.  Can we please turn to 3580, Ms. Chen.

3          Now, this seems to indicate that payments were made

4   on -- at the top, August 19, 2009, in the amount of $2,720 in

5   cash, correct?

6   A.  Correct.

7   Q.  And then on a different day, two days earlier, a certified

8   check for $20,000 was handed over, correct?

9   A.  Correct.

10  Q.  Now, as the sales manager, would you have been present for

11  the customer paying the money?

12  A.  There is no -- no need for me to be present unless I'm

13  asked by the salesperson.  Other than that, if it's cash given,

14  then due diligence would be the salesperson would count it from

15  the customer and proceed to bring me the money and count it in

16  front of me.

17  Q.  But as the part owner and vice president, that's not really

18  your role, to be present for that cash changing hands?

19  A.  No.  I have staff that would facilitate that.  I have an

20  accounting department, along with a controller, that would

21  begin to double check a salesperson if they received X amount

22  of dollars in funds.

23  Q.  And the staff would also oversee the certified check rather

24  than you, correct?

25  A.  Correct.

Ea2ecla4                        Hill - cross

1   Q.  The top part of this says that cash was given over in the

2   amount of $2,720, and it says Messiah Clark.  Is there any way

3   of knowing from this receipt whether Messiah Clark actually

4   handed over the cash or somebody he sent did it?

5   A.  There's no way of telling from the receipt, no.

6   Q.  And with respect to the certified check, is there any way

7   of knowing whether Messiah Clark personally handed over a

8   certified check or some other individual handed it over?

9   A.  Based upon the receipt, there's no telling.

10          MR. YANNELLA:  No further questions.  Thank you.

11          THE COURT:  Any further questions?

12          MS. GARNETT:  No, nothing further.

13          THE COURT:  Thank you, sir.  You can step down.

14          (Witness excused)

15          MS. GARNETT:  Call the government's next witness.

16          MS. CUCINELLA:  The government calls John Kaplan.

17   JOHN KAPLAN,

18       called as a witness by the Government,

19       having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. CUCINELLA:

22   Q.  Mr. Kaplan, where do you work?

23   A.  I am a senior sales and finance consultant with Jaguar Land

24   Rover of Larchmont.

25   Q.  Is that a car dealership?

Ea2ecla4                    Kaplan – direct

1    A.  It is.

2    Q.  What kinds of cars are sold there?

3    A.  We sell luxury cars, Land Rover Range Rovers, Range Rover

4    Sports LR4s and Jaguars.

5    Q.  How long have you worked there?

6    A.  About six and a half years.

7    Q.  What is your title?

8    A.  Senior sales and finance consultant.

9    Q.  What are some of the duties and responsibilities associated

10   with your position?

11   A.  I meet and greet clients.  I walk them through the sales

12   and financing process.  I secure financing and loans for them

13   for leases and financing.  I follow right from the beginning to

14   the end, ma'am.

15   Q.  In connection with your responsibilities, are you familiar

16   with the records that your dealership creates when a car is

17   sold?

18   A.  Yes, ma'am.

19   Q.  What types of records are created?

20   A.  All sorts of paper works, ma'am.  We do purchase orders,

21   which outlays the whole financial process, VIN number, type of

22   vehicle, price of the vehicle, if there's a trade-in involved,

23   sales tax, registration documents, title documents, accessory

24   documents.

25   Q.  Do you request any records from the customer?

1    A.  We have -- we request licenses.  We request insurance

2    paperwork.  For example, the vehicle that they buy must match

3    up their name, address and the VIN number, and we also require

4    Social Security numbers.

5    Q.  Why do you ask for those documents from customers?

6    A.  To make sure that they are the proper person purchasing the

7    vehicle and match them up to the person that actually comes and

8    picks them up and signs for the documents.

9    Q.  If you are the salesman on the deal, are you the one

10   responsible for creating and collecting the records associated

11   with the sale?

12   A.  The preliminary documents, yes, ma'am.

13   Q.  And do you do that at or about the time of the sale?

14   A.  Yes, ma'am.

15   Q.  Are the records then stored by the dealership?

16   A.  Yes, they are.

17   Q.  Mr. Kaplan, were you involved in the sale of a Range Rover

18   on or about October 14th of 2010?

19   A.  Yes, ma'am.

20          MS. CUCINELLA:  Your Honor, may I approach.

21          THE COURT:  Yes.

22   Q.  I'm showing you what's been marked for identification as

23   Government Exhibit 601.  Take a look at those documents.

24   A.  Yes, ma'am.

25   Q.  Do you recognize those documents?

1    A.  I do.

2    Q.  What are they generally?

3    A.  We have the client's license.  We have the insurance copy

4    that we procure for the clients with them, with their insurance

5    agency that matches up the name, the address and the VIN number

6    for the vehicle sold.  We have registration documents, if they

7    choose to transfer plates from a certain vehicle; again, the

8    registration documents from the new vehicle; the purchase

9    order, which I explained before outlines the exact sale, the

10   name, the address, the VIN number, the type of vehicle,

11   signatures and exact prices of the vehicle and signatures from

12   the client; a bill of sale, again, just like the purchase order

13   but for the client's purposes outlines everything, type of the

14   sale.

15           And this is an 8300 form.  What the 8300 form is is if

16   a client comes in and spends more than $10,000 or $10,000 and

17   above in cash -- and when I say "cash," I mean bills or

18   cashier's check or wire transfer -- we fill out the 8300 form

19   and report it to the government.  And they choose or choose not

20   to check to see if the funds are legitimate.

21   Q.  And are all of these documents associated with the sale of

22   a Range Rover on October 14, 2010?

23   A.  They are, ma'am.

24           MS. CUCINELLA:  The government offers Exhibit 601.

25           THE COURT:  Any objection?

1          MR. YANNELLA:  No, your Honor.

2          THE COURT:  They'll be admitted into evidence.

3          (Government's Exhibit 601 received in evidence)

4          MS. CUCINELLA:  Ms. Chen, will you please display the

5     first page of Government Exhibit 601.

6     BY MS. CUCINELLA:

7     Q.  Mr. Kaplan, which of these documents are we seeing up on

8     the big screen right now that you just described?

9     A.  This is the purchase order.  It describes, top left, the

10    client's information.  I should say right below the darkened

11    black line is the type of vehicle.  It's a 2011 and Rover,

12    Range Rover sport.  It shows black, the stock number for our

13    purposes and the VIN number to the right of that.

14    Q.  And who is the -- you referred to him as the client before.

15    Who is the client in this case?

16    A.  On this piece of paper it shows Messiah Clark.

17    Q.  And what address is given?

18    A.  2018 Story Avenue, Bronx, New York 10473.

19    Q.  Looking at the top right corner, the salesperson is listed.

20    Who is the salesperson for the sale?

21    A.  That would be myself, Jonathan Kaplan.

22    Q.  Do you think you would recognize the purchaser of this car

23    if you saw him again?

24    A.  I do, yes.

25    Q.  Can you describe and point out the person who purchased

Ea2ecla4                          Kaplan - direct

1    this car from you?

2    A.  He's right there in the second row, back with the blue tie

3    and blue shirt.

4            MS. CUCINELLA:  May the record reflect that the

5    witness has identified the defendant as the purchaser of this

6    car.

7            THE COURT:  The record will so reflect.

8    Q.  Looking at the middle of this form, it says the trade-in?

9    A.  Yes.

10   Q.  What is reflected there?

11   A.  That would be the year, 2008; make, Toyota Camry; color,

12   black; the plate number, and as well the VIN number; and as

13   well, the amount that we gave him for the trade, which in this

14   case would be 13,700.

15   Q.  What does it mean to trade in a car?

16   A.  If the client comes and wants to trade in a vehicle,

17   obviously we have the registration right here which shows that

18   it was under his ownership.  They can choose to trade it in.

19   If they do not owe anything on that vehicle, the whole net

20   would be moved to the vehicle -- to the new vehicle purchased.

21   And if they do owe something, then the net of that would be

22   moved to the new vehicle.

23           So right now it shows that the net would be 13.7.  So

24   I cannot remember if he owed anything on that, but if he did,

25   then that would not show there.

Ea2ecla4                      Kaplan - direct

1   Q.  So walking us through the total, the net that you just

2   described and the cash price, how does that work out?

3   A.  Basically the total price of the car would be right here

4   with 62,454, minus the trade-in price, which was 13,700.  So

5   the total cash price there would be 48,754, plus the taxes and

6   fees, which show up on the bottom right.

7   Q.  Ms. Chen, if you -- thank you.

8           So what's the total price of this -- excuse me, the

9   total that was due for this Range Rover?

10  A.  The total due for the Range Rover for the purchase was

11  53,261.42, minus the $2,000 deposit, which you show less cash

12  deposit.  So the total would be 51,261.42.

13  Q.  And there are two signatures that appear on the bottom

14  left.

15  A.  The buyer's signature would be Mr. Clark's, and the seller

16  approved by, it would be Aaron Thigpen, which was at that time

17  the sales manager of the US store.

18  Q.  Turning to the second page of that document, what is this?

19  A.  This would be the registration documentation for the new

20  vehicle purchased.  So about a week or so after the DMV gets

21  through with it, they send us the new documentation and we mail

22  this out to the client.  The left part gets put on the

23  windshield and the right part gets held in a book for the

24  client's own purposes.

25  Q.  And who does this record indicate that the Range Rover was

1   registered to?

2   A.   This record indicates Messiah Clark, 2018 Story Avenue,

3   Bronx, New York 10473.

4   Q.   Turning to the next page of this document.

5   A.   This is the registration of the vehicle that he traded in

6   spoken of before.  And again, we collect this for two reasons:

7   One, to make sure he owns the vehicle; and the other, to

8   transfer plates from that vehicle.  The DMV needs that to

9   transfer plates.  And again, this shows that this vehicle was

10  indeed owned by Messiah Clark.

11  Q.   And is this a document you collect directly from the

12  customer or do you get it from the DMV?

13  A.   Direct from the customer.

14  Q.   Turning to the next page.  What is this?

15  A.   This is Mr. Clark's license.  That's pretty much it.  It

16  shows that he lived at 2018 Story Avenue, Bronx, New York

17  10473.

18  Q.   Did you make a photocopy of his license?

19  A.   I did, yes.

20  Q.   Why did you do that?

21  A.   To make sure that the person in front of me is indeed, in

22  fact, the person that is signing for the documents and the

23  person on the license.

24  Q.   And turning to the next page, what does this page of the

25  document represent?

1    A.   This is the insurance information that we collect while the

2    client is there.  This also, again, we need to release the

3    vehicle to show that he is driving away with proper insurance.

4    Again, right here it shows replacement vehicle.  Yep, you got

5    it.  It shows that he did indeed transfer plates from that

6    Toyota, and that, the new vehicle information, the date he

7    picked the vehicle up, the VIN number and the name.

8    Q.   And what is the insurance agency's name that's used here?

9    A.   Choong Lee Insurance Agency, 38 West 32nd Street.

10   Q.   Whose name is the insurance held in?

11   A.   Mr. Clark, 2018 Story Avenue.

12   Q.   Turning to the next page of this exhibit.  What does this

13   document represent?

14   A.   This is the 8300 form.  This, again, if we collect $10,000

15   or over in cash, we report it to the government.  They can in

16   turn choose or not choose whether to --

17            MR. YANNELLA:  Objection to this part, your Honor,

18   what the government may or may not do.

19            THE COURT:  I'll sustain the objection.

20   Q.   Did you fill out this form?

21   A.   I did not fill out that form.  That is not my handwriting.

22   The finance director fills that form out under my supervision

23   of the deal.

24   Q.   And then this form is placed in the same file that these

25   other documents are held in?

Ea2ecla4                          Kaplan - direct

1    A.  Correct.

2    Q.  Turning to the next page.

3    A.  This is the bill of sale.  This pretty much outlines the

4    entire deal, just like the purchase order does.  This shows the

5    client name, sold to, address, the year of the car, the VIN

6    number, the salesperson, and outlines all the prices, as it

7    does on the purchase order.

8    Q.  And the total price of the vehicle is reflected here as

9    well?

10   A.  The total price after the $2,000 deposit was 51,261.42.

11   Q.  Did you personally receive the cash from Mr. Clark when he

12   purchased this vehicle?

13   A.  Myself and the finance director, yes.

14            MS. CUCINELLA:  Nothing further.

15            THE COURT:  Cross-examination, Mr. Yannella?

16            MR. YANNELLA:  No, your Honor.

17            THE COURT:  Thank you, sir.  You can step down.

18            (Witness excused)

19            THE COURT:  Are we ready with --

20            MS. CUCINELLA:  The government calls Teresa Garrido.

21            (Pause)

22            MS. CUCINELLA:  Your Honor, may we take a short break?

23   We just need a --

24            THE COURT:  Sure.

25            Ladies and gentlemen, let me take a five-minute break.

Ea2ecla4                    Kaplan – direct

1   Don't discuss the case -- as a matter of fact, I'll give you a

2   ten-minute break.  We're making very good time.

3           (Recess)

1              (Jury not present)

2              MR. YANNELLA:  Your Honor, I have an issue to discuss.

3    The government marked as Exhibit 330 a subpoena that they

4    served on my client through me, and it's for MSM Tax Services

5    Inc.  The subpoena required production of various business

6    records, employment records, payroll records, accounts

7    receivable, accounts payable, etc., etc.  In response to that,

8    I consulted with my client, and we had no records to produce.

9              Now the government today has marked the subpoena

10   itself as an exhibit, and I am not sure that they necessarily

11   want to put the subpoena in, but they do want to explore the

12   fact that a subpoena was issued

13             THE COURT:  Explore with whom?

14             MR. YANNELLA:  A witness they are going to put on.

15             MS. GARNETT:  I can summarize, your Honor.  I have

16   agreed with Mr. Yannella that there is no need to offer the

17   subpoena itself as an exhibit.  We marked it as a caution.  The

18   subpoena was served on MSM Tax Services Inc., which is a

19   corporation --

20             THE COURT:  OK.

21             MS. GARNETT:  -- through Mr. Yannella, as he agreed to

22   accept service.

23             THE COURT:  Did Mr. Yannella represent the

24   corporation?

25             MS. GARNETT:  He agree to accept service and to

1    function as its agent.  So, we intend to call an investigator

2    from our office who served the subpoena and to whom the records

3    were supposed to be produced.  And the testimony would be very

4    simple, that on X date he served a subpoena on the lawyer for

5    MSM Tax Services -- without identifying Mr. Yannella of course

6    by name -- and that the subpoena called for the production of

7    certain records that were to be produced to him, and on X date

8    he was informed by the lawyer for that company that there were

9    no records to produce.

10           THE COURT:  What records did you subpoena?

11           MS. GARNETT:  We asked for employment records, human

12   resource files, payroll records, records of accounts receivable

13   or accounts payable, records related to tax returns filed on

14   behalf of customers, invoices/bills for services rendered,

15   e-mail communications with customers regarding services

16   rendered, and tax filings on behalf of the corporation.

17           Your Honor, I mean I think the law is very clear that

18   a corporation has no Fifth Amendment privilege and that the

19   fact that documents were requested from a corporation and no

20   documents were provided is admissible and relevant testimony.

21           THE COURT:  Well, no documents were provided is

22   admissible to prove what?  You're going to say that there --

23   you want to imply that there was a response to the subpoena

24   that the documents don't exist?  There was a refusal to produce

25   the documents?  Or whether or not he just sat around and never

EA27CLA5

1   waited for a response to the subpoena?

2          MS. GARNETT:  No, your Honor, the testimony would be

3   that investigator Braccini was told on a certain date --

4          THE COURT:  By whom?

5          MS. GARNETT:  -- by the lawyer for the company --

6   without mentioning Mr. Yannella by name -- that there-- we will

7   use the exact words that were said to us -- there are no

8   records to produce.

9          THE COURT:  And who do you think the jury is going to

10  infer that is?

11         MS. GARNETT:  I don't know that -- I mean our

12  intention is not in any way to implicate Mr. Yannella.

13         THE COURT:  Well, I think your argument is -- and I

14  don't know if you have already come right out and said it --

15  there is nobody else in this company except the defendant.

16         MS. GARNETT:  That's right, Judge.

17         THE COURT:  So, who do you think they are supposed to

18  infer is not producing the documents and is responding that I

19  don't have any documents to produce?

20         MS. GARNETT:  But, your Honor --

21         THE COURT:  And whose lawyer do you think -- who do

22  you think the jury is going to assume hired the lawyer,

23  regardless of whether it's Mr. Yannella or not?

24         MS. GARNETT:  Well, your Honor, that's a permissible

25  inference.  There is an issue in this case that arises in a

EA27CLA5

1    couple of different ways.  One, there are tax returns that form

2    part of this case in which it is represented to the IRS that

3    the persons who filed the returns are employees of MSM Tax

4    Services.

5              THE COURT:  OK.

6              MS. GARNETT:  In the 2013 --

7              THE COURT:  And you've argued that there are no

8    employees of MSM.

9              MS. GARNETT:  Exactly.  The fact that we requested

10   employment, human resources and payroll records, and we were

11   told that there are no such records to produce, supports an

12   inference that that was a false statement.

13             Likewise in the --

14             THE COURT:  By whom?

15             MR. GARNETT:  By the defendant, because he is the

16   owner and president of MSM Tax Services.

17             THE COURT:  But that's not a false statement that's

18   charged in this case.

19             MS. GARNETT:  Yes, it's a false statement that

20   underlies the --

21             THE COURT:  Well, which count is that?  That's not

22   what is charged.

23             MS. GARNETT:  What is charged is that the tax return

24   is fraudulent and that the refunds were not owed.

25             THE COURT:  Not tax returns of the company.

EA27CLA5

1          MS. GARNETT:  Your Honor, for some of the tax returns

2     that were filed, the purported employer, the person that the

3     tax filer supposedly worked for and provided the W-2 was MSM

4     Tax Services.  Mr. Clark represented to the IRS when he filed

5     the returns that John Smith was an employee of MSM and that's

6     how that John Smith had earned the money.

7          Likewise, in the 2013 scheme the way that Mr. Clark

8     gets the money -- and we will have a witness to describe this

9     this afternoon -- is that he registers for third-party debit

10    cards where the refunds are supposed to go, and he represents

11    to that debit card company that he wants the cards as payroll

12    cards for all of these employees he has, and he provides them

13    with the names of people.

14          THE COURT:  How does this subpoena and no response to

15    this subpoena prove there are no employees?

16          MS. GARNETT:  I think if you are a company and you

17    supposedly have employees --

18          THE COURT:  Maybe they just don't want to respond to

19    your subpoena.

20          MS. GARNETT:  They told us there were no records.

21          THE COURT:  Who told you there were no records?

22          MS. GARNETT:  An authorized representative of the

23    company, your Honor.

24          THE COURT:  I'm not going to allow it.  It's much more

25    prejudicial than probative.  It's clear that this jury, based

EA27CLA5

1    on your argument, is in a position to conclude that the only

2    person who is associated with this company is the defendant,

3    and anything that you offer as a response on behalf of this

4    company, clearly the direct inference is going to be it's a

5    response of the defendant.

6         The defendant has absolutely no obligation to make any

7    statements, nor to let you hold against him any statements made

8    about MSM, so I'm not I'm not going to allow that.  And even if

9    that were admissible on that basis for that purpose, the

10   probative value is far outweighed by the potential prejudice.

11   And, as they say, I fall back on my basic rule, if you can't

12   win this case without it, you shouldn't have brought this case.

13        So let's move on to something more substantive.

14        MS. GARNETT:  Then I think we are ready to go.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

EA27CLA5

```
 1              (Jury present)
 2              THE COURT:  Will the government call its next witness.
 3              MS. CUCINELLA:  The government calls Herminia Morales.
 4     HERMINIA MORALES,
 5          called as a witness by the government,
 6          having been duly sworn, testified as follows:
 7              THE COURT:  You can inquire.
 8     DIRECT EXAMINATION
 9     BY MS. CUCINELLA:
10     Q.  Good afternoon, Ms. Morales.
11     A.  Good afternoon.
12     Q.  How old are you?
13     A.  83.
14     Q.  Do you live in the Bronx?
15     A.  Yes, ma'am.
16     Q.  How long have you lived in the Bronx?
17     A.  Up, since '63.
18     Q.  Since 1963?
19     A.  Yes, because I came in in 1954 from Puerto Rico.
20     Q.  Ms. Morales, do you work?
21     A.  No.
22     Q.  Why don't you work?
23     A.  Because of my age.
24     Q.  Do you recall the last time you worked?
25     A.  I came from Puerto Rico in 54, and worked until 1956, two
```

EA27CLA5                           Morales - direct

1    years.

2    Q.  In the calendar year 2010 did you make approximately

3    $53,000 working for Exxon Mobil?

4    A.  No, I didn't.  No.

5    Q.  Have you ever worked for Exxon Mobil?

6    A.  No.

7    Q.  In the year 2011 did you file a federal income tax return

8    for the year 2010?

9    A.  No.

10   Q.  Is that because you weren't working?

11   A.  Yes, madam.

12   Q.  Did you authorize or ask anyone else to file a federal

13   income tax return on your behalf?

14   A.  No.

15             MS. CUCINELLA:  Your Honor, may I approach?

16             THE COURT:  Yes.

17   Q.  Ms. Morales, I am showing you what has been marked as

18   Government Exhibit 1185.

19   A.  Let me see if I can still wear my glasses.  Where do I have

20   to look?

21   Q.  Is that your name at the top of this document?

22   A.  Yes, Herminia Morales, yes.

23   Q.  And looking at the right-hand side, are those the last four

24   digits of your Social Security number?

25   A.  Yes, 8427.

EA27CLA5                         Morales - direct

1    Q.  And, Ms. Morales, have you seen this document before where

2    the whole number was represented here?

3    A.  What do you mean by before?

4    Q.  Did you ever meet with an agent from the IRS who showed you

5    this document before?

6    A.  No, because I don't fill out taxes.

7    Q.  OK.  I'm going to ask you to look at the address.  Have you

8    ever lived at 3357 Cerrillos Road, Apartment 285, in Santa Fe,

9    New Mexico?

10   A.  Yeah, after I came here from Puerto Rico I never left New

11   York.

12   Q.  Looking at the last page of the document, is that the year

13   that you were born reflected on this document?

14   A.  Yes, 1931.

15   Q.  Ms. Morales, do you know anyone named Messiah Clark?

16   A.  No, never.

17   Q.  Do you know anyone named Lamont Kemp?

18   A.  No.

19   Q.  Did you ever authorize anyone named Messiah Clark to file a

20   return on your behalf?

21   A.  No.

22   Q.  Did you ever authorize anyone to accept a $4100 refund on

23   behalf of you?

24   A.  No, not that I remember.

25   Q.  Did anyone ever provide you with $4100?

EA27CLA5                         Morales - direct

1   A.  No.

2           MS. CUCINELLA:  Nothing further.

3           THE COURT:  Mr. Yannella?

4   CROSS EXAMINATION

5   BY MR. YANNELLA:

6   Q.  Good afternoon.

7   A.  Good afternoon.

8   Q.  When were you first contacted in connection with this case?

9   A.  It's only recently now that I have been advised about this,

10  not before.

11  Q.  So it was in September of 2014?

12  A.  No.

13  Q.  Just in the last few weeks?

14  A.  No, I haven't received anything or talked about anything.

15  Q.  Until the last couple of weeks you were asked to come down

16  here.

17  A.  Yeah, only now.

18  Q.  Have you ever been to Kohler Goldwater Hospital?

19  A.  No.

20  Q.  Have you been to any hospital on Roosevelt Island?

21  A.  No.

22          MR. YANNELLA:  Nothing further.

23          THE COURT:  Any further questions?

24          MS. CUCINELLA:  No, your Honor.

25          THE COURT:  Thank you, ma'am.  You can step down.

EA27CLA5                          Morales – cross

1          THE INTERPRETER:  The witness said something.  Should

2    I interpret?

3          THE COURT:  Yes.

4          THE WITNESS:  The only hospital I go to is Lincoln.

5          THE COURT:  Thank you, ma'am.

6          (Witness excused)

7          THE COURT:  Would the government call its next

8    witness.

9          MS. CUCINELLA:  The government calls Glenn Womack.

10    GLENN WOMACK,

11        called as a witness by the government,

12        having been duly sworn, testified as follows:

13          THE COURT:  You can inquire.

14   DIRECT EXAMINATION

15   BY MS. CUCINELLA:

16   Q.  Good afternoon, Mr. Womack.

17   A.  Yes.

18   Q.  How old are you?

19   A.  51.

20          THE COURT:  Just talk into that mike.

21   A.  51.

22   Q.  Where did you live?

23   A.  Kohler, Kohler Hospital Nursing Home.

24   Q.  How long have you lived at Kohler Nursing Home?

25   A.  I was in Goldwater first and then Kohler since 2007.

EA27CLA5                          Womack - direct

1    Q.  2007?

2    A.  Yes.

3    Q.  And you are a patient there?

4    A.  Yes.

5    Q.  As a patient at Kohler, are you familiar with -- were you

6    familiar with their transport staff?

7    A.  Yes.

8    Q.  Do you recognize anyone from Kohler or Goldwater transport

9    staff in the courtroom today?

10   A.  Yes, I do.

11   Q.  Can you please identify the individual that you know from

12   the transport staff?

13   A.  I don't know his name; I know he is an escort.

14   Q.  Can you identify him by an article of clothing he is

15   wearing?

16   A.  That gentleman right there with the blue shirt and blue

17   tie.  That gentleman right there, ma'am.

18          MS. CUCINELLA:  Your Honor, may the record reflect

19   that the witness has identified the defendant.

20          THE COURT:  The record will so reflect.

21   Q.  Mr. Womack, just to clarify, do you know that individual's

22   name?

23   A.  No.

24   Q.  Mr. Womack, do you work?

25   A.  No.

EA27CLA5                        Womack - direct

1   Q.  Did you ever work?

2   A.  Summer jobs.

3   Q.  Summer jobs?

4   A.  Yeah.  I have MS, multiple sclerosis.  I can't work.

5   Q.  Can you hold the microphone a little bit closer.

6   A.  Yes.

7   Q.  Thank you.  In the calendar year 2007 did you make

8   approximately $27,000 working for New York City Health and

9   Hospitals Corporation?

10  A.  No.

11  Q.  Have you ever worked for New York City Health and Hospitals

12  Corporation?

13  A.  No.

14  Q.  In the calendar year 2007 were you a student?

15  A.  No.

16  Q.  In 2008 did you file a federal income tax return for the

17  year 2007?

18  A.  No.

19  Q.  Is that because you weren't working?

20  A.  I wasn't working.  I don't know nothing about that.  I

21  haven't filed taxes in my life.

22  Q.  Did you authorize anyone to file a federal income tax

23  return on your behalf?

24  A.  No.

25          MS. CUCINELLA:  One moment.

1              Your Honor, may we approach?

2              THE COURT:  Yes.

3  Q.  Ms. Garnett is showing you what has been marked as

4  Government Exhibit 1410 which is already in evidence.

5  A.  Yes.

6  Q.  Have you seen this document before?

7  A.  No.

8  Q.  Did anyone show it to you when they met with you when they

9  came to visit you at Kohler Hospital?

10  A.  Yes, they did.

11  Q.  And was that an agent from the IRS and an individual from

12  my office, the U.S. attorney's office?

13  A.  Yes.

14  Q.  Is this a document that you filed with the IRS?

15  A.  I don't even understand it, no.  No, no, no, no.

16             MS. CUCINELLA:  Ms. Chen, can you put it up on the

17  screen.

18  Q.  Let's just, Mr. Womack, so the jury can see what you are

19  looking at, is that your name that appears at the top of the

20  document.

21  A.  Glenn Womack, yes, ma'am.

22  Q.  And looking to the right-hand side where it says Social

23  Security number?

24  A.  Yes, that's it.

25  Q.  Is that the last four digits of your Social Security

1  number?

2  A.  Yes, yes.

3  Q.  And when you saw this document before, could you see all of

4  the numbers that were there?

5  A.  Yes.

6  Q.  And was that your whole Social Security number?

7  A.  Yes, whole number.

8  Q.  Looking now at the address underneath your name, do you see

9  where it says 758 Dumont Avenue?

10 A.  Yes, I seen it.  I never heard of that address.  I never

11 lived there.  But when they told me that, I said that's a

12 second floor.  How am I going to get up there in a wheelchair?

13 That's what I told them.  That's what I told them.

14 Q.  Turning to the last page of this document, do you see the

15 year there underneath where it says taxpayer date of birth?

16 A.  Yeah.

17 Q.  Is that the year of your birth date?

18 A.  Yes, ma'am.

19 Q.  And when you saw this document before, was your whole

20 birthday represented there?

21 A.  Yes.

22 Q.  You can set that to the side.  Hand it back to Ms. Garnett.

23      Do you know anyone named Lamont Kemp?

24 A.  No.

25 Q.  Have you heard the name Messiah Clark before?

EA27CLA5                          Womack – direct

1    A.  Yes.

2    Q.  Have you heard the name Messiah Clark before you were

3    contacted by someone from the government?

4    A.  No.

5    Q.  Did you ever authorize someone named Messiah Clark to file

6    a tax return on your behalf?

7    A.  No.

8    Q.  Did you ever authorize Lamont Kemp to file a tax return on

9    your behalf?

10   A.  No.

11   Q.  Did you ever authorize this individual to file a tax return

12   on your behalf?

13   A.  No.

14   Q.  Did you ever authorize anyone to accept a $1600 tax refund

15   on your behalf?

16   A.  No.

17   Q.  Did anyone ever give you $1600?

18   A.  No.

19            MS. CUCINELLA:  Nothing further.

20            THE COURT:  Mr. Yannella?

21            MR. YANNELLA:  No, your Honor.  No questions.

22            THE COURT:  Thank you, sir.

23            (Witness excused)

24            THE COURT:  Government, call its next witness.

25            MS. CUCINELLA:  The government calls Teresa Garrido.

1    TERESA GARRIDO,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Please be seated.

5              MS. CUCINELLA:  Your Honor, may I inquire?

6              THE COURT:  Yes.

7    DIRECT EXAMINATION

8    BY MS. CUCINELLA:

9    Q.  Good afternoon, Ms. Garrido.

10   A.  Good afternoon.

11   Q.  Where do you work?

12   A.  I work at TFG Card Solutions.

13   Q.  What is TFG Card Solutions?

14   A.  We are a payroll prepaid debit card company.

15   Q.  How long have you worked there?

16   A.  I have been there for six years.

17   Q.  What is your title?

18   A.  I am the compliance officer.

19   Q.  Would you mind just moving the microphone just a little bit

20   closer.

21              What is your title?

22   A.  I'm the compliance officer.

23   Q.  What are some of your duties and responsibilities as a

24   compliance officer at TFG Card Solutions?

25   A.  Select and monitor the day-to-day activities of all the

EA27CLA5                    Garrido - direct

departments to make sure we are following the procedures of our

company.  I report to our bank quarterly and in monthly reports

on operational duties of each department.  And I have to write

and train people on policies.

Q.  You testified that TFG is a prepaid payroll service

company.  Specifically what services does TFG offer its

customers?

A.  So, we offer debit cards to clients who want to get away

from issuing paper checks and want to get all of their unbanked

employees on a direct deposit system.

Q.  You just used the term unbanked employees.  What are you

referring to?

A.  So, someone who doesn't have a bank account because they

can't get one or they choose not to, a traditional bank

account.

Q.  And who typically are your customers?

A.  Clients, just companies who want to use our cards for

payroll.

Q.  Companies or individuals?

A.  Companies.

Q.  Does TFG actually issue physical debit cards?

A.  Yes, we do.

Q.  And when those cards are issued, are they sent to the

company or are they sent to the individual employees?

A.  They are sent to the company.

EA27CLA5                        Garrido - direct

1    Q.   When TFG issues those cards, have they been loaded with

2    funds at that time?

3    A.   No, they haven't.

4    Q.   When or how are the cards loaded with funds?

5    A.   They're loaded through a direct deposit, typically the

6    payroll, your payroll.

7    Q.   The payroll of the client who has subscribed for the cards.

8    A.   Right.

9    Q.   Are there other uses for these cards besides for payroll?

10   A.   Yeah, you can use them for any direct deposit, so if you

11   get Social Security, tax returns, maybe alimony payments,

12   anything that's a direct deposit.

13   Q.   If a card is going to be used for a tax refund, is it still

14   issued to a company or is it typically issued to an individual?

15   A.   A company.

16   Q.   So what type of company would use your services for tax

17   refunds?

18   A.   Just any company who is wanting to get their people to

19   get -- instead of waiting to get a paper check, they can just

20   use the card to get a direct deposit tax refund quicker.

21   Q.   Would a tax preparation service company use your services?

22   A.   Yes.

23   Q.   Ms. Garrido, does TFG keep records of the companies that

24   apply for its prepaid debit card services?

25   A.   Yes, we do.

EA27CLA5                    Garrido - direct

```
1    Q.   And does it also keep records of companies that actually
2    open accounts with TFG?
3    A.   Yes.
4    Q.   Where are these records kept?
5    A.   We use a third-party provider.
6    Q.   And what is the purpose of these records?
7    A.   Just to make sure that we have every documentation that we
8    need, because our bank will ask for it.
9    Q.   What kind of documentation is kept in these files?
10   A.   So, business agreements, applications that are submitted,
11   any record that we have.
12   Q.   Did MSM Tax Services ever apply for TFG's prepaid debit
13   services?
14   A.   Yes, they did.
15   Q.   How do you know that?
16   A.   Because I looked in our file, and we had record of them.
17   Q.   I'm going to --
18            Your Honor, may I approach?
19            THE COURT:  Yes.
20   Q.   I am showing you what has been marked for identification as
21   Government Exhibit 200 and 200A.  Take a look at those
22   documents and tell me if you recognize them.
23   A.   Yes, I do.
24            MS. CUCINELLA:  May I approach again?
25            I gave you my copy too.
```

1              THE COURT:  Sure.

2    Q.  Turning first to 200.  I'm sorry.  My last question was do

3    you recognize these documents?

4    A.  Yes, I do.

5    Q.  What are they?

6    A.  They are business applications.

7    Q.  How do you know that?

8    A.  I pulled them from the client's file.

9              MS. CUCINELLA:  The government offers Exhibits 200 and

10   200A.

11             THE COURT:  Any objection?

12             MR. YANNELLA:  No, your Honor.

13             THE COURT:  They will be admitted into evidence.

14             (Government's Exhibits 200 and 200A received in

15   evidence)

16   Q.  Ms. Garrido, turning first to Government Exhibit 200A.  Was

17   this document sent to TFG?

18   A.  Yes, it was.

19             MS. CUCINELLA:  Ms. Chen, will you please display

20   200A.

21   Q.  Will you please explain to the jury what this document

22   shows.

23   A.  It's a business application that we have our clients fill

24   out before they are issued cards.

25   Q.  And who is the business that is applying for the

EA27CLA5                    Garrido – direct

1   application -- or applying for the card services here?

2   A.   MSM Tax Services.

3   Q.   And is there an address listed for MSM Tax Services?

4   A.   Yes.

5   Q.   What is that address?

6   A.   2018 Story Avenue, Bronx, New York 10473.

7   Q.   And is there an owner of that company listed?

8   A.   Yes.

9   Q.   And who is that?

10  A.   Messiah Clark.

11  Q.   And on this application does it reflect what kind of

12  company MSM Tax Services is?

13  A.   Yes, it does.

14  Q.   And what does it say?

15  A.   Tax prep services.

16  Q.   And when does it indicate that MSM Tax Services went into

17  business?

18  A.   July of 2008.

19  Q.   And is this information that is filled out before the

20  application is sent to you?

21  A.   No, we send this out first.

22  Q.   I'm sorry, let me rephrase that.  Do you receive a

23  filled-out application?

24  A.   Yes.

25  Q.   So, this is actually sent to you by whoever is applying for

EA27CLA5                        Garrido - direct

1    your services?

2    A.  Right.

3    Q.  Down at the lower portion of the application, bank

4    references, what is this?

5    A.  It shows the reference from whatever client is signing up

6    for the cards.

7    Q.  And what are the two banks that are listed here?

8    A.  Commerce Bank and Bank of America.

9    Q.  And what are the last four digits of the Commerce Bank

10   account?

11   A.  7795.

12   Q.  And the last four digits of the Bank of America account?

13   A.  8856.

14   Q.  And is this document signed?

15   A.  Yes, it is.

16   Q.  And who does that appear to be the signature for?

17   A.  Messiah Clark.

18   Q.  And what is the date of this document?

19   A.  August 15, 2008.

20   Q.  Turning to the second page, what is this?

21   A.  It's our client agreement.

22   Q.  And what is the purpose of the client agreement?

23   A.  It's the terms and conditions that we give to each client.

24   It shows how the cardholder could use the cards when they

25   receive them.

EA27CLA5                    Garrido - direct

1    Q.  And is the top section filled out by whoever sends in the

2    application?

3    A.  Yes.

4    Q.  And it's dated when?

5    A.  August 15, 2008.

6    Q.  And who is purportedly entering into this agreement with

7    TFG Card Solutions?

8    A.  MSM Tax Services.

9    Q.  And you indicated that this agreement outlines how the card

10   can be used, is that right?

11   A.  Right.

12   Q.  And what are some of the ways -- looking at the middle of

13   the agreement, what are some of the ways that the funds on the

14   cards can be accessed?

15   A.  You can use them at any point of sale, online, at a store,

16   you can use them at ATMs to withdraw funds, or you can take

17   them to a bank teller and withdraw funds that way as well.

18   Q.  And when you say point of sale, what does that mean?

19   A.  So, if you go to a Walmart, a grocery store, you can go buy

20   something online.

21   Q.  Turning to the next page.  Is this a continuation of the

22   client services agreement?

23   A.  Yes.

24   Q.  Was this information filled out when TFG received this

25   application?

EA27CLA5                      Garrido - direct

1    A.   Yes, it was.

2    Q.   And what is reflected here?

3    A.   The client's signature and address, phone number, tax ID

4    number.

5    Q.   And the signature of the officer, who has signed this

6    document?

7    A.   Messiah Clark.

8    Q.   Turning to the next page, what is this document?

9    A.   It's a New York State Department corporation search.

10   Q.   And was this located in the file with this application?

11   A.   It was.

12   Q.   Can you explain what this document is.

13   A.   It's basically showing that the company exists, it's

14   registered.

15   Q.   And is this something that would have been supplied by the

16   applicant, or is this a document that would have been placed in

17   the file by someone at TFG?

18   A.   This would have been someone at TFG.

19   Q.   Why would someone at TFG put this in the file?

20   A.   To make sure that the client actually existed or the

21   company existed.

22   Q.   Based on your review of MSM Tax Services' client files held

23   by TFG, did TFG ever issue cards -- withdrawn.

24        Based on your review of this file, did TFG ever issue

25   cards in connection with this application?

EA27CLA5                      Garrido - direct

1    A.  No.

2    Q.  You can set that to the side.  Based on your review of

3    TFG's files, was there ever a time that TFG issued cards to a

4    business located at 2018 Story Avenue in the Bronx?

5    A.  Yes, there was.

6    Q.  Approximately when was that?

7    A.  2011.

8    Q.  I am going to turn your attention now to Government Exhibit

9    200 which is already in evidence.  What is this document?

10   A.  It's another business application.

11   Q.  Looking at the top of this application, what is the name of

12   the business?

13   A.  MSM Accounting Services.

14   Q.  And what is the address provided for MSM Accounting

15   Services?

16   A.  2018 Story Avenue, Bronx, New York 10473.

17   Q.  And who is listed as the owner of MSM Accounting Services?

18   A.  Lamont Kemp.

19   Q.  What type of business is this purported to be?

20   A.  Accounting.

21   Q.  And again this is information that is filled out before

22   this form is sent to you, is that right?

23   A.  Right.

24   Q.  When is MSM Accounting Services purported to have begun

25   business?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EA27CLA5                          Garrido – direct

1    A.   2008.

2    Q.   And looking down below at the bank references, what's the

3    last four digits of the bank reference provided for MSM

4    Accounting Services?

5    A.   8856.

6    Q.   And is this document signed?

7    A.   Yes, it is.

8    Q.   Whose signature does that appear to be?

9    A.   Lamont Kemp.

10   Q.   And what is it dated?

11   A.   June 7, 2011.

12   Q.   Turning to the next page, what does this reflect?

13   A.   It's a client agreement.

14   Q.   And is this the same agreement that was sent in with the

15   2008 application?

16   A.   It's the same -- yes, it is.

17   Q.   It's the same principles but sent in by purportedly

18   different applicant, is that fair?

19   A.   Yes.

20   Q.   What is the name that appears on this agreement?

21   A.   Lamont Kemp/MSM Accounting Services.

22   Q.   What is the date of this agreement?

23   A.   June 7, 2011.

24   Q.   And does this agreement also indicate how these third-party

25   debit cards can be used?

EA27CLA5                         Garrido - direct

1    A.  Yes, it does.

2    Q.  Turning to the next page and then to the final page of the

3    agreement, is this information that would have been filled out

4    by the applicant?

5    A.  Yes.

6    Q.  And who filled out this information?

7    A.  Lamont Kemp.

8    Q.  And he is listed as the signatory?

9    A.  Yes.

10   Q.  For MSM Accounting Services?

11   A.  Yes.

12   Q.  In 2011 did TFG have any practices or policies in place to

13   determine whether a company applying for your services was a

14   legitimate company?

15   A.  Just these two documents.

16   Q.  Can you repeat that?

17   A.  Just these two documents.

18   Q.  Can you explain your answer?

19   A.  So, we would supply them with a business application and

20   this referral agreement, and then that's the only information

21   we would collect.

22   Q.  So there were no other steps taken to verify whether or not

23   MSM Accounting Services was a legitimate company?

24   A.  No.

25   Q.  You testified that TFG cards were issued to MSM Tax

EA27CLA5                          Garrido - direct

1    Services -- excuse me -- to MSM Accounting Services in 2011.

2    How do you know that?

3    A.   Because I looked at the records.

4    Q.   And if TFG issued third-party debit cards to a customer, is

5    it TFG's practice to keep records related to those cards?

6    A.   Yes.

7    Q.   Where are those records typically stored?

8    A.   They are on our processor's database that we have access to

9    view.

10   Q.   What kind of information is contained in those records?

11   A.   It will have the applicant's social, date of birth, name,

12   address, phone number.

13   Q.   Are there transaction details contained based on the cards

14   that are issued?

15   A.   Yes.

16   Q.   With respect to the MSM account, did there come a time when

17   you reviewed the records related to every card that was issued

18   to MSM Accounting Services?

19   A.   Yes, I did.

20   Q.   Approximately when was that?

21   A.   In 2011.

22   Q.   Sitting here today, can you recall how much money in total

23   was loaded onto cards issued to MSM Accounting Services and on

24   what dates those cards issued?

25   A.   It was roughly around $436,000.

EA27CLA5                      Garrido - direct

1    Q.  And do you know if there came a time when the cards were

2    restricted with respect to the cardholder's ability to access

3    the funds on those cards?

4    A.  Yes, in 2011.

5    Q.  And did that mean that the cardholders couldn't access the

6    fund anymore?

7    A.  Yes, they were all closed.

8    Q.  And, if you recall, how much money had been accessed on the

9    cards before that restriction was put in place?

10   A.  It was about $330,000.

11              MS. CUCINELLA:  May I just have one moment?

12              THE COURT:  Sure.

13   Q.  Ms. Garrido, with respect to the cards that were issued to

14   MSM Accounting Services in 2011, do you know where they were

15   sent?

16   A.  Yes.

17   Q.  Where were they sent?

18   A.  They were sent to the 2018 Story Avenue address.

19   Q.  And how were they sent to the 2018 Story Avenue address?

20   A.  We just sent them regular priority mail.

21              MS. CUCINELLA:  Nothing further.

22              THE COURT:  Mr. Yannella?

23              MR. YANNELLA:  No questions, your Honor.

24              THE COURT:  Thank you, ma'am.  You can step down.

25              (Witness excused)

EA27CLA5                    Garrido - direct

 1              THE COURT:  Government call its next witness.

 2              MS. CUCINELLA:  The government calls Eric Tchiakpe.

 3      ERIC TCHIAKPE,

 4          called as a witness by the government,

 5          having been duly sworn, testified as follows:

 6      DIRECT EXAMINATION

 7      BY MS. CUCINELLA:

 8      Q.  Good afternoon, Mr. Tchiakpe.  Where do you work?

 9      A.  I work for Motivano Incorporated.

10      Q.  What is Motivano Incorporated?

11      A.  That's an employee technology benefit company.  We provide

12      employers a platform where it can design and manage benefits

13      for their employees.

14      Q.  Design and manage benefits for their employees?

15      A.  That's correct.

16      Q.  Do you have a title at Motivano?

17      A.  I am the director of finance.

18      Q.  What are some of your duties and responsibilities as the

19      director of finance at Motivano?

20      A.  Well, I have to actually oversee anything that has to do

21      with finance, like approving new clients, going over financials

22      and reporting to the investors.

23      Q.  You testified that Motivano helps its clients manage

24      employee benefits.  What specifically -- excuse me -- what

25      services specifically do you offer your clients?

1    A.   One of them is a payroll deduction.  Payroll deduction,

2    basically what we do is the employee elects to have money

3    deducted from their pay checks and sent, for instance, to a

4    gym, like Gold's Gym, New York Health and Racket Club, for a

5    membership, and we have a payroll card for people who don't

6    have a bank account, and they would like to have the money sent

7    to those pay cards as opposed to having a check where they can

8    cash and have the money themselves.

9    Q.   Are your cards -- when these cards are issued, are they

10   intended to be used for anything other than payroll?

11   A.   Not to my knowledge.

12   Q.   If an employer wants to use your payroll card services, how

13   do they seek out your services?

14   A.   Well, they will have to contact someone either who heard

15   about the company through someone.  They will have to contact

16   our client service.  There is a number of requirements they

17   have to fulfill, like certificate of incorporation, bank

18   accounts, check, anything that's official, a third-party

19   document.

20   Q.   I'm sorry.  I didn't mean to cut you off.

21   A.   A third-party documentation that you have to provide.

22   Q.   Why do they have to provide this third-party documentation?

23   A.   We want to make sure that it's a company that exists, it's

24   not a fake company.  That's basically why we have to make sure

25   of that.

1   Q.  Assuming that a company passes through this test, how are

2   the cards physically delivered to your customers?

3   A.  Well, the person who is the owner of the company, or who is

4   the representative of the company, has to elect where he wants

5   the card to be issued.  Does he want the card to be sent to the

6   address?  Anywhere he wants.

7   Q.  Once the cards are sent out, what if anything are the

8   employers expected to do with those cards?

9   A.  Load the earning of the employee on the card.

10  Q.  When you say the earning of the employee, what do you mean?

11  A.  Well, when someone works and doesn't have a bank account,

12  instead of that person having a check issued to him, he can

13  have the money sent to that card.

14  Q.  Mr. Tchiakpe, does Motivano keep records relating to the

15  cards that it issues?

16  A.  Yes, we do.

17  Q.  Do you keep files specific to -- excuse me.  Do you keep

18  files relating to specific accounts together?

19  A.  Can you rephrase the question again.

20  Q.  Sure.  Do you keep account files?

21  A.  We do.

22  Q.  And what types of documents are in those files?

23  A.  Any transaction related to that account is kept.

24  Q.  And are those records made close in time to the events that

25  are reflected in those records?

EA27CLA5                          Tchiakpe - direct

1    A.   That's correct.

2    Q.   Mr. Tchiakpe, did there come a time when you were asked to

3    review your files to determine whether any application had ever

4    been submitted in the name of Messiah Clark or MSM Tax

5    Services?

6    A.   Yes.

7    Q.   I am showing you what has been marked for identification as

8    Government Exhibit 210.

9                Your Honor, may I approach?

10               THE COURT:  Yes.

11   Q.   Do you recognize that document?

12   A.   Yes, I do.

13   Q.   What is it?

14   A.   It's a request that came from our client service, to

15   approve the application from this company, MSM Tax Services.

16   Q.   And is this a document that you retrieved from the client

17   files kept by Motivano?

18   A.   That's correct.

19               MS. CUCINELLA:  The government offers Exhibit 210.

20               THE COURT:  Any objection?

21               MR. YANNELLA:  May I just examine it for a moment?

22               THE COURT:  Sure.

23               MR. YANNELLA:  No objection, your Honor.

24               THE COURT:  It will be admitted into evidence.

25               (Government's Exhibit 210 received in evidence)

EA27CLA5                        Tchiakpe - direct

1   Q.  Looking at the document in front of you, Mr. Tchiakpe, in

2   what name is it filed?

3   A.  MSM Tax Services.

4   Q.  Ms. Chen has put it up on the big screen.  So the business

5   name is MSM Tax Services?

6   A.  That's correct.

7   Q.  Is there a contact name provided for that business?

8   A.  Yes.

9   Q.  What is it?

10  A.  Messiah Clark.

11  Q.  Is there an address provided?

12  A.  Yes.

13  Q.  What is that address?

14  A.  2018 Story Avenue, Bronx, New York.

15  Q.  And is there a contact e-mail provided for Messiah Clark?

16  A.  Yes, I see that.  MSMtaxservices@yahoo.com.

17  Q.  Is there also an employer payroll e-mail provided?

18  A.  That's the same.

19  Q.  That's the same address?

20  A.  Yes.

21  Q.  Does it indicated on this form how many employees MSM Tax

22  Services purportedly has?

23  A.  It says 30 employees.

24  Q.  30 employees?  And then what is the information provided

25  down below?  What is the purpose of that information?

1    A.  It shows the owner or the administrator of the business.

2    Q.  And that would be the person who would be administrating

3    the cards?

4    A.  That's correct.

5    Q.  And looking at the bottom of the page, what is this?

6    A.  It shows the owner, the name, the signature and the title

7    and the date.

8    Q.  Are you saying the title?

9    A.  Yeah.

10   Q.  And then actually staying on the first page, based on your

11   review of the files, were there ever any cards issued in 2008

12   to MSM Tax Services or to Messiah Clark?

13   A.  I have not found any dating back to 2008.

14   Q.  Under what circumstances, based on your experience with the

15   company, would Motivano have received an application but no

16   cards have issued?

17   A.  Well, before anyone is approved, that person is required to

18   submit three third-party documentation which it could be, as I

19   said before, a bank statement, a certificate of incorporation,

20   a tax return.  It looks like -- when I'm looking at this, none

21   of this was submitted in conjunction with this application, so

22   it's possible that it wasn't approved by the bank.

23            MR. YANNELLA:  Objection to what's possible, your

24   Honor.

25            THE COURT:  Sorry.  You cut him off at the end.

1              What was the answer?

2              (Record read)

3              THE COURT:  I will strike the last part about what is

4    possible.  Disregard that.

5    Q.  Mr. Tchiakpe, if additional documentation had been

6    submitted with this application, would it have been located in

7    the file?

8    A.  That's correct.

9    Q.  Can you tell based on this document alone why cards were or

10   were not issued?

11   A.  Most of the documents that we required were missing.

12   Q.  Turning to the second page and the rest of the documents

13   contained in Government Exhibit 210, what are these?

14   A.  This is another application.

15   Q.  What name is this filled out in?

16   A.  MSM Tax Services.

17   Q.  And is there a business address provided?

18   A.  Yes.

19   Q.  What is that?

20   A.  2018 Story Avenue, Bronx, New York.

21   Q.  And does it state how long MSM Tax Services has purportedly

22   been in business?

23   A.  Yes.

24   Q.  And what does it say?

25   A.  Three years three months.

EA27CLA5                    Tchiakpe - direct

1   Q.   And what type of business is MSM Tax?

2   A.   Tax preparation and accounting.

3   Q.   And what's the contact name provided?

4   A.   Messiah Clark.

5   Q.   Is there a contact e-mail?

6   A.   Yes.

7   Q.   And does it list how many employees MSM Tax Services

8   purportedly has?

9   A.   25.

10  Q.   For the user set-up information, does that repeat the

11  information that's listed above?

12  A.   That's correct, yes.

13  Q.   Looking at this second page of this form, and just drawing

14  your attention to the top of this page -- and I believe it

15  repeats what was on the first page -- is this an application

16  for a payroll pay card?

17  A.   That's correct, yes.

18  Q.   OK.  So this is that service that you were talking about?

19  A.   Yes.

20  Q.   Where an employer would load an employee's earnings onto

21  these cards.

22  A.   That's correct.

23  Q.   Looking at this page, who is listed as the authorized

24  representative for this account?

25  A.   Messiah Clark.

1    Q.  And he is listed as what with this title?

2    A.  As the owner.

3    Q.  And he is the authorized signature?

4    A.  Yes.

5    Q.  And what is this dated?

6    A.  March 20, 2012.

7    Q.  Turning to the next page, what is this document?

8    A.  That's corporate records.

9    Q.  And is this a document that would have been provided by the

10   applicant?

11   A.  That's correct.

12   Q.  And this is the corporate records of MSM Tax Services?

13   A.  Yes.

14   Q.  Turning to the second page, what is this page?

15   A.  That's the certificate of incorporation from New York

16   State.

17   Q.  This shows that the certificate of incorporation was filed,

18   is that right?

19   A.  Yes.

20   Q.  And what is the date from which this company began to

21   exist?

22   A.  July 16, 2008.

23   Q.  Turning to the next page, what is this?

24   A.  Certificate of incorporation of MSM Tax Services Inc.

25   Q.  Is this a second document that would have been supplied in

EA27CLA5                         Tchiakpe - direct

1    connection with this application?

2    A.  That's correct also.

3    Q.  And turning to the next page, what are these?

4    A.  Those of articles of incorporation.

5    Q.  Articles of incorporation?

6    A.  Yes.

7    Q.  And again these would have been provided with the

8    application?

9    A.  That's correct, yes.

10   Q.  And these would have been one of the three documents that

11   you needed to see to verify a company.

12   A.  Right.

13   Q.  Turning finally to the last page, the articles of

14   incorporation are how many pages?  If you can look at the

15   document in front of you.

16   A.  It's nine pages.

17   Q.  Nine pages?

18   A.  Yes.

19   Q.  Turning to the last document, was this taken from the file

20   that your company had on MSM Tax Services?

21   A.  Yes.

22   Q.  And why would this have been in the file?

23   A.  Because it's part of the record of this company.

24   Q.  I'm sorry.

25   A.  It's part of the record, the documents submitted by this

EA27CLA5                        Tchiakpe - direct

1   company.

2   Q.   Would this be something that the applicant sent in with his

3   application?

4   A.   That's correct.

5   Q.   And what is this?

6   A.   That's the void check.

7   Q.   Why would they send this in with their application?

8   A.   To prove that they are in business, it's a legitimate

9   company.

10  Q.   And what company is listed at the top?

11  A.   MSN Tax Services Inc.

12  Q.   And what bank is this from?

13  A.   Bank of America.

14  Q.   And what are the last four digits of the account number?

15  A.   8856.

16  Q.   You can set that to the side.

17            Your Honor, may I approach?

18            THE COURT:  Yes.

19  Q.   I am showing you what has been marked for identification as

20  Government Exhibit 211 and 212.  Turning first to Government

21  Exhibit 212, do you recognize this document?

22  A.   Yes.

23  Q.   What is it?

24  A.   It's one of my assistants whom I asked to review the file

25  for approval, and he is coming back to me saying --

1   Q.  Hold on.  I'm going to stop you there.  It's an e-mail from

2   an employee of yours?

3   A.  That's correct, yes.

4   Q.  And did you receive it as part of your duties as Motivano?

5   A.  Yes, that's correct.

6         MS. CUCINELLA:  The government offers Exhibit 212.

7         THE COURT:  Any objection?

8         MR. YANNELLA:  No, your Honor.

9         THE COURT:  It will be admitted into evidence.

10         (Government's Exhibit 212 received in evidence)

11         MS. CUCINELLA:  Ms. Chen, will you please exhibit

12   Government Exhibit 212 to the jury.

13   Q.  Mr. Tchiakpe, who is Marvin James?

14   A.  He is one of my staff accountants.

15   Q.  And what was Marvin James' role in connection with the MSM

16   Tax Services application?

17   A.  He is the one that reviewed the account.

18   Q.  And what was the purpose of this e-mail?

19   A.  We got application to review the account, and he looked

20   through the documents that were submitted, and he didn't find

21   any objection, that it was OK to go ahead with the application

22   and approve it.

23   Q.  You can set that aside.

24         Now directing your attention to Government Exhibit

25   211.  Do you recognize this document, Government Exhibit 211?

1    A.  Yes, I do.

2    Q.  Do you recognize this document?

3    A.  Yes, I do.

4    Q.  What does this document -- what is this document?

5    A.  Well, it's a detail of the transaction relating to this

6    account.

7            MS. CUCINELLA:  The government offers Government

8    Exhibit 211.

9            THE COURT:  Any objection?

10           MR. YANNELLA:  No, your Honor.

11           THE COURT:  It will be admitted in evidence.

12           (Government's Exhibit 211 received in evidence)

13           MS. CUCINELLA:  Ms. Chen, would you please display

14   Government Exhibit 211 to the jury.

15   Q.  Can you please explain to the jury what they are seeing

16   here?

17   A.  Well, the first one has the client ID.  That's the number

18   we assign to every client we have.  Then the client here again

19   in this case is MSM Tax Services.  The next one, total amount,

20   $149,514.22, that's the total amount that was loaded onto these

21   cards.

22           MS. CUCINELLA:  And, Ms. Chen if you could please turn

23   to the second page and blow that up.

24   Q.  What is reflected here?

25   A.  These are the names of cardholders, the last four digits of

1    their Social Security number, and the precard number, the date

2    of the transaction and the amount that was loaded.

3    Q.   The amount that was loaded on the card?

4    A.   Yes.

5    Q.   Do you have an issuing bank that you work with for these

6    cards?

7    A.   That's correct, yes.

8    Q.   What's the role of the issuing bank?

9    A.   Typically the form will be sent to the bank, and once the

10   bank authorized that the amount was there, then they will

11   authorize the card to be loaded.

12   Q.   And what was the name of the issuing bank with respect to

13   this account?

14   A.   Center State Bank.

15   Q.   Center State Bank?  So would Center State Bank have records

16   relating to the specific transactions that occurred on each of

17   these cards?

18   A.   Yes.

19              MS. CUCINELLA:  One moment.

20              Nothing further.

21              THE COURT:  Any further questions?

22              MR. YANNELLA:  No, your Honor.

23              THE COURT:  Thank you, sir.  You can step down.

24              (Witness excused)

25              THE COURT:  Ms. Cucinella?

1          MS. CUCINELLA:  The government calls Kevin Song.

2      KEVIN SONG,

3          called as a witness by the government,

4          having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. CUCINELLA:

7    Q.  Good afternoon, Investigator Song.  Where do you work?

8    A.  Good afternoon.  I work for the U.S. Attorney's Office,

9    Southern District.

10   Q.  What is your title there?

11   A.  Criminal investigator.

12   Q.  What are some of the duties and responsibilities associated

13   with being a criminal investigator at the U.S. Attorney's

14   Office?

15   A.  As a criminal investigator at the U.S. Attorney's Office, I

16   am assigned to the Complex Fraud and Cyber Crimes Unit.  I

17   investigate criminal activity, I investigate fraud, identity

18   theft, financial institution fraud.  I assist the U.S.

19   attorneys in preparing cases for trial and investigating cases

20   related to the Southern District.

21   Q.  Where did you work before you came to the U.S. Attorney's

22   Office?

23   A.  I worked for the United States Secret Service.

24   Q.  What did you do at the Secret Service?

25   A.  I was a special agent for the Secret Service.  I was

1  employed for approximately 12 years.  During my time at the

2  Secret Service I investigated fraud, identity theft,

3  counterfeit currency, check fraud, different kinds of

4  investigations that are part of the core violations for the

5  U.S. Secret Service.  I also did a lot of protection with the

6  Secret Service.  I led and coordinated presidential, vice

7  presidential visits.

8           MR. YANNELLA:  Objection.

9           THE COURT:  Overruled.  He can answer.

10 Q.  You weren't responsible for presidential protection in

11 September of this year though, right?

12 A.  No.

13 Q.  In connection with your duties and responsibilities at the

14 U.S. Attorney's Office, did you review records produced by

15 Center State Bank?

16 A.  Yes.

17 Q.  I am going to hand you Government Exhibit 440 -- or a

18 binder that contains those documents.  This is Government

19 Exhibit 440, which is already in evidence.  Are these the bank

20 records from Center State Bank that you reviewed?

21 A.  Yes.

22 Q.  What types of information generally are contained in those

23 records?

24 A.  Well, these bank records contain names, dates of birth of

25 various people, they contain withdrawel transactions from

1    various ATM machines across the New York area.

2    Q.  And are those records specific to debit cards that have

3    been issued?

4    A.  Yes.

5    Q.  And they detail the transactions that occurred in

6    connection with those debit cards?

7    A.  Yes, they do.  They detail date and time and locations of

8    where withdrawals were made for ATM cards.

9    Q.  I'm sorry.  Did I cut off the end of your answer?

10   A.  I was just saying they show the date and time of

11   withdrawals for various ATM cards.

12          MS. CUCINELLA:  Ms. Chen, if you could pull up the

13   page labeled Clark 3914 of Government Exhibit 440.

14   Q.  Investigator Song, is this one of the transaction records

15   that you were just describing?

16   A.  Yes.

17   Q.  Can you explain for the jury what this shows?

18   A.  Well, this is a page that shows the card number, sort of

19   near -- yeah, right there -- the card number for the ATM card.

20   It also shows the merchant name, which is the location which

21   this card was used for withdrawal below.  Also on the top right

22   it shows the amount of the withdrawal, which for this

23   transaction it was $803.

24          The line right above card number, you will see that

25   the transaction date which shows the date in which the card was

EA27CLA5                    Song – direct

1    used and the time.

2    Q.   And along with these transaction records, do the Center

3    State Bank records also indicate when money is loaded on these

4    cards?

5    A.   Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ea2ecla6                          Song – direct

1          MS. CUCINELLA:  Your Honor, may I approach?

2          THE COURT:  Yes.

3   Q.  I'm going to show you what's been marked for identification

4   as Government Exhibit 856.  Do you recognize this document?

5   A.  Yes, I do.

6   Q.  What is that?

7   A.  This is a document that is a summary of the core state's

8   bank records -- or Center State's bank records.  I'm sorry.

9   Q.  And is this chart based -- excuse me.

10          Did you review this chart for accuracy against the

11  underlying records?

12  A.  Yes, I have.

13  Q.  And is the chart limited to ATM transactions and when money

14  is loaded on to these cards?

15  A.  Yes, it is.

16          MS. CUCINELLA:  The government offers Exhibit 856.

17          THE COURT:  Any objection?

18          MR. YANNELLA:  No, your Honor.

19          THE COURT:  It will be admitted into evidence.

20          (Government's Exhibit 856 received in evidence)

21          MS. CUCINELLA:  Ms. Chen, can we display Government

22  Exhibit 856 to the jury.  And can we go to the third page,

23  focusing on the bottom five transactions.

24  BY MS. CUCINELLA:

25  Q.  Investigator Song, can you explain to the jury what they're

Ea2ecla6                        Song - direct

1    looking at?

2    A.   So the bottom five transactions are dated February 13,

3    2013.  Those are the transaction dates in which the ATM cards

4    were actually used.  The third column indicates the last four

5    numbers of the card.  So, for example, you'll see 8229, so

6    that's the last four numbers of a card that was used that day.

7    It has a load value to the far right of $1,100 -- $1,140.

8    Q.   And does it say the origin of that money?

9    A.   Yes.

10   Q.   And what does it say for --

11   A.   So the origin of load value is US Treasury tax refund.

12   Q.   And is that information taken directly from the Center

13   State Bank records?

14   A.   Yes, it is.

15   Q.   Turning to the next page of this chart, focusing on that

16   first third of the chart.  Can you explain to the jury what

17   they're seeing here?

18   A.   So basically this is what happens to the cards that were

19   loaded previously, in the previous page.  You'll see the same

20   date on February 13, 2013.  These cards were being used at

21   various locations.  So -- and the location column, you'll see

22   Key Bank NA, 366 Windsor Highway, Vails Gate, New York.  And

23   then you'll see on the far right the amount, which was

24   withdrawn.  So -- and the days after the cards were loaded, on

25   February 13th, you'll see the same card numbers in the third

Ea2ecla6                          Song - direct

1   column being withdrawn, and the amounts of which they were

2   being withdrawn on the right, and the locations of the ATMs in

3   the location column.

4            MS. CUCINELLA:  Your Honor, may I approach?

5            THE COURT:  Yes.

6   Q.  I'm handing you now two sets of documents, Investigator

7   Song.  The first is a set of documents marked for

8   identification as Government Exhibit 851, 852, 850, 853 and

9   854.  The second is a set of pictures that are marked as

10  Government Exhibits 813, 814, 815, 816, 817, 818, 819 and 828.

11  Do you recognize these two sets of documents?

12  A.  Yes, I do.

13  Q.  What is the first set of documents, Government Exhibits 850

14  through 854?

15  A.  These documents were maps that I created on Google.

16  Q.  How did you create these maps?

17  A.  So I looked at the locations of the ATMs that were found in

18  the Center State's records, and I found them on the Internet,

19  found the locations, coordinating it with the banks that are

20  located there.  And then I plotted it on these maps that you

21  see here.

22           MS. CUCINELLA:  The government offers Exhibits 850,

23  851, 852, 853 and 854.

24           THE COURT:  Any objection?

25           MR. YANNELLA:  Just one moment, your Honor, please.

Ea2ecla6                    Song – direct

1          THE COURT:  Yes.  (Pause)

2          MR. YANNELLA:  No objection, your Honor.

3          THE COURT:  They'll be admitted into evidence.

4          (Government's Exhibits 850, 851, 852, 853 and 854

5     received)

6          MS. CUCINELLA:  One moment, your Honor.  (Pause)

7     BY MS. CUCINELLA:

8     Q.   Investigator Song, would you please look at Government

9     Exhibit 853, which was received in evidence.

10          Ms. Chen, with the Court's permission, would you

11     publish it to the jury.

12          Investigator Song, what is the jury looking at here?

13     A.   So this is a map of the New Windsor, New York area.  The

14     column on the left with all the different addresses there are

15     the ATM addresses and bank addresses that were found in the

16     Center State's records.  And then the first address on the list

17     is lettered A, and that was the address given to me to plot on

18     this map.

19     Q.   And what address is that?

20     A.   1604 Hawthorne Way, New Windsor, New York.

21     Q.   And what do all the other addresses represent?

22     A.   All the other addresses represent banks or ATM locations.

23     Q.   And are those banks or ATM locations where the third-party

24     debit cards were accessed?

25          MR. YANNELLA:  Objection to the leading.

Ea2ecla6                          Song – direct

 1   Q.  What do they represent?  Why did you choose those banks?

 2   A.  Those locations were chosen because that's where these ATM

 3   cards were used.

 4   Q.  Does this map reflect transactions during a certain time

 5   period?

 6   A.  Yes, they do.

 7   Q.  What time period?

 8   A.  These transactions basically took place in 2013.

 9   Q.  And based on your review of the bank records, did you see

10   any pattern as to how the ATMs were accessed?

11   A.  Yes.

12   Q.  Were there multiple ATMs accessed on the same day?

13   A.  Yes.

14   Q.  What other patterns, if any, did you see?

15   A.  Just location.  They were all close to this geographic

16   location in Newburgh, New Windsor, New York.

17   Q.  And approximately how far away are each of the ATM

18   locations from 1604 Hawthorne Way?

19   A.  The farthest that I found was approximately five miles.  I

20   put after every ATM or bank location the mileage in which I

21   found.

22   Q.  And that's the distance between 1604 Hawthorne Way and the

23   ATM?

24   A.  Yes.

25   Q.  Did there come a time where you also visited the ATMs that

Ea2ecla6                        Song - direct

1    are reflected on Government Exhibit 853?

2    A.  Yes, I have.

3    Q.  I'm turning your attention now to the second pile of

4    documents I gave you.  What are those documents?

5    A.  These are photos of the bank or ATMs that I went and took.

6    Q.  And did these photos fairly and accurately represent the

7    ATMs and banks on the date that you took those photos?

8    A.  Yes, they do.

9    Q.  And approximately when did you take those photos?

10   A.  Tuesday of this week.

11            MS. CUCINELLA:  The government offers Exhibits 813,

12   814, 815, 816, 817, 818, 819 and 828.

13            THE COURT:  Any objection?

14            MR. YANNELLA:  No, your Honor.

15            THE COURT:  They'll be admitted into evidence.

16            (Government's Exhibits 813 through 819 and 828

17   received)

18   BY MS. CUCINELLA:

19   Q.  Let's walk through those pictures quickly.  Ms. Chen, if

20   you can put up Government Exhibit 813.

21            What bank is this?

22   A.  This is a Citizens Bank located at 456 Broadway Avenue in

23   Newburgh, New York.

24   Q.  And was this ATM visited on multiple occasions and those

25   Center State cards accessed there?

1    A.   Yes.

2    Q.   Turning to 814.  What does this show?

3    A.   This was the driveup ATM that's on the outside of this same

4    bank at 456 Broadway Avenue.

5    Q.   Based on your review of the records, were there days where

6    multiple ATM machines that were located in close proximity were

7    accessed?

8    A.   Yes.

9    Q.   Turning to Government Exhibit 815, is this another picture

10   of the same bank?

11   A.   That's the same bank, yes.

12   Q.   816.  What is this?

13   A.   So this is a Chase Bank that is located on 201 Auto Park

14   Place in Newburgh.  It's very close in proximity to the

15   Citizens Bank that we just looked at.

16   Q.   And does this bank also have a driveup ATM?

17   A.   Yes, it does.

18   Q.   Turning to Government Exhibit 817.  Is that the driveup

19   ATM?

20   A.   Yes, it is.

21   Q.   Turning to Government Exhibit 818.  What is this?

22   A.   Hudson Valley Federal Credit Union.

23   Q.   And is there an ATM at this location?

24   A.   Yes, there is.

25   Q.   Turning to Government Exhibit 819.  What is this?

Ea2ecla6                    Song - direct

1    A.  These are the ATMs that are located right in the front door

2    of this bank.

3    Q.  I'm going to draw your attention back to Government

4    Exhibit 856.  And looking again at the fourth page of that

5    document, focusing again on the first third, is the ATM machine

6    that we just saw a picture of indicated on this chart?

7    A.  Yes.

8    Q.  Where?

9    A.  The fourth input into this chart, where it says 201 Auto

10   Park Place, Newburgh.

11   Q.  And looking down below, where it says Hudson Valley F

12   Newburgh Lobb.  Do we see a picture of that location?

13   A.  Yes.

14   Q.  And looking at this chart, can you tell if there were

15   multiple transactions done on the same day using this ATM?

16   A.  Yes.  So looking at just the Hudson valley Newburgh lobby

17   location, you can see the transactions happening there with

18   multiple cards on February 17th.  You can see card number

19   6437 -- I'm sorry.  I mean, 5238 is being used at that bank,

20   and then you can see at the same bank 0338 is used.

21   Q.  And 0338 is used on February 18th, is that right?

22   A.  Yes, that's right.

23   Q.  And are there additional cards used on February 18th as

24   well?

25   A.  Yes.  You can see card number 6437 and 5238.

Ea2ecla6                    Song - direct

1    Q.  And those are all used at the same location?

2    A.  Yes.

3    Q.  You can take that down, Ms. Chen.

4             We can now look at Government Exhibit 850.  Actually,

5    let's look at 851.

6             Investigator Song, what does this map show?

7    A.  This is a map of the Bronx.  It includes all the ATM or

8    bank locations that were accessed in and around the Bronx area.

9    Q.  And what was the time period of when ATMs were accessed

10   using the Center State cards in and around the Bronx area?

11   A.  There is a 2012 time frame.

12   Q.  And is the address 2018 Story Avenue reflected on this map?

13   A.  Yes, it is.

14   Q.  Where is that shown?

15   A.  It's in red and it's the letter A on the map.

16   Q.  And are the other addresses reflected, all ATMs where

17   Center State cards were accessed?

18   A.  Yes, they are.

19   Q.  Is there also an indication on this map that there was an

20   ATM used in Vails Gate, New York?

21            Ms. Chen, can you zoom out?

22   A.  Yes, there is.

23   Q.  Is Vails Gate, New York, near New Windsor, New York?

24   A.  Yes.  Vails Gate is the southern end of New Windsor.

25   Q.  And when was the New Windsor or Vails Gate ATM accessed in

Ea2ecla6                    Song - direct

1    2012?

2    A.   Looking back at this chart --

3    Q.   And by "this chart," you mean Government Exhibit 856?

4    A.   Yes.  Okay.  In November 5, 2012, there is a transaction at

5    New Windsor, New York.

6    Q.   Are the majority of the other transactions in 2012, do they

7    take place in the Bronx, New York?

8    A.   Yes.

9    Q.   One moment.

10             MS. CUCINELLA:  Nothing further.

11             THE COURT:  Do you have questions, Mr. Yannella?

12             MR. YANNELLA:  Yes, your Honor.

13   CROSS EXAMINATION

14   BY MR. YANNELLA:

15   Q.   Good afternoon.

16   A.   Good afternoon.

17   Q.   When were you first assigned to work on this case?

18   A.   Approximately two weeks ago.

19   Q.   Can we please put Government Exhibit 856 back up on the

20   board and turn to page four, the top third.

21             Now, this indicates locations of banks or ATM machines

22   where withdrawals were supposedly made, correct?

23   A.   Correct.

24   Q.   And did you help put this chart together?

25   A.   Correct.  I helped review the chart.

1    Q.  But you didn't put it together?

2    A.  No.

3    Q.  And then, but you did this at the locations on the chart,

4    right?

5    A.  Yes.

6    Q.  For example, you went to the Key Bank, correct?

7    A.  Yes.

8    Q.  You went to the Hudson Valley, correct?

9    A.  Yes.

10   Q.  The Citizens Bank, correct?

11   A.  Yes.

12   Q.  And those were some of the photographs we saw a few minutes

13   ago, correct?

14   A.  Yes.

15   Q.  For example, 813 is the Citizens Bank, right?

16   A.  Yes.

17   Q.  Now, did you go inside -- could you please put Government

18   Exhibit 814 up on the board.

19          What does this show?

20   A.  This shows the ATM on the outside of the Citizens Bank.

21   Q.  And can you zoom in, please, upon the area where there's a

22   dark spot on the upper right-hand corner of the ATM.

23          Now, this has a camera on there, am I correct?

24   A.  Yes.

25   Q.  Did you inquire how long the images are stored when

Ea2ecla6                        Song - cross

1    pictures are taken?

2    A.  I did not.

3    Q.  Did you inquire whether images are taken every time someone

4    withdraws money from an ATM?

5    A.  I did not.

6    Q.  Did you do that for any of the banks that are listed on

7    here?

8    A.  No.

9    Q.  As far as you know, some of these banks, either Hudson

10   Valley, Key Bank, Citizens Bank, might have images of the

11   person who withdrew money on the ATMs as listed in Government

12   Exhibit 856, correct?

13   A.  I don't know the answer to that.

14           MR. YANNELLA:  Nothing further, your Honor.

15           THE COURT:  Any further questions?

16           MS. CUCINELLA:  No, your Honor.

17           THE COURT:  You can step down, sir.

18           (Witness excused)

19           THE COURT:  Ladies and gentlemen, give me five

20   minutes.  I want to talk to the lawyers a second and give you a

21   chance to stretch, then I'm going to tell you how we're going

22   to proceed.

23           So don't discuss the case.  Keep an open mind.  Just

24   go in the jury room, stretch, use the restroom.  Literally,

25   I'll bring you back out in five minutes.

Ea2ecla6                    Song - cross

1              (In open court; jury not present)

2              THE COURT:  I just want to get an idea of what --

3              MS. GARNETT:  So here's where we are, Judge.  We have

4     one more witness left; five to ten minutes, I would guess.

5     With the Court's permission, we would like to wait to rest

6     until the morning and submit a letter tonight asking your Honor

7     to reconsider your ruling about the document issue.

8              THE COURT:  Okay.

9              MS. GARNETT:  And either way, if your Honor allows us

10    to do it, that witness is three minutes and we would be

11    prepared to go forward and close after that, regardless of your

12    Honor's ruling.

13             And then there's just one other housekeeping matter,

14    which is that Government Exhibit 430A was included within the

15    stipulation that's Government Exhibit 1507, but I neglected to

16    list it as one of the exhibits I was asking your Honor to

17    admit.  So I think the parties agree that 430A was admitted by

18    the stipulation.  I just wanted to make it clear for the record

19    that that exhibit is in evidence.

20             THE COURT:  Then I'll admit it into evidence.

21             Let's do this, then:  Let's finish this witness.

22    We'll adjourn for the day after that witness.  I'll just

23    instruct the jury that if there are any further witnesses,

24    we're going to hear them first thing tomorrow.  If there

25    aren't, then I'm going to give the case to them, we're going to

Ea2ecla6                    Song - cross

have summations and charge and I'll give the case to them to

begin deliberations.

        So I'll wait to hear.  I'll get whatever request for

reconsideration you want.  And then tomorrow morning I'll ask

Mr. Yannella if he wishes to call any witnesses.  If he does,

we'll hear them tomorrow.  If not, both sides rest, then we'd

be prepared to start with the openings.

        What I'd like to do is we'll talk about the charge a

little bit before you go, but I'd like to start at 9:20 and

have the jurors here at 9:30.  I don't expect to keep them

beyond 4:00 tomorrow.

        So if we can have summations and charge, approximately

how long do you anticipate the government's summation?

        MS. CUCINELLA:  Approximately half an hour.

        THE COURT:  Mr. Yannella?

        MR. YANNELLA:  The same, your Honor.

        MS. CUCINELLA:  Probably more like an hour.

        THE COURT:  Okay.

        MR. YANNELLA:  Then the same, your Honor.

        THE COURT:  Okay.  As I say, I don't put time limits

on lawyers because by the time I tell you to sit down, you

would have lost the jury long before that.  If I can get the

case to them before lunch, give them several hours to begin

their deliberations.  If they don't render a verdict until

4:00, we can adjourn until Monday and they can come back and

Ea2ecla6                        Song - cross

1    continue their deliberations.

2            Take a short break, use the restroom and we'll be

3    ready to finish the case.  I have a possible verdict form my

4    law clerk is working on.  We'll give that to you and we can

5    discuss all that.

6            MS. GARNETT:  Once we dismiss the jury, we haven't had

7    a chance to look at the charge, before we --

8            THE COURT:  But I'm going to go over it with you and

9    tell you what's there, and then we'll probably give you better

10    guidance, then we'll talk about it again tomorrow morning.

11            MS. GARNETT:  Tomorrow morning, wonderful.

12            THE COURT:  Let's just take a two or three minute

13    break.

14            (Recess)

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Ea2ecla6                         Song - cross

1              (In open court; jury present)

2              THE COURT:  Government, call their next witness.

3              MS. CUCINELLA:  The government calls Special Agent

4    Barbara Renken.

5     BARBARA RENKEN,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. CUCINELLA:

10   Q.  Good afternoon, Agent Renken.

11             Where do you work?

12   A.  IRS criminal investigation.

13   Q.  Do you have a title?

14   A.  Yes.

15   Q.  What is your title?

16   A.  Special Agent.

17             THE COURT:  Could you just pull the microphone down

18   and a little closer to you.

19   A.  Special Agent.

20   Q.  How long have you been with the IRS?

21   A.  About five years.

22   Q.  What are some of your duties and responsibilities as a

23   Special Agent with the IRS criminal investigation unit?

24   A.  I investigate potential violations of the internal revenue

25   code.  So I investigate suspected federal tax related crimes.

Ea2ecla6                        Renken – direct

1   Q.  As part of your duties and responsibilities, were you asked

2   to take photos of locations connected to the investigation of

3   Messiah Clark?

4   A.  Yes, I was.

5   Q.  In front of you we placed pictures that have been marked

6   for identification as Government Exhibit 801, 802, 805, 806 and

7   812.  Do you recognize these documents?

8   A.  Yes, I do.

9   Q.  What are they?

10  A.  These are photographs that I took.

11  Q.  Did these photographs fairly and accurately represent the

12  location depicted as it looked on the day that you took them?

13  A.  Yes, they do.

14  Q.  Approximately when did you take these pictures?

15  A.  These were taken in late August through September of 2014.

16          MS. CUCINELLA:  The government offers Exhibit 801,

17  802, 805, 806 and 812.

18          MR. YANNELLA:  No objection.

19          THE COURT:  They'll be admitted into evidence.

20          (Government's Exhibits 801, 802, 805, 806 and 812

21  received)

22  BY MS. CUCINELLA:

23  Q.  Let's first turn to Government Exhibit 801.  Agent Renken,

24  what is this a picture of?

25  A.  That's 2018 Story Avenue in the Bronx, New York.

Ea2ecla6                         Renken - direct

1    Q.  And are there two doors on that building?

2    A.  I believe so, yes, there are two.

3    Q.  And is one of the doors 2018, or are both doors connected

4    to 2018?

5    A.  It's hard to tell.  The one on the left looks like 2018.

6    It's hard to tell.

7    Q.  And is 2018 the one with the carport in front?

8    A.  Yes.

9    Q.  Did any of the homes on either side have a carport in front

10   of them?

11   A.  This one, when I took a picture.

12   Q.  2018 had the carport in front of it?

13   A.  Yes, 2018.

14   Q.  Turning now to Government Exhibit -- one moment.

15            Staying on Government Exhibit 801 for a moment, does

16   this appear to be a single-family home?

17            MR. YANNELLA:  Objection to the leading.

18            THE COURT:  Sustained.  Put another question.

19   Q.  What kind of building is 2018 Story Avenue?

20   A.  It's a residence.  It appears to be a residence.

21   Q.  And does it appear to be for multiple families or a single

22   family?

23   A.  If it's -- it's hard to tell if the two doors go to one

24   residence or if they're two separate residences.

25   Q.  But just one of the doors is marked 2018 Story Avenue, is

Ea2ecla6                    Renken - direct

1    that right?

2              MR. YANNELLA:  Objection to the leading.

3              THE COURT:  Sustained.

4    Q.  Are multiple doors marked with 2018 Story Avenue?

5    A.  The one that has the 2018 by the gates to the -- under the

6    carport, that appears to be 2018.  I don't know if it opens to

7    the doorway on the right.

8    Q.  Turning now to Government Exhibit 802.  What does this

9    picture depict?

10   A.  This is 1604 Hawthorne Way in New Windsor, New York.

11   Q.  And you took this picture?

12   A.  Yes.

13   Q.  And is the garage in the middle 1604?

14   A.  Yes.  That's the garage in the middle there, yes.

15   Q.  And was that the address right above the garage?

16             MR. YANNELLA:  Judge, object to the leading.

17             THE COURT:  Again, why don't you be less leading.

18   Q.  Is the address reflected on that building?

19   A.  Yes.

20   Q.  Where is it reflected?

21   A.  It's on top of the garage door.

22   Q.  Turning now to Government Exhibit 805.  What is this a

23   picture of?

24   A.  That's 758 Dumont Avenue in Brooklyn, New York.

25   Q.  And what type of building is this?

1   A.  Looks like a residence.

2   Q.  Turning now to Government Exhibit 806.  Is this the second

3   picture of the same building?

4   A.  Yes, it is.

5   Q.  Turning now to Government Exhibit 812.  What were you asked

6   to take a picture of for Government Exhibit 812?

7   A.  I was asked to take a picture of 1699 Amsterdam Avenue.

8   Q.  And what did you discover when you went to take a picture

9   of 1699 Amsterdam Avenue?

10  A.  I didn't see any 1699 Amsterdam Avenue.  It seemed to go

11  from 1701 to 1695 on the other corner.

12  Q.  You can put that aside.

13          Agent Renken, did you participate in the arrest of

14  Messiah Clark?

15  A.  Yes, I did.

16  Q.  Where did that arrest take place?

17  A.  1604 Hawthorne Way.

18  Q.  Where is that?

19  A.  That's in New Windsor, New York.

20  Q.  At what time of day did that arrest take place?

21  A.  That was early in the morning.  Around 6:00 in the morning

22  he showed up.

23  Q.  Was Messiah Clark at that residence at that time?

24  A.  He -- he answered -- yes.  He was there.

25  Q.  Was anyone else home?

Ea2ecla6                        Renken - direct

1   A.  There was a woman there that I believe was his wife.

2              MS. CUCINELLA:  Nothing further.

3              THE COURT:  Mr. Yannella?

4   CROSS EXAMINATION

5   BY MR. YANNELLA:

6   Q.  What day was that arrest?

7   A.  I don't know the date of the arrest.

8   Q.  What year was it?

9   A.  2013.

10  Q.  What month?

11  A.  It was May.

12             MR. YANNELLA:  Nothing further, your Honor.

13             THE COURT:  Any further questions of this witness?

14             MS. CUCINELLA:  No, your Honor.

15             THE COURT:  Thank you.  You may step down.

16             (Witness excused)

17             THE COURT:  Ladies and gentlemen, this is what we're

18  going to do:  We're going to adjourn for the day.

19             I want to thank you for your patience.  The reason

20  I've kept you is because we're way ahead of schedule.  If there

21  are further witnesses tomorrow, we'll hear them tomorrow

22  morning.  If there are no further witnesses tomorrow, which is

23  a possibility, then we're going to go ahead and have the

24  summations or closing arguments of the lawyers, I'm going to

25  instruct you on the law and I'm going to send you in to begin

Ea2ecla6                          Renken - cross

1    your deliberations.

2            At this point what I'll do is I'm going to ask you to

3    be here before 9:30, okay, so that we can get an early start.

4    And we will take your lunch orders, so when your lunch arrives,

5    we'll just send it in.  If you're already deliberating, we'll

6    send it in to the jury room so you can eat and deliberate, or

7    you can suspend the deliberations, eat your lunch and then

8    continue; however you want to conduct yourselves.

9            What I will do is I will let you -- if I give you the

10   case tomorrow, I'll let you deliberate until about 4:00 but not

11   beyond 4:00.  And then we'll adjourn by that time, and we'll

12   have you continue deliberations on Monday morning, if you're

13   still deliberating by that time.

14           So what I'd like to do is I'd like to see if there are

15   going to be any further witnesses; if not, go straight into

16   summations, give you the instructions and try to get you in the

17   jury room as early as possible so you have as much time

18   tomorrow to begin discussing the case.  So that's the way we

19   intend to proceed.

20           So don't discuss the case.  Keep an open mind until I

21   finally give the case to you.  I'll see you tomorrow morning at

22   9:30.  Have a nice day.

23           (In open court; jury not present)

24           THE COURT:  Before I talk about the jury instructions,

25   if you're going to make an application tonight for me to

1    reconsider, I'd like you to also consider whether or not this

2    may raise an issue with regard to the defendant's

3    Fifth Amendment privilege.

4         MS. GARNETT:  Yes, your Honor.  That's what I'm going

5    to address in a letter.

6         THE COURT:  So think about it.  Think about whether or

7    not -- you know, if this is an issue you want to interject into

8    this case, I have some real concerns about what it indicates in

9    terms of the jury taking this as a forced acknowledgment by the

10   defendant personally that he has no employees.  So think about

11   it.  If you think that it's important enough and the legal

12   grounds are solid enough to consider the issues you talk about

13   and that issue, you want to renew it, let me know tonight and

14   then I will reconsider it.  I don't want to surprise you with

15   that, but that's part of my concern.

16        MS. GARNETT:  No, Judge, I do understand that.  And if

17   we decide not to request reconsideration, we'll let your

18   chambers know that as well.  I just didn't want us to rest

19   until we had the opportunity to consider whether we wanted to

20   submit some further argument to your Honor.

21        MR. YANNELLA:  Judge, can I just say one thing.

22        THE COURT:  Yes.

23        MR. YANNELLA:  With respect to that, I don't think I

24   ever represented that I'm the attorney for MSM.  I was seated

25   next to my client about ten days ago, before we were going to

Ea2ecla6                    Renken - cross

1    be -- I think in the final pretrial conference on the Friday

2    before the Monday scheduled jury selection.  And I accepted a

3    subpoena to avoid an agent having to interact with my client.

4    So I just want to make that clear.  I represent only Messiah

5    Clark.

6              THE COURT:  No, I understand.

7              So this is what I'm going to do.  I'm not going to go

8    through each page.  The first part is the standard

9    instructions, most of it standard from Sand.  You can go

10   through that and tell me if you have any particular language or

11   corrections to be made, or if you see something in the

12   instruction that's not there that you think is appropriate for

13   this case that I have left out, you know, I'll consider it

14   either tonight -- if you want to, again, fax it to me, or

15   tomorrow morning I can add or delete something.

16             What I've done, if you look at -- there are a couple

17   of things that are in here that I didn't think at the time I

18   was working on it that there would be issues in this case.  So

19   they're really marked -- they're marked in the dark, I forget

20   what you call that.  If you go to page 24, for example,

21   impeachment by prior inconsistent statement, I'm not quite sure

22   that there was any impeachment by a prior statement.  So unless

23   you think of something that I don't have in mind, I'm probably

24   going to drop that.

25             The next page, failure to name a defendant, on the

Ea2ecla6                        Renken - cross

1    facts before this jury, I don't know who is possibly a

2    defendant that should have been named, so I am thinking about

3    dropping that.  If you think you can articulate why that is

4    relevant to this case, I'll leave it in.

5           Obviously cooperating witness testimony, there's no

6    cooperating witness in this case.

7           Then I will go to page 32, uncalled witnesses.  I

8    don't think that that's an issue at this point, unless

9    Mr. Yannella is going to argue in his summation that there are

10   ten more witnesses that we're missing that the government

11   should have called.  But we'll see -- I mean, if you think,

12   based on the arguments, that it should be in there, I'll put it

13   back in there.  I just don't want to use up a lot of time on

14   issues that are not before the jury.

15          The next page, use of evidence obtained pursuant to

16   search, there was no search.  So I'm going to take that out.

17          Go to 37, it depends on obviously 36 or 37.  If the

18   defendant does not testify, 36 will be the appropriate

19   instruction and 37 would be left out.  If defendant does

20   testify, then I'll use 37 instead.

21          I think, again, what I should point out, don't worry

22   about the headings.  I don't read headings.  That's just for us

23   to work on.  So it's going to read straight through without any

24   of the bolded headings.

25          I guess the only other thing I point out now, so you

1    can look it overnight, if you have anything you want to look at

2    overnight, you can fax it to me.  Otherwise, first thing in the

3    morning we can make the adjustments.  I think the substantive

4    instructions are pretty straightforward, close to, if not

5    exactly, what was requested, and/or Sand.

6            I gave you, which I don't have in front of me, I gave

7    you a verdict form which I'm looking at.  If you have some

8    suggestions on that, look that over.  Obviously I try to keep

9    it consistent with the indictment and distinguish it by the

10   nature of the claim, the nature of the charge and the time

11   period.  And it's in the order, obviously, Counts One through

12   Count Nine, in the order in which it's in the indictment.

13           It's usually not my practice to give them the

14   indictment or quote the indictment or send it in the jury room,

15   so I leave it up to the parties if they want to use the

16   indictment during summation or they want to just summarize it

17   or they want to read some portion of it, depending on what you

18   think is relevant.

19           So that's pretty much -- I'll work on trying to

20   finalize it as you're working on it tonight, too.  As I say,

21   let's meet at 9:20.  We'll finalize the jury instructions, see

22   if there are any more witnesses.  If there are no more

23   witnesses, then I'd like you, as soon as we get the jury, to

24   have summations and then charge them and try to get them in by

25   lunchtime.  And if there are other witnesses by the government

Ea2ecla6                     Renken – cross

1   or the defendants, we'll put those on.  Depending how long they

2   last, I mean, if they last hours, then we may put this off

3   until Monday.  If they last minutes, then we may still move

4   forward after we deal with that.  So I think we're prepared to

5   move forward tomorrow.

6           Is there anything else we need to address right now?

7   You look it over.

8           MS. GARNETT:  Nothing from the government tonight,

9   your Honor.  Thank you.

10          THE COURT:  Mr. Yannella?

11          MR. YANNELLA:  Nothing further, your Honor.

12          THE COURT:  Then I'll see you all tomorrow morning at

13  9:20.  Have a good evening.

14          (Adjourned to October 3, 2014, at 9:20 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION
2    Examination of:                          Page
3    ROBIN LAHIRI
4    Direct By Ms. Garnett . . . . . . . . . . . 166
5    Cross By Mr. Yannella . . . . . . . . . . . 182
6    Redirect By Ms. Garnett . . . . . . . . . . 190
7    RICHARD MINOTT
8    Direct By Ms. Cucinella . . . . . . . . . . 192
9    Cross By Mr. Yannella . . . . . . . . . . . 205
10   CARMEN LAJARA
11   Direct By Ms. Cucinella . . . . . . . . . . 211
12   Cross By Mr. Yannella . . . . . . . . . . . 214
13   JESSICA RIVERA
14   Direct By Ms. Cucinella . . . . . . . . . . 214
15   Cross By Mr. Yannella . . . . . . . . . . . 218
16   MARY RIVERSO
17   Direct By Ms. Cucinella . . . . . . . . . . 223
18   DULCE MARROQUIN
19   LISA GREEN
20   Direct By Ms. Cucinella . . . . . . . . . . 252
21   Cross By Mr. Yannella . . . . . . . . . . . 255
22   TYRONE HILL
23   Direct By Ms. Garnett . . . . . . . . . . . 256
24   Cross By Mr. Yannella . . . . . . . . . . . 268
25   JOHN KAPLAN
```

1    Direct By Ms. Cucinella . . . . . . . . . . 272

2    HERMINIA MORALES

3    Direct By Ms. Cucinella . . . . . . . . . . 289

4    Cross By Mr. Yannella . . . . . . . . . . 292

5    GLENN WOMACK

6    Direct By Ms. Cucinella . . . . . . . . . . 293

7    TERESA GARRIDO

8    Direct By Ms. Cucinella . . . . . . . . . . 299

9    ERIC TCHIAKPE

10    Direct By Ms. Cucinella . . . . . . . . . . 313

11    KEVIN SONG

12    Direct By Ms. Cucinella . . . . . . . . . . 327

13    Cross By Mr. Yannella . . . . . . . . . . 340

14    BARBARA RENKEN

15    Direct By Ms. Cucinella . . . . . . . . . . 346

16    Cross By Mr. Yannella . . . . . . . . . . .351.

17

18

19

20

21

22

23

24

25

```
 1                        GOVERNMENT EXHIBITS

 2      Exhibit No.                                      Received

 3      303  . . . . . . . . . . . . . . . . . . 167

 4      302  . . . . . . . . . . . . . . . . . . 174

 5      951, 952, 953 and 954  . . . . . . . . . . 197

 6      1507  . . . . . . . . . . . . . . . . . . 222

 7      400, 400A - 400D, 410, 410A - 410D, . . . . . 222

 8              415, 420, 420B, 420C, 430 and

 9              440

10      500, 510, 510A, 510B, 520 and 530  . . . . . 226

11      420A  . . . . . . . . . . . . . . . . . . 247

12      553  . . . . . . . . . . . . . . . . . . 254

13      600  . . . . . . . . . . . . . . . . . . 259

14      830, 831 and 832  . . . . . . . . . . . 268

15      601  . . . . . . . . . . . . . . . . . . 276

16      200 and 200A  . . . . . . . . . . . . . 303

17      210  . . . . . . . . . . . . . . . . . . 316

18      212  . . . . . . . . . . . . . . . . . . 324

19      211  . . . . . . . . . . . . . . . . . . 325

20      856  . . . . . . . . . . . . . . . . . . 331

21      850, 851, 852, 853 and 854  . . . . . . . . 334

22      813 through 819 and 828  . . . . . . . . 336

23      801, 802, 805, 806 and 812  . . . . . . . . 347

24

25
```