Ea3ecla1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          13 CR 420(GBD)

5   MESSIAH CLARK,

6              Defendant.

7   ------------------------------x

8
                                          October 3, 2014
9                                         9:27 a.m.

10
    Before:
11
                    HON. GEORGE B. DANIELS,
12
                                          District Judge
13

14                        APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  BROOKE CUCINELLA
17       MARGARET GARNETT
         Assistant United States Attorneys
18
    DONALD YANNELLA
19       Attorney for Defendant

20

21

22

23

24

25

Ea3ecla1

```
 1              (In open court; jury not present)
 2              MS. GARNETT:  Good morning, your Honor.
 3              Just as housekeeping, I'm going to handle the charge
 4    conference myself, so there's no need to wait for
 5    Ms. Cucinella.  As soon as Mr. Yannella arrives, we'll be ready
 6    to go.
 7              THE COURT:  Sure.  (Pause)
 8              Ms. Garnett, what's your intention?  Do you intend to
 9    present any further evidence?
10              MS. GARNETT:  Yes, Judge.  I mentioned this to your
11    Honor's law clerk last night so your Honor would be informed,
12    but we don't intend to call a witness.  We were able to reach
13    last night with Mr. Yannella a stipulation, a testimonial
14    stipulation about what an IRS witness would testify to
15    regarding corporate filings for MSM Tax Services.  So our
16    intention this morning is to read that stipulation and then
17    rest.
18              THE COURT:  Mr. Yannella, do you intend to call any
19    witnesses?
20              MR. YANNELLA:  No, your Honor.
21              THE COURT:  Then what I'll do is -- as a matter of
22    fact, we'll go ahead and -- I don't think we have all the
23    jurors here yet.  We'll go ahead and finish up the testimony --
24    you want to make a motion now, Mr. Yannella?
25              MR. YANNELLA:  Yes, your Honor.
```

Ea3ecla1

1          I make a motion at the close of the government's case

2     to dismiss the charges pursuant to Rule 29 on the grounds that

3     the government has not put forth a prima facie case

4     establishing all the elements of the nine different counts in

5     the indictment; the identity theft, the theft of federal funds

6     or submitting false claims.  They haven't proved that my client

7     is the one who committed those acts.

8          THE COURT:  Did you want to be heard?

9          MS. GARNETT:  Your Honor, we oppose the motion.  I'm

10    happy to say more, if your Honor needs me to, but I don't want

11    to waste time.

12         THE COURT:  Well, I'll consider the motion to have

13    been made at the close of the government's case and renew it

14    after defense rests.

15         I'm going to deny the motion.  I think that obviously

16    there's strong direct evidence that a crime was committed, and

17    I believe in this case strong circumstantial evidence that the

18    defendant was the one who committed this crime.  And at least

19    sufficient evidence for the jury, at least for the jury to

20    conclude that, given the nature of the crime and the use of

21    Mr. Clark's name and his home and other places and businesses,

22    there is strong circumstantial evidence that a reasonable jury

23    could conclude that Mr. Clark was the person who committed this

24    crime.  So I'm going to deny those motions.

25         Do you have anything on the charge, Ms. Garnett?

Ea3ecla1

1          MS. GARNETT:  I just have a couple of, I think, small

2     things, your Honor.

3          The first thing that I have is on page 43 of your

4     Honor's proposed charge.  On the venue section, we just would

5     ask that your Honor instruct them that on venue and venue alone

6     the standard is preponderance of the evidence.

7          THE COURT:  I usually avoid doing that because I don't

8     want to confuse the jury about two different standards, unless

9     there's a real genuine dispute about venue.  Since here in the

10    case it's clear that Manhattan, Bronx and -- which counties --

11         MS. GARNETT:  Orange County.

12         THE COURT:  Orange County, there's such strong

13    evidence that I don't really want to confuse them.  If you want

14    me to, I'll consider it, but --

15         MS. GARNETT:  No, Judge.  I think that's a fair point.

16    And I just wasn't sure whether that was a deliberate choice or

17    an oversight.  So we're fine with the charge as written.  I

18    just wanted to raise it in case it was an oversight by your

19    Honor.  I agree that venue is not really in dispute in the

20    case.

21         The second thing, your Honor, it's on page 48 of your

22    Honor's proposed charge, about excusing alternate jurors.  In

23    particular, because today is a Friday and they may not finish

24    deliberating today, we would ask that your Honor not discharge

25    the alternates -- send them home, of course, but ask them to

Ea3ecla1

1    not discuss the case until they've been notified by your

2    Honor's chambers that the case is resolved.

3         So we've had a number of criminal trials just in the

4    last month or so where we lost jurors during deliberations; a

5    case in front of Judge Forrest a couple of weeks ago and

6    another in front of Judge Engelmayer.  So I have a concern with

7    the weekend that we might need an alternate, if they don't

8    finish today.  So we just would ask that your Honor not

9    discharge them.  Send them home and ask them not to discuss the

10   case until they hear otherwise.

11        THE COURT:  Well, I don't keep them unless both sides

12   are going to agree that if we lose a juror during

13   deliberations, that we can substitute an alternate without the

14   defendant's agreement.  I don't think I have the authority to

15   do that.

16        MS. GARNETT:  Your Honor, I don't think that that is

17   accurate.  Again, we've just dealt with this issue a couple of

18   times within the last month.  It is entirely within your

19   Honor's discretion to substitute an alternate juror who has not

20   yet been discharged, even after deliberations have begun.  The

21   defendant's consent is not required.

22        THE COURT:  Mr. Yannella, what's your position?

23        MR. YANNELLA:  Judge, if we did lose a juror, I would

24   discuss it with my client and I'd be inclined probably to

25   substitute a juror.  But I should discuss that more fully with

Ea3ecla1

1  him before making that representation to the Court.  But I

2  would be inclined ahead of time to make that commitment.

3          THE COURT:  I understand your excess of caution, and I

4  even understood it with the four alternates, which I didn't

5  really agree that we needed four alternates, but you were more

6  comfortable with it.

7          But this is a case where if some juror gets sick on

8  Monday, they'll come back on Tuesday.  We'll take off Monday.

9  I've had 25 years on the bench, I've never had that problem.

10  But if you want me to keep them, quite frankly, I think it's a

11  little unfair to make all four of them stick around.

12          MS. GARNETT:  Your Honor, to be clear, they would be

13  free to leave and go back to their jobs.  So they just would

14  not be discharged from their oath as jurors; in other words,

15  they couldn't discuss the case or do research until a verdict

16  had been reached.

17          THE COURT:  Well, I'm not sure they would be free to

18  leave.  They'd have to be here on Monday.

19          MS. GARNETT:  Judge, in my experience, when this path

20  was followed, those jurors are free to go about their lives.

21  They don't have to come back unless the Court calls them back,

22  and then it would just be a small burden on your Honor's

23  chambers to notify those four alternates when a verdict was

24  reached that they at that point were discharged and could

25  discuss the case or do whatever they want to.

Ea3ecla1

1          THE COURT:  Let Mr. Yannella discuss that with his

2     client.  We'll discuss that before we send the jury out.  And

3     let me look at the rule and remind myself of it.

4          Anything else?

5          MS. GARNETT:  Yes, Judge.  The last point is an actual

6     legal point.

7          On pages two and three of your Honor's substantive

8     instructions, on the false claim charge, we had requested --

9     and I would renew that request -- that your Honor define for

10    them what claim means in the context of this statute.  We had

11    proposed language -- it's on page five of the government's

12    requests to charge -- that a claim is a demand for money or for

13    transfer of public property.  A presentation is made when a

14    fraudulent tax return is signed and filed, as well as when

15    refund checks obtained for fraudulent tax returns are deposited

16    or cashed.  And in your Honor's proposed charge, it doesn't

17    define what presented a claim means.  So we just would ask for

18    that further clarification.

19         THE COURT:  I don't have a strong feeling one way or

20    the other about that.  Quite frankly, it is beyond my

21    comprehension that the jury doesn't understand what claim we're

22    talking about.

23         MS. GARNETT:  Your Honor, I do agree that they know

24    what claim we're talking about.  I think that our concern is

25    really more about this presentation point, because I don't

Ea3ecla1

think it's obvious to a layperson or to the average juror that

you can present a claim within the meaning of the statute

either when the tax return is signed or filed or when you get

the refund check and you cash it or deposit it.  So we do think

that it's an important clarification.

MR. YANNELLA:  Judge, I don't think there's any danger

of that type of confusion.  I'm satisfied with the instruction

that your Honor has given them.

THE COURT:  Let me just look at -- what page were

you --

MS. GARNETT:  It's on page five.

THE COURT:  I have your page five, but where would you

want it?

MS. GARNETT:  So, your Honor, it would go at the top

of your page three, at the end of the description of what the

first element is.  So right after when you say "the defendant

knowingly made or presented a claim to the IRS," and then we

would just ask that you define claim and present it within the

meaning of the statute.

And that's all that I have, your Honor

THE COURT:  I'll probably give you some simple

language, but I just don't like the way the second sentence is

phrased.  And, quite frankly, we're talking about more than

refund checks.  So I think that --

MS. GARNETT:  That's fine, your Honor.  I think it's a

Ea3ecla1

1   relatively small point.  It just was --

2           THE COURT:  I don't think it really matters.  But if

3   you want it, I'll say a claim is a demand for money.  I don't

4   know if we have to say transfer of public property.

5           MS. GARNETT:  That's fine, Judge.

6           THE COURT:  And then it's presented when a fraudulent

7   return is signed and filed, as well as when --

8           MS. GARNETT:  And I think for the last, if we wanted

9   to simplify, we could say, as well as when any government money

10  is deposited or cashed.  And that would be fine with the

11  government.

12          THE COURT:  I'd rather not say anything, but I'd

13  rather just say that, as well as when a refund is obtained.

14          MS. GARNETT:  That's acceptable.  That's acceptable

15  also, your Honor.  Thank you.

16          THE COURT:  Then I'll give you that language.  I'll

17  write it out and give you that language.

18          Anything else from the government on the charge?

19          MS. GARNETT:  No, your Honor.  That was our last.

20          THE COURT:  Anything?

21          MR. YANNELLA:  Judge, I don't have any objections, but

22  the one thing I wanted to say is that I might comment on

23  witnesses not called.

24          THE COURT:  Okay.

25          MR. YANNELLA:  So I didn't think that should

Ea3ecla1

1    necessarily be removed.

2              THE COURT:  Okay.  So what page is that?  Uncalled

3    witnesses on page 33?

4              MR. YANNELLA:  Thirty-two.

5              THE COURT:  All right.  So you're going to raise that

6    issue, so I should leave that one in?

7              MR. YANNELLA:  Yes, your Honor.

8              THE COURT:  Okay.  I think all our jurors are here, so

9    let's bring them in.

10             I'll turn to the government.  The government can

11   present the rest of their evidence and then rest.  And I'll

12   turn to defense and ask whether or not you wish to call any

13   witnesses, and then you can rest and we'll go into the

14   summation.

15             Let's get the jury.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Ea3ecla1

1          (In open court; jury present)

2          THE COURT:  Ms. Garnett, anything further on behalf of

3    the government?

4          MS. GARNETT:  Yes, your Honor.  The government has one

5    additional stipulation to offer.

6          THE COURT:  Sure.

7          MS. GARNETT:  This stipulation is marked for

8    identification as Government Exhibit 1508.

9          It is hereby stipulated and agreed, by and among the

10   United States of America, by Preet Bharara, United States

11   Attorney for the Southern District of New York, Brooke E.

12   Cucinella and Margaret Garnett, Assistant United States

13   Attorneys of counsel, and Messiah Clark, the defendant, by and

14   with the consent of his attorney, Donald Yannella, Esquire,

15   that, if called to testify, Dennis Laffin, an analyst at the

16   Internal Revenue Service, would testify as follows:  One,

17   employer identification number, or EIN, 26-3003212 is

18   registered to MSM Tax Services, Incorporated.  EIN 45-4513764

19   is registered to MSM Tax Prep and Accounting, Incorporated.

20         Two, IRS form 1120 is the US corporation income tax

21   return.  The IRS requires that any US corporation other than

22   nonprofit entities registered under Section 501 to file form

23   1120 each tax year, whether or not they have taxable income.  A

24   search of the IRS internal databases for each year from 2007

25   through 2013 found no record of any form 1120 filings for

Ea3ecla1

1    either EIN 26-3003212 or EIN 45-4513764.

2            Three, IRS form 940 is the employer's annual federal

3    unemployment tax return.  The IRS requires that any employer

4    who paid wages of $1,500 or more to employees in any calendar

5    quarter of the year or who had one or more employees for at

6    least some part of 20 weeks in the year file a form 940 each

7    year.  A search of the IRS internal databases for each year

8    from 2007 through 2013 found no record of any form 940 filings

9    for EIN 26-3003212 or EIN 45-4513764.

10           Four, IRS form 941 is the employer's quarterly federal

11   tax return.  The IRS requires that all employers file form 941

12   quarterly to report wages they paid employees and various tax

13   payments withheld from those wages.  Only seasonal employers

14   who pay no wages in any given calendar quarter, employers of

15   household employees and employers of farm employees are exempt

16   from filing form 941.  A search of the IRS internal databases

17   for each year from 2007 through 2013 found no record of any

18   form 941 filings for EIN 26-30303212 or EIN 45-4518764.

19           It is further stipulated that this stipulation may be

20   received in evidence as a government exhibit at the trial at

21   the above referenced matter.  It's dated today, October 3,

22   2014, signed by me on behalf of the United States Attorney and

23   Mr. Yannella on behalf of Mr. Clark.

24           Your Honor, at this time we offer Government

25   Exhibit 1508.

Ea3ecla1

```
1              THE COURT:  Any objection?

2              MR. YANNELLA:  No, your Honor.

3              THE COURT:  It will be admitted into evidence.

4              (Government's Exhibit 1508 received in evidence)

5              MS. GARNETT:  The government rests.

6              THE COURT:  Mr. Yannella, do you wish to call any

7    witnesses on behalf of the defendant?

8              MR. YANNELLA:  No, your Honor.

9              THE COURT:  Defense rests?

10             MR. YANNELLA:  Defense rests.

11             THE COURT:  Ladies and gentlemen, both sides have

12   rested.  Now we're going to move straight into the summations

13   or closing arguments of the lawyers.

14             Did you have something else?

15             MS. GARNETT:  If we could have just one moment, your

16   Honor.  (Pause)

17             We're ready to proceed, your Honor.

18             THE COURT:  Ladies and gentlemen, as I said, we're

19   going to have the summations or closing arguments of the

20   lawyers.  Then I'm going to instruct you on the law and send

21   you in to begin your deliberations.

22             Let me just remind you of two things before we begin.

23   What the lawyers say is not evidence, and it is your

24   recollection of the testimony that controls.  So with those two

25   reminders, we'll first start with the closing argument for the
```

Ea3ecla1

1    government by Ms. Cucinella.

2         MS. CUCINELLA:  Messiah Clark has stolen hundreds of

3    thousands of dollars from the United States Treasury.  He did

4    it by filing hundreds of fraudulent tax returns, by creating

5    fake W-2s and stealing the refunds issued by the government.

6    He did it by preying upon some of the most vulnerable members

7    of our society.  He took advantage of people that he knew no

8    one was looking out for, and he did it out of nothing more than

9    greed, pure and simple.

10        Because of what he did, Messiah Clark is charged in a

11   nine-count indictment, three counts of defrauding the federal

12   government with respect to claims, three counts of theft of

13   federal government funds and three counts of identity theft.

14   One in each type of charge for each of the three tax fraud

15   schemes he committed in 2008, 2011 and 2013.  After the closing

16   statements Judge Daniels will instruct you on the law.  And

17   what Judge Daniels says controls.

18        But, in brief, I expect that he will tell you that to

19   find the defendant guilty on the fraudulent claims counts, you

20   must find that the defendant made a false, fictitious or

21   fraudulent claim or a demand for money to the IRS, which is a

22   department or agency of the United States.

23        To find the defendant guilty on the theft of

24   government funds counts, you must find the defendant

25   intentionally stole more than $1,000 of money that belonged to

Ea3ecla1                    Ms. Cucinella - summation

1    the United States government.

2            Finally, to find the defendant guilty of the identity

3    theft counts, you must find that the defendant unlawfully

4    transferred, possessed or used a means of identification which

5    can include the name, Social Security number or date of birth

6    of another person in connection with the theft of government

7    funds.

8            Judge Daniels will, of course, provide you with more

9    detailed instructions on each of these charges.

10           Now, anyone who sat through this trial knows that it

11   can't be seriously disputed that these identities were stolen

12   and that the tax returns were fraudulent, and those refunds and

13   stimulus checks that were sent out by the government, that they

14   were not actually owed.  There's no real question of that.  No

15   one here seriously thinks that Juana Cardona or Thomas

16   Rodriguez filed those tax returns or that they authorized

17   Messiah Clark or anyone else to file those returns in their

18   names.  That didn't happen.

19           And while it is true that you didn't hear from every

20   individual in whose name or whose Social Security number was

21   stolen and used to file a tax return, you heard from a number

22   of them.  And you saw their reactions on that witness stand.

23   You heard Glenn Womack say that he recognized the defendant as

24   someone who had worked on the transport staff at the nursing

25   home where he has lived since 2007.  And you watched as

Ea3ecla1                    Ms. Cucinella - summation

1    Mr. Womack looked directly at Messiah Clark and testified that

2    he never authorized that man to file a tax return in his name.

3            There can be no suggestion that they were in on the

4    scheme or in some way complicit.  Indeed, there is no question

5    that the opposite is true.

6            And that brings us to the only real dispute in this

7    case:  Whether Messiah Clark is the person who did these

8    things.

9            We told you at the beginning of this case, way back on

10   Tuesday, 24 witnesses ago, that by the end of this trial, if

11   you listened to the evidence and used your common sense, you

12   would see that that evidence shows that the defendant is guilty

13   of every single one of the counts with which he is charged, and

14   that there is no doubt that it was Messiah Clark who

15   perpetrated this fraud.  This wasn't a long trial, so I'm not

16   going to spend too long up here talking to you.  But I want to

17   focus the time that I do spend on walking you through exactly

18   how all of the testimony and all of the documents that you saw

19   proved conclusively that Messiah Clark is the man who stole

20   those identities, who filed those tax returns, who took that

21   money.

22           I'm going to talk to you about how you know that

23   Messiah Clark is guilty.  Let's start with 2008, which relates

24   to Counts Four, Five and Six of the indictment.  First, how do

25   we know that it was Messiah Clark who filed those returns?

Ea3ecla1                      Ms. Cucinella - summation

1        Let's look at what Messiah Clark was doing in 2008.

2   He was working at Coler-Goldwater as a community assistant, and

3   he was making somewhere between 11 and $17 an hour.  You heard

4   Howard Kritz testify that there were no issues with his

5   performance on the job.  Exhibit 100 tells you that he and his

6   wife had just purchased a new home on Story Avenue and that

7   they were carrying a $335,000 mortgage.  Messiah Clark went to

8   work every day, he earned his hourly wage, and he wanted more.

9        Who did Clark see on a daily basis?  Who was right in

10  front of him?  You know who.  Albert Regan, Glenn Womack.

11  Messiah Clark saw people like Glenn Womack at work every day.

12  But instead of viewing Mr. Womack as a person or an individual,

13  he saw him as an opportunity.  He saw dollar signs.  He knew

14  that the people at Coler-Goldwater weren't working.  He knew

15  that those patients weren't filing tax returns.

16       You heard Richard Minott testify that the majority of

17  the people on the 2008 list provided to him by the IRS, the

18  people in whose name 2007 tax returns had been filed, were

19  patients at Coler-Goldwater.  Almost everyone on that list was

20  confirmed as a patient, and almost everyone on that list was

21  confirmed as a patient at some hospital within the New York

22  City Health and Hospitals network.

23       And you saw with your own eyes how each of those

24  victim witnesses reacted to seeing their names and Social

25  Security numbers and their birth dates on a tax return that

Ea3ecla1                    Ms. Cucinella - summation

1    they didn't create, a document they never saw until someone

2    from the government knocked on their front doors.

3            You also saw right in front of you in this courtroom

4    what all of these victims had in common:  Some sort of

5    vulnerability; whether a physical disability, their age, or in

6    the case of Carmen Lajara, the inability to read.  The victims

7    here were all people who were unlikely to be monitoring their

8    credit or engaging in activities where this crime would come to

9    light.  This was no coincidence.  This was by design.  And this

10   is one of the ways that you know that Messiah Clark was the one

11   who filed these tax returns.  He knew these people were sick,

12   disabled, retired.  He knew they weren't filing tax returns.

13   And he knew he could steal their names.  He believed he could

14   get away with it.

15           How else do you know that it was Messiah Clark that

16   filed those tax returns?  You know because the scheme in 2008

17   lacked what we'll call creativity.  First, it lacked creativity

18   with respect to the addresses he used.  Of the 113 tax returns

19   filed in connection with the 2008 scheme, 77 of those

20   individuals supposedly lived at 2018 Story Avenue.

21           You know from Government Exhibit 801 and Exhibit 100A

22   that 2018 Story Avenue is a single-family dwelling.  And it

23   wasn't just any single-family dwelling; it was the one that

24   Messiah Clark lived in with his wife.  You know that from

25   Messiah Clark's driver's license and from his car insurance.

1    That was his home.  And it was also supposedly the place out of

2    which MSM Tax Services was run.  There is no doubt that Messiah

3    Clark is inextricably intertwined with 2018 Story Avenue.  He

4    used his own address on 77 of the returns in 2008.

5        What other addresses were used in connection with the

6    2008 scheme?  758 Dumont Avenue.  According to the returns

7    filed in 2008, 31 of those people supposedly lived at this

8    address in this building.

9        What else was supposedly happening at this address?

10   AJA Tax Services was purportedly being run out of there.  Where

11   else did we see AJA Tax Services?  On the checks in Messiah

12   Clark's personal account.  Many checks made out to MSM Tax

13   Services, Messiah Clark's fake company, and to Lamont Kemp,

14   Messiah Clark's fake name.  Lamont is Clark's middle name.  And

15   where did the Kemp come from?  Remember his passport

16   application?  It was his father's last name.  The checks were

17   also made out to Messiah Clark himself.  There is no question

18   that Messiah Clark was connected to 758 Dumont Avenue.

19       Another address you see in connection with the 2008

20   scheme, 1368 Metropolitan Avenue, apartment 5D, another address

21   connected to Messiah Clark.  How do you know?  Remember the

22   driver's license that he showed to Tyrone Hill at the Bentley

23   dealership?  1368 Metropolitan Avenue, apartment 5D.  He also

24   listed it on an application for health benefits while he was

25   working at Coler-Goldwater.  This was before he and Ms. Vaughan

Ea3ecla1                          Ms. Cucinella - summation

1    had their child in late 2005, the child whose first initial

2    starts with M, the final M in MSM Tax Services; messiah,

3    Shavanda, and M for the child.  So Messiah Clark didn't get

4    real creative with the addresses in 2008.

5            What else didn't he get creative with?  The W-2s.

6    Ninety-five of the one hundred thirteen tax returns he filed

7    claimed that the filers worked for New York City Health and

8    Hospitals Corporations.  You heard Nancy Doyle tell you that

9    none of those people actually ever worked for New York City

10   Health and Hospitals Corporation.  It was made up.  Why?

11   Because it was easy.  He knew what the W-2 forms from New York

12   City Health and Hospitals Corporations looked like because he

13   had been receiving them for the past eight years.  And

14   importantly, he also already had access to the employer

15   identification number, those EINs that you keep seeing.  He had

16   access to that number because it was on his W-2, the legitimate

17   W-2s that he received in connection with his work as a

18   community assistant.  It was clean.  It was simple.  And it's a

19   dead giveaway.

20           What are the other companies used in that 2008 scheme?

21   Two pharmaceutical companies, UPS, and of course, AJA Tax

22   Services.  Nor was there any creativity that involved how the

23   defendant received the funds in 2008.  Seventy-two of the

24   checks were, of course, mailed directly to 2018 Story Avenue.

25           Do we know exactly how Messiah Clark got his hands on

Ea3ecla1                    Ms. Cucinella - summation

1    the checks that weren't sent to 2018 Story Avenue?  We don't.

2    But there is no question that he got his hands on them.  You

3    can see it in the TD Bank records, the documents in Government

4    Exhibit 410B.  These checks were deposited directly into the

5    MSM bank account.  Indeed, there were a total of 127 treasury

6    checks deposited into that account, 113 stimulus checks and 14

7    actual refund checks, all caused to be sent out by the IRS by

8    those fraudulent tax returns.  The checks ranged in amount from

9    approximately $300 to $43,000.  They totaled approximately

10   $127,000.  And they all went directly into the MSM bank

11   account, and then into Messiah Clark's pocket.

12        How do we know the money made its way to Messiah

13   Clark's pockets and not to someone else's?  You saw the checks

14   that went straight from the MSM bank account to the mortgage

15   company.  Ms. Riverso testified that there were four of them,

16   straight out of that MSM business account.  And you saw in

17   Exhibit 101 that Messiah Clark paid off the mortgage at 2018

18   Story Avenue in 2009.  You can also see in Exhibit 101A that

19   after paying off that mortgage, Clark almost immediately

20   transfers that property into his wife's name, his name no

21   longer on the deed.

22        You also saw and heard from Tyrone Hill, who showed

23   you the Bentley that Messiah Clark bought in 2010.  He bought

24   it with a certified check, which Mr. Hill told you was as good

25   as cash.

Ea3ecla1                        Ms. Cucinella - summation

1              And you heard from John Kaplan.  He told you about how

2      the defendant turned in his $13,000 Toyota, along with $48,000

3      in actual cash, actual dollar bills, which he paid directly to

4      John Kaplan.  You watched as Mr. Kaplan sat on that witness

5      stand and pointed out Mr. Clark.  He told you that it was

6      Mr. Clark who was the man who handed him that bag of cash so he

7      could drive that Range Rover off the lot.  A Toyota to a Range

8      Rover and $140,000 Bentley?  That's quite an upgrade for

9      someone who's earning less than $20,000 a year for the ten

10     years leading up to those purchases.

11             And it helps tell you what you need to know.  There is

12     no question that the defendant is the one who filed those tax

13     returns and caused those economic stimulus checks and those

14     refund checks to be sent.  There is no question that those

15     checks were deposited directly into the bank account at TD

16     beginning in 2008 and throughout 2009 and '10, a bank account

17     for which Messiah Clark was the only signatory.  And there is

18     no question that Messiah Clark is the one who took that money

19     and spent it.  He stole that money.  He is the thief.  He is

20     the fraud.

21             So what happened next?  Messiah Clark is living it up,

22     no mortgage, driving his Bentley, paying his bills, writing

23     $9,000 checks to Shavanda Vaughan with the memo, "to my wife,

24     enjoy."  In May of 2010 he quits his job at Coler-Goldwater and

25     he's got time on his hands, time to get creative; savvy, even.

1          You saw the charts that Richard Minott put in evidence

2     showing that while almost all of the identities the defendant

3     used to file the 2008 returns were patients at Coler-Goldwater,

4     the facility at which Mr. Clark worked, Clark branched out for

5     the 2011 scheme.  He got his hands on patient lists for other

6     hospitals.  But they were all hospitals within the New York

7     City Health and Hospitals network.  He was expanding his

8     horizons, growing more sophisticated, branching out.

9          How else was Clark getting more sophisticated?  You'll

10    recall Robin Lahiri, the man who testified about

11    FEINsearch.com.  He told you that Messiah Clark first bought a

12    subscription to FEINsearch in February of 2009 and that he kept

13    renewing it and using that subscription right up through March

14    of 2013.

15         Let's talk for a minute about exactly what FEINsearch

16    is and why it's important to this case.  Robin Lahiri told you

17    that FEINsearch is a web-based database full of information

18    about thousands of American companies, and that the purpose of

19    FEINsearch is to help legitimate companies comply with the law

20    by verifying the EINs of the companies they're doing business

21    with; those employment identification numbers.  But you know

22    that that's not what Messiah Clark was doing on FEINsearch.

23         First, how do you know that the person behind the MSM

24    tax at FEINsearch is really Messiah Clark and not some

25    imposter?  Well, you know that the person who registered for

Ea3ecla1                          Ms. Cucinella - summation

1    this membership gave the name Messiah Clark and said he was the

2    owner of MSM Tax Services, located at 2018 Story Avenue;

3    Messiah Clark's home.  He gives msmtaxservices@yahoo.com as his

4    e-mail address, and we know that that e-mail address is linked

5    directly back to Messiah Clark.  And he pays for the

6    subscriptions using two credit cards in Messiah Clark's name,

7    one of which is clearly a debit card because in the records of

8    Messiah Clark's account at Sovereign Bank, which is Government

9    Exhibit 430, there is an entry for a payment of $479 just after

10   March 19, 2012, and an entry for another payment of $479.52 to

11   FEINsearch on March 19, 2013, which matches right up with the

12   FEINsearch records of Messiah Clark's membership activity.

13          And you know that when one of Robin Lahiri's customer

14   service representatives spoke to Messiah Clark in March of 2012

15   to verify that $479 purchase, she was fully satisfied that the

16   person she spoke with was Messiah Clark.  She was satisfied

17   that everything matched up.

18          MR. YANNELLA:  Objection.  Not in evidence.

19          THE COURT:  Overruled.

20          MS. CUCINELLA:  So what was Messiah Clark, the Messiah

21   Clark who's sitting right here before you, doing with his

22   FEINsearch subscription?  Well, you know that he was maxing out

23   his EIN searches.  He used every single search that his paid

24   subscription allowed.

25          Why was he doing those searches?  So that he could use

1    real EINs of real companies to make fake W-2s; to document

2    fictitious income and to support the refunds he was claiming on

3    tax returns filed in the names of other people.

4            And the information in those searches is telling.  His

5    very first search upon joining the service in 2009, his very

6    first search is for AJA Tax Services, the company he claimed

7    five of the 2008 scheme victims worked at and to which he is

8    connected to and a bunch of other ways, as you saw earlier.  He

9    does the search and he gets no results.  He runs a check on the

10   EIN number that he used for AJA Tax Services on those 2008

11   returns.  That EIN number that he puts in is the same number

12   that was on those 2008 tax returns.  And he also gets no

13   results.  Messiah Clark is verifying that AJA Tax Services is

14   still a fake company.  In 2011 he resubscribes on

15   February 28th.  And again, the first thing he does is run a

16   search for AJA Tax Services and a reverse search for the EIN

17   number and, again, gets no results.

18           Then a month later he logs back in, on March 31, 2011,

19   and he runs multiple searches for Exxon and Exxon Mobil,

20   finally settling on a search for Exxon Mobil in Texas, the

21   exact company and the exact location that he uses for almost

22   all of the fake W-2s attached to the fraudulent tax returns he

23   files in 2011, Exxon Mobil in Irving, Texas.

24           What's the other company that the rest of the

25   fraudulent taxpayers supposedly worked for in the 2011 scheme?

Ea3ecla1                    Ms. Cucinella - summation

1    Pepsi-Cola Bottling Company, in Albuquerque, New Mexico.  Where

2    do we see a search for that EIN?  In Messiah Clark's FEINsearch

3    records on July 21, 2011 at 7:41 p.m.

4              There's other important information in the defendant's

5    FEINsearch records.  Remember how Robin Lahiri told you that

6    the FEINsearch billing record shows the IP address from where

7    the order originated?  Take a look at the IP address from where

8    Clark's March 19th order was placed.  Where else have we seen

9    that IP address?  Government Exhibit 551.  That spreadsheet

10    shows you all the things that the returns filed in 2011 had in

11    common, along with the IP addresses.  Whoever filed all of

12    those returns requested that they all be sent to the same bank.

13              Excuse me.  Looking back at the IP addresses, sorry,

14    Ms. Chen, it if you could put that back up.  The spreadsheet

15    tells you that the IP address from which this FEINsearch order

16    originated is the same IP address where all of those 2011 tax

17    returns were filed from.  They match.  Who was sitting behind

18    the computer filing tax return after tax return in 2011?  The

19    same guy who placed that order in 2012:  Messiah Clark.

20              Now, how else do we know that Messiah Clark filed

21    those tax returns?  Let's look back at Government Exhibit 551.

22    This time we'll look at the routing numbers.  Whoever filed all

23    of those tax returns requested that they be sent to the same

24    bank.  That's what this routing number represents.  And where

25    were those refunds sent?  You know where they were sent.  To

Ea3ecla1                       Ms. Cucinella - summation

1    TFG.

2              Teresa Garrido testified that MSM tax had an account

3    with them.  Lamont Kemp was listed as the owner.  Where did

4    Lamont Kemp and MSM supposedly function out of?  You know

5    where; everyone knows where:  2018 Story Avenue.  Ms. Garrido

6    told you that the MSM account at TFG had received 121 deposits,

7    worth approximately $430,000 before access was restricted, as

8    Ms. Garrido described it.  How much of that $400,000 was

9    accessed before that access was cut off?  Approximately

10   $330,000.

11             And where had those TFG cards been sent?  To the owner

12   of MSM Tax Services.  Note the phone number that he lists.

13   That is the very same phone number that is listed on Messiah

14   Lamont Clark's passport application.  Messiah Clark and Lamont

15   Kemp are the same person.  Where did those cards go?  To

16   Messiah Clark at 2018 Story Avenue.

17             Now, could Ms. Garrido tell you that Messiah Clark is

18   the one who received those cards?  No.  Is it possible that

19   someone stole them out of the mail?  It's possible.  It's also

20   possible that one of you is going to win the lottery tonight,

21   and it's possible that I'm going to be appointed the next

22   Attorney General.  It's possible.  It's not very likely.  And

23   more importantly, there is absolutely no proof in this record

24   that something like that happened.  What is there proof of?

25   Messiah Clark with access to a whole lot of cash.

1          Let's start with Government Exhibit 420A.  Who is this

2     a picture of?  If you remember Government Exhibit 420A, it was

3     a picture of the defendant, that man, at a bank.  He was

4     depositing $5,000 in cash to the Bank of America in

5     Parkchester.  He was doing it at 10:36 a.m. on October 20,

6     2014.  You saw the deposit ticket, and you know it matches up

7     directly with the time stamp on that picture.  Where did

8     Messiah Clark get that $5,000 in cash?  You know where he got

9     that:  From cashing in a TFG cards.

10          What else is there proof of?  During this period the

11     defendant was buying a new house, a brand new construction

12     condo for $270,000.  Government Exhibit 110A reflects some of

13     the documents relating to that purchase.  It details the

14     finishes that Clark and his wife were requesting, the

15     appliances that they wanted put into that condo.  It also shows

16     that Clark received a discount because the home he bought in

17     the spring of 2012 was bought with all cash.  Clark reported no

18     income for 2011.  His wife reported approximately $30,000.  And

19     they bought a home in all cash?

20          There is no doubt that Messiah Clark is the one who

21     stole this money.  There is no doubt that he is the one who

22     filed those tax returns in 2011 using the Social Security

23     numbers, the birth dates and the names of real people.  And

24     there is no doubt that he is guilty of Counts Seven, Eight And

25     Nine of the indictment.

Ea3ecla1                    Ms. Cucinella - summation

1          Ladies and gentlemen, you also know that Messiah Clark

2     did it again in 2013.  You know it was Messiah Clark, the real

3     Messiah Clark, because the scheme had the same more

4     sophisticated pattern that we saw in 2011.  For example, you

5     saw the 2013 searches Messiah Clark conducted on FEINsearch and

6     you saw the patient list from New York City Health and

7     Hospitals.

8          You also heard from Georgia Hooks, who you will see,

9     if you examine that chart, was never treated at any of the

10    hospitals in the New York City Health and Hospitals network.

11    Where was she treated at?  The Bridge, a not-for-profit

12    organization that provides services to the homeless and those

13    suffering from mental illness.  Indeed, Messiah Clark stole the

14    identities of six people who were clients at The Bridge and

15    actively receiving their services, the same facility where

16    Clark's wife worked.  Do we know how Clark got that

17    information?  No.  What do we know?  Clark was no longer

18    working at New York City Health and Hospitals Corporations.  He

19    was branching out.

20         How else do we know that it was Messiah Clark who

21    filed those tax returns in 2013?  The IP address.  Just like in

22    2011, they were all filed from the same IP address.  Where does

23    that IP address go back to?  Remember Theron Stubbs, the man

24    who testified from Time Warner Cable?  He had a band-aid on his

25    mouth when he was testifying.  He told you exactly where those

Ea3ecla1                          Ms. Cucinella - summation

1    IP addresses went back to:  A modem that was located inside

2    Messiah Clark's brand new home at 1604 Hawthorne Way in New

3    Windsor, New York, in Orange County, New York, which Judge

4    Daniels will instruct you is in the Southern District of

5    New York.

6              For 2011 we don't have the benefit of records that can

7    tell us exactly where that IP address was assigned to.  We just

8    know that they match, which in and of itself is enough to tell

9    you that Clark filed those returns.  But in 2013 we have the

10   actual address of the home from where those returns were sent

11   to the IRS.  Where?  The same home Messiah Clark paid $270,000

12   in cash for, and the same home at which Messiah Clark was

13   arrested in May of 2013 early in the morning, a few months

14   after those tax returns had been filed.

15             You also know that it was Messiah Clark who filed

16   those returns in 2013 because, again, he continued his pattern.

17   He continues to branch out and he gets more creative with the

18   companies his taxpayers supposedly work at, from Altru Health

19   System, Baker Hughes Oil Field Operations, Bayer Corporation to

20   Regeneron Pharmaceuticals.  And every single one of them

21   matches up with the EIN searches that Messiah Clark did using

22   his subscription at FEINsearch.

23             (Continued on next page)

24

25

1          Every single one of them matches up except for MSM Tax

2     Services.  Remember hearing from Georgia Hooks, who told you

3     that she never worked at a company called MSM Tax and

4     Preparation Services?  That was the company that appeared on

5     the W-2 filed in her name.  Why didn't Clark have to look that

6     EIN up on FEIN Search?  Because he already knew it because it

7     was his fake company.

8          And just to address this for a moment -- it's a point

9     I don't think we need to spend much time on -- but how do you

10    know that MSM was a fake company?  You heard the stipulation

11    that was read earlier today just before the government rested.

12    You know that MSM never filed corporate tax returns; they never

13    filed any of the documentation to report employees or payroll

14    to the IRS.  Why not?  Because it wasn't a real company; it was

15    a front for Messiah Clark's scheme, nothing more.

16         Finally, how do you know that Messiah Clark got the

17    money from the tax returns that he filed in 2013?  You heard

18    from Eric Tchiakpe at Motivano, who testified that Messiah

19    Clark filled out an application for payroll cards, payroll

20    cards for those fake employees, and you saw the incorporation

21    records and the voided check that he sent to Motivano in

22    connection with that application.  That was in 2012.  You heard

23    Mr. Tchiakpe tell you that those cards were sent out to 2018

24    Story Avenue.  And the records in Government Exhibit 440 show

25    you that they were loaded with tax refunds from the U.S.

EA37CLA2                    Summation - Ms. Cucinella

1    Treasury.

2              Now, how do you know that it was Messiah Clark that

3    was accessing those cards?  Look at where they were used.  You

4    learned from Investigator Song that until the end of 2012,

5    while Messiah Clark was living at 2018 Story Avenue in the

6    Bronx, the cards were accessed at ATMs in the Bronx.  But then

7    in 2013 the cards were being accessed in and around New

8    Windsor, New York, at ATMs within a five mile radius from

9    Messiah Clark's new house.  Why?  You know exactly why.

10   Because Messiah Clark had moved; he moved from the Bronx to New

11   Windsor, New York.

12             You also know that those cards weren't being used for

13   payroll.  How do you know that?  First, that stipulation.  You

14   know that MSM Tax Services never reported paying any employees

15   on any payroll.  Why?  It wasn't a real company.

16             How else do you know that it was Messiah Clark

17   standing at the ATM making withdrawal after withdrawal?  Look

18   at the patterns of how they were used.  The way that these

19   cards are used is consistent with one person being in

20   possession of multiple cards.

21             Investigator Song walked you through Government

22   Exhibit 856, and you saw those patterns:  Multiple cards being

23   used at one location, back-to-back cash withdrawals, day after

24   day at ATMs right down the street from each other, hundreds of

25   dollars each time.

1          How much did Messiah Clark get from this scheme?  The

2    records show that he was able to access approximately $44,000

3    before he was arrested in May of 2013.

4          There is no question that Messiah Clark is guilty of

5    Counts One, Two and Three as charged in the indictment.

6          Messiah Clark's scheme evolved from what was almost a

7    careless plan, in which he deposited treasury checks directly

8    into his bank account; it evolved into a more sophisticated

9    scheme using third-party debit cards and ATM machines.  But the

10   defining characteristics, the hallmarks of the fraud remained

11   the same:  He stole the identities of our society's most

12   vulnerable members.  He created fake W-2 forms using the

13   companies he looked up at FEIN Search.  And he tried to dress

14   up the receipt of the money by hiding first behind a fake

15   business's bank account and then fake payroll cards for fake

16   employees at a fake company.  And then once he got the money,

17   he spent it in cash.

18         Ladies and gentlemen, there are a lot of pieces to put

19   together here to form one picture, but when you consider all

20   those pieces, when you look at the full picture, you will

21   know -- you already do know -- that Messiah Clark is guilty of

22   all the charges in this case.  Thank you.

23         THE COURT:  Mr. Yannella?

24         MR. YANNELLA:  Yes, your Honor.

25         Good morning.  We first met on Tuesday morning.  It

EA37CLA2                    Summation - Mr. Yannella

1    has been a long three days.  We all worked very hard, whether

2    we were talking, or whether you were sitting there trying to

3    pay attention to all of this evidence.  We didn't have many

4    breaks; we worked from early in the morning to late in the

5    afternoon.

6           There is one thing I think I can agree with the

7    government on here, and it's that we all owe you a debt of

8    gratitude for sitting through this and trying to pay attention.

9    We pulled you away from your families and your professional

10   lives.  It hasn't been an easy task, but it's not supposed to

11   be an easy task.  What you are doing here is very serious.  You

12   are being asked to pass judgment on, to render a verdict

13   against an individual who is charged with very serious crimes.

14          So, we thank you for the effort you have made so far,

15   but it is an effort that really hasn't begun in earnest yet,

16   because soon the case will be yours, and that's when the

17   responsibility really shifts to you.

18          On Tuesday, when I made my opening statement, I said I

19   would only be here defending Mr. Clark for the charges in the

20   indictment.  Now, Mr. Clark and I do not have to defend his

21   lifestyle, we do not have to defend the type of cars he may

22   have driven, we only have to defend the nine charges in the

23   indictment.  He pleaded not guilty to those charges, and that's

24   all we intend to defend.

25          Now, there is going to come a point when the lawyers

1    here after making our closing arguments will sit down, and that

2    will be a moment where your job will begin.  At that point

3    Judge Daniels will instruct you on the law, but you are the

4    exclusive judges of the facts.  It is your province, your

5    responsibility, to make a fair and responsible judgment of what

6    the facts are in the case.

7         The other side of the coin is that Judge Daniels is

8    the one who is going to give you the law.  Once you have that

9    law, you will be the ones who will apply the law exclusively to

10   the facts as you determine them.

11        Now, keep in mind there are multiple counts in the

12   indictment, and you are going to have to return a different

13   verdict for each and every count.  You are going to have to

14   pass judgment, guilty or not guilty, separately on each count.

15        Now, what occurred here?  I will submit to you that

16   what the government proved is that a fraud did occur, but they

17   haven't proved that Messiah Clark is the individual who

18   committed that fraud.

19        Now, I think you heard from 11 of the victims, and

20   it's obvious to everybody here that the people who testified

21   did not authorize anybody to file tax returns on their behalf,

22   and they did not obtain the refunds or the benefits.  I think

23   only 11 of them testified.  We didn't hear from the vast

24   majority, so we can't say for sure with respect to those

25   people.  This is another case where the government is asking

EA37CLA2                      Summation - Mr. Yannella

1   you to assume that the other victims would have been similar to

2   the 11 who testified here.

3          But what don't we have?  Nobody -- nobody -- came in

4   here and testified that they saw Messiah Clark file a tax

5   return, whether fraudulent or not.  Nobody saw Messiah Clark

6   create a W-2, the employer's statement of wages, whether

7   fraudulent or not.  Nobody came in here and testified that they

8   saw Messiah Clark steal a Social Security number, obtain a list

9   of names or dates of birth.  Nobody came in here to testify

10  that they saw Messiah Clark access the database at the New York

11  City Health and Hospitals Corporation of the patients.  And

12  that list would have contained names and dates of birth.

13         No cooperators testified.  So often you have other

14  people involved in the crime who get up on the witness stand

15  and say, yes, I did it with Messiah Clark, or I did it with

16  whoever is on trial.  That didn't happen here.

17         No one said they saw him going to ATMs.  No one said

18  he tried to bribe them.  No one said he tried to buy a list of

19  names or dates of birth.  No one said they saw him filling out

20  tax returns.

21         There is no undercover work here.  The government

22  doesn't send an undercover officer back in 2008, when they have

23  77 returns filed using the address of 2018 Story Avenue.  Some

24  of those refunds are paid, some are not.  At that point does an

25  undercover go to 2018 Story Avenue back in 2008?  Do some

EA37CLA2                    Summation - Mr. Yannella

1    investigation?  See who's there?  See who's committing this

2    fraud?  Try to gain evidence?  Try and wear a wire?  Take some

3    photographs, surveillance photographs back then?  No, it

4    doesn't occur.

5           Now, another type of evidence we have:  There is no

6    ledger seized from Messiah Clark.  We know from Special Agent

7    Barbara Renken, who was present there for the arrest, that they

8    went to his home, he was there with his wife very early in the

9    morning, they arrested him in May of 2013.  But they don't

10   seize any proof.  Nothing is seized from his car.  No blank

11   returns are seized.  No copies of filled-out returns are

12   seized.  No ledgers, no names.  The evidence here is

13   insufficient to prove that he is the one who committed this

14   crime.

15          Now, of course, as you heard from the prosecutor,

16   Judge Daniels is the one who is going to instruct you on the

17   law, but there is one thing that all of these counts have in

18   common:  They have to prove that Messiah Clark knowingly --

19   that he is the one who committed the crime.  Whether it's

20   making false claims, they are going to have to present evidence

21   and prove beyond a reasonable doubt that he is the one who made

22   or presented the claim.  For the theft of government funds,

23   they are going to have to prove that he is the one who stole

24   the property.  And for the identity theft, they are going to

25   have to prove that Messiah Clark is the individual who

EA37CLA2                    Summation - Mr. Yannella

1    transferred, possessed or used a means of identification.

2              Now, let's go through some of the evidence.

3    Mr. Crowley testified from the IRS.  And the IRS's failures

4    were on display here, shockingly on display.  They receive

5    returns, and they send a check out in about two weeks, two to

6    four weeks, sometimes sooner, without verifying that the W-2

7    information for the employer is accurate.  They don't verify

8    that the address that they're sending the refund to is

9    accurate.  They don't verify that the bank account, or the

10   account number, or the routing number is accurate if they're

11   going to be sending out the refund electronically as opposed to

12   by mail.  They don't verify the IP address.  And they don't do

13   anything to shut this fraud down in 2008, 2011, 2012.  It's not

14   until May of 2013 that an arrest of Messiah Clark finally

15   occurs.

16             Mr. Crowley testified that there are two types of

17   returns:  Paper and electronic.  If it's paper, it's just

18   mailed in.  If it's electronic, it's either made by a preparer

19   who has access to electronically filing returns with the IRS,

20   or through some type of commercial software.

21             When a person files a return electronically -- and you

22   heard this from Mr. Crowley -- the person makes up the PIN

23   number.  There is no way of knowing whether any other people

24   use that PIN number.  So, when a PIN number is used, and the

25   same PIN number is used on more than one return, we don't know

EA37CLA2                    Summation - Mr. Yannella

1    if one person filed all of those returns; we don't know if

2    multiple people did it.  There is no way of proving who

3    actually filed the returns.  You have an IP address, but the

4    IRS can't track who is filing the return just because there is

5    an IP address.  They can just tell that the return came from

6    some IP address.  There could be any computer or device

7    connected.

8         We heard from some of the victims:  Juana Cardona,

9    Carmen Lajara, Jessica Rivera.  I think these are all elderly

10   people.  Your verdict can't be based on sympathy for them; it

11   can't be based on feeling sorry for them; it can't be based on

12   a notion that someone took advantage of them.  Now, none of

13   those individuals ever went to Kohler Goldwater, and although

14   some of these people had returns filed in their names

15   unbeknownst to them as far as back as 2008, nobody contacted

16   them until 2014.  One common question for every witness was

17   when were you first contacted?  Two weeks ago.  One week ago.

18        Now, the government wants you to infer or to assume

19   that Messiah Clark's employment at the New York City Health and

20   Hospitals Corporation is proof that he somehow had access to

21   Social Security numbers, dates of birth or identities, the fact

22   that he was once employed there for 11 years.

23        Now, there is no proof of when these names, dates of

24   birth, Social Security numbers were compromised.  There is no

25   proof of when they were stolen.  There is no proof of where it

EA37CLA2                    Summation - Mr. Yannella

occurred.  For example, we had a victim named Santiago,

Mr. Santiago, who lost his wallet back in 2011 with his Social

Security number.  He reported it to the police.  I asked him

when were you first contacted.  In 2014, September of 2014.

There is no proof that Kohler Goldwater Hospital is

where the databases were compromised.  Listen to the list of

hospitals.  I am not going to read that entire list again, but

you heard all 22 read off, and it took over a minute, almost a

couple of minutes to read that.  Now, the people -- as the

government has shown you through 11 of the victims -- did tend

to be either elderly or disabled in some way, but under those

circumstances is it any surprise whatsoever that they were once

patients at the New York City Health and Hospitals Corporation?

If you're elderly, if you are disabled, if you have medical

problems, then certainly it's not surprising that you'd go to

the New York City hospitals.  It's probably about the same

percentage of people who would ride the subway.  So, there is

no really significant connection simply because Messiah Clark

worked for ten or 11 years at Kohler Goldwater Hospital.

They have brought evidence that Ms. Hooks had been The

Bridge.  That doesn't prove anything.  Again, it's assumptions

that that's somehow significant and ties her to Messiah Clark.

Now, what the prosecutor says is the evidence is not

what the evidence is necessarily.  An example of that was you

heard the prosecutor today testify that 2018 Story Avenue is a

EA37CLA2                    Summation - Mr. Yannella

1    single-family dwelling, a single-family residence.  Well, the

2    witnesses didn't testify to that.  An investigator who took the

3    photograph of that address was asked by the prosecutor is it a

4    single-family dwelling, and she said you can't tell.  So, what

5    the government says the evidence will be is not necessarily

6    what it is.

7            Another example of that is MSM.  They're asking you to

8    speculate that those initials correspond to my client's family

9    members.  They don't know that.

10           We had Mr. Minott testify from the New York City

11   Health and Hospitals Corporation.  Now, the purpose of his

12   testimony was that he was given a list of people and asked if

13   they were patients at the hospital.  And some of them were.

14   Now, the prosecutor said that he said the majority of those

15   people were from Kohler Goldwater.  He didn't say that.  That's

16   the prosecutor's argument, and that was the prosecutor's

17   question.  He hadn't really compared it.

18           He also -- and this came out in cross-examination --

19   pointed out that many of these patients were seen at Lincoln,

20   Bellevue, Coney Island, Gouverneur, all types of hospitals.

21           Now, one significant thing about Mr. Minott's

22   testimony was that he said my client as a community assistant

23   would not have had access to the database of dates of birth and

24   Social Security numbers.  He said that someone who drives

25   patients around from one building to the next or one hospital

EA37CLA2                        Summation - Mr. Yannella

1    to the next wouldn't need and wouldn't be given access to those

2    computers.  It's not sufficient to prove that these identities

3    were compromised or that the database from New York City Health

4    and Hospitals was somehow compromised.  They have to prove that

5    Messiah Clark was involved in that.

6           What do we know about his employment there from 1999

7    until 2010?  We know from Mr. Kritz, who is from the human

8    resources department, that he worked there for 11 years.  There

9    were no records of any complaints.  11 years he worked there;

10   no performance concerns whatsoever.  179-page file, no

11   performance concerns whatsoever.

12          Mr. Kritz also testified that -- now he is the human

13   resources person.  They are trying to prove that he accessed

14   the Social Security numbers and dates of birth.  He had no

15   information whatsoever about whether Messiah Clark would have

16   been given a user name and a password for those computers.

17          Now, we already know from the other witness that a

18   person at his level wouldn't have that.  And the director of

19   human resources had no information whatsoever tending to

20   suggest that my client had a user name or password to access

21   the database.

22          Mr. Stubbs, a very important witness who was from Time

23   Warner Cable, and he was the director of security.  Well, he is

24   the one who talked about modems and IP addresses.  He told us

25   that just because you have an IP address, the IP address is

1    assigned to the modem that Time Warner Cable or Comcast or

2    Verizon puts into your home.  It's only assigned to that main

3    device that's in your home.  There could be all types of

4    devices that connect to it:  It could be your smart phone in

5    your pocket, it would be a computer, it could be a tablet, it

6    could be someone in your house, it could be the downstairs

7    neighbor, it could be the upstairs neighbor, it could be the

8    nextdoor neighbor.

9             Now, you saw pictures of these residences.  This is

10   not somewhere out in the suburbs where homes are far from each

11   other.  All the homes are packed together.  Mr. Stubbs

12   testified that the fire wall could be turned or off.  You can't

13   tell if one person or multiple people are accessing the router.

14   If you share the user name and password of the router one time,

15   then anyone in the future can use that same user name and

16   password to access it again.

17            Mr. Lahiri testified.  He was from the FEIN Search

18   company.  It's a four person company with over 500,000

19   customers, and they are the ones who troll the databases of

20   local, state and federal agencies looking for Social Security

21   numbers or EIN numbers to post on the Internet for a fee.  This

22   witness couldn't answer a simple question.  When I asked him if

23   he could verify whether or not his subscribers shared their

24   user name and password, he couldn't answer the question.  He

25   kept on saying, well, the subscriber agreement prohibits from

EA37CLA2                    Summation - Mr. Yannella

doing that.  OK, fine, the agreement says that.  But did your

500,000 customers comply with that?  He wouldn't answer a

simple question.  And I think that suggests he was concerned

about protecting the integrity of his own business.  He says

this is a business-to-business service.  He doesn't know who

his customers are; he doesn't know verification.  As long as he

gets a bank account document, or a certificate of

incorporation, he is willing to sell these very important

numbers on the Internet for a fee.

So, I would suggest to you that he is a man who has

something to hide, or is concerned about the integrity of his

business, a man who does zero background check on the people he

is selling this information to.  He admitted that he didn't

know if one of his four employees, Juliann, spoke to a male or

female.  The notes gave no indication of who she had spoken to.

But then he changed his testimony and said his notes contained

things that were not in the written notes.  He didn't know the

password for the FEIN Search customer, because the customer

assigns the password.  He didn't know how many people had used

that password and those log-in credentials.  He didn't know if

it was one person, multiple people, if it was shared.  And he

had no interaction whatsoever with Messiah Clark.

We had a witness from Bank of America, Dulce

Marroquin.  Through her they put up the photograph from October

20, 2011.  It was a picture at a bank branch.  It's Messiah

EA37CLA2                    Summation - Mr. Yannella

1    Clark at a bank branch.  Is it a crime to go to a bank branch

2    to do a cash transaction?  No, it is not, not unless you are

3    doing some other type of crime with it.  Messiah Clark on that

4    day did not wear a hat, he did not wear sunglasses, he didn't

5    send someone else to do the transaction for him.  There was

6    nothing criminal there.

7           We had two witnesses who testified from the card

8    companies:  Theresa Garrido from TFG Card Solutions, and

9    Mr. Tchiakpe from Motivano.  They both testified that they are

10   companies that offer cards which you can use to pay your

11   employees who don't have bank accounts.  But once they mail

12   those cards out, they have no idea what happened to them.  They

13   don't know who received the cards.  They don't know if the

14   cards reached their intended destination.  They don't know what

15   happened to the cards once they were there, who they

16   distributed them to, who activated the cards.  They don't keep

17   track of where the money is sent.  Well, how could you track

18   that?

19          Well, could we put Government Exhibit 817 on the

20   board, please.  Thank you.

21          This is a Chase Bank machine from Newburgh, New York;

22   it's Government Exhibit 817.  It's up on the board.  And what

23   does it have?  If you look at it, in the upper right-hand

24   corner there is a camera which takes a picture of the person

25   who is accessing the ATM machine.  Now, you know the timing of

EA37CLA2                    Summation – Mr. Yannella

the arrest. We heard it through Special Agent Barbara Renken

that my client was arrested in May of 2013. Now, that's only

two months after these records we have of people going into

these very ATM machines. There is another one. There was one

from a Citizens Bank, it's Government Exhibit 814. We don't

need to put that on the board. I think there is yet a third

one. All the ATMs have cameras.

        Well, Kevin Song -- who I believe is an investigator

from the U.S. Attorney's office -- did he go up there back in

May of 2013 and get the pictures from the bank of who had just

accessed the ATM machines in connection with this case? No.

When was he asked to go up there? Two weeks ago. Once he went

up there he spent a lot of time taking pictures, doing Google

maps, showing what is in proximity to what. Did he go into one

bank and say, hey, I've got this big stack of transactions on a

stack of paper; can you give me pictures from your ATM

machines? Can you tell me whether you have pictures of Messiah

Clark going up there with these cards? He didn't even ask the

banks for the pictures. They have pictures of license plates

of cars that go through drive-through tellers.

        Now, I'm close to sitting down here, but I just want

to remind you at the end of the case, the time is coming when

the case is going to be yours to make these very important

decisions. Now, this is a criminal case, it's not a civil

case. This is not about money, it's not some kind of civil

EA37CLA2                     Summation - Mr. Yannella

 1  case.  This is a criminal case, so it's different from those

 2  civil cases.

 3          In a criminal case we have constitutional rights

 4  involved.  Messiah Clark has a constitutional right to remain

 5  silent, and Judge Daniels is going to tell you that you can't

 6  infer anything from the fact that he didn't testify.

 7          In a criminal case, under our United States

 8  Constitution the proof and the burden of proof is on the

 9  prosecutors, and that burden is proved beyond a reasonable

10  doubt.  So this is not a 50/50 thing, if there is smoke then

11  there must be fire, if we think maybe he did it, then we can

12  say guilty.  They have to prove beyond a reasonable doubt all

13  the elements of the crimes.

14          Now, we have three different time periods here.  We

15  have something back in 2008 approximately, around 2011 and into

16  2013.  There are three different time periods.  For each

17  different time period there are three different counts:

18  Identity theft, theft of funds and making false claims.  You

19  have to judge each of those individually.

20          Messiah Clark didn't have any burden when we walked in

21  here on Tuesday morning to prove that he is innocent, and we

22  haven't attempted to do that.  If I had to prove that he was

23  innocent, this would have been a different type of trial, but

24  under our criminal system those are the rules.  We are entitled

25  to rely on you to accept the rules and the law as Judge Daniels

1    gives it to you more fully quite soon.

2            After you get the case, you are going to go in the

3    back; you are going to start talking to each other; you are

4    going to each individually have your own opinion of what the

5    evidence is.  Now, sometimes when you talk to other people you

6    are assuming everyone else is going to see it your way.  If

7    other people don't see it your way, then talk to them, discuss

8    it with them, exchange ideas, tell them why you see it one way

9    and ask why they see it a different way.

10            But one thing I would urge you is if you have a strong

11    judgment in your own heart and in your mind that the government

12    did not prove the case beyond a reasonable doubt, if other

13    jurors can convince you otherwise, then change your verdict.

14    But don't compromise your verdict just to be in agreement with

15    other people.

16            If it turns out one way or the other that you are in

17    the minority, don't surrender your opinion just to get out of

18    the unpleasant duty of being a juror and sticking up for what

19    your opinion is.

20            So, be courteous tour fellow jurors, listen to them,

21    discuss it with them, but whatever your verdict is in your

22    heart and mind, stick with it.

23            And I am going to ask you to return the only verdict

24    that is justified under these circumstances, which is not

25    guilty.  Thank you.

EA37CLA2                    Summation – Mr. Yannella

1          THE COURT:  Ms. Cucinella?

2          MS. CUCINELLA:  Your Honor, we have a brief rebuttal,

3     but may we have just a five minute break beforehand?

4          THE COURT:  Sure.

5          Ladies and gentlemen, I am going to give you a ten

6     minute break.  Don't discuss the case.  Keep an open mind until

7     I finally give the case to you.  Why don't you be back in the

8     jury room in ten minutes and we will continue.

9          (Jury not present)

10         THE COURT:  OK, take ten minutes.

11         MS. CUCINELLA:  Thank you.

12         (Recess)

13         THE COURT:  One quick thing before they come in.  You

14    know, I can't in good conscience keep these four jurors around.

15    This is not a case that -- given the length of the case and the

16    nature of the case, I just don't think it's fair to make them

17    stick around.  I would rather take my chances, as they say.

18    And as opposed to some other case where we have been on trial

19    for three months or something, maybe there would be a danger,

20    but I have never had a problem, and I don't anticipate we will

21    have a problem here.

22         MS. GARNETT:  I understand your decision, Judge.

23         THE COURT:  Let's hope I'm proven right.

24         MS. GARNETT:  I hope so too.

25         (Jury present)

1              THE COURT:  Ms. Cucinella.

2              MS. CUCINELLA:  This is not a whodunnit.  It's not an

3     Agatha Christie novel.  We do not need Sherlock Holmes or Nancy

4     Drew to get to the bottom of what happened here.  There is no

5     real mystery about who filed these tax returns or who stole

6     this money.

7              I'm not going to be able to respond to all of

8     Mr. Yannella's points, and quite frankly I don't want to waste

9     your time.  I know that you are eager to get to the case and to

10    start deliberating.  I am just going to respond to a few of the

11    most important points and then rely on all of you and the close

12    attention that I know you have been paying throughout this

13    trial.  There are some cases that are close; this is not one of

14    them.

15             Now, I want to be absolutely clear that the defendant

16    doesn't have to say or do anything at this trial, but when

17    defense counsel chooses to address you and to make arguments

18    through jury addresses and the cross-examination of witnesses,

19    you can and should examine those arguments with the critical

20    eye just like you would any other aspect of this case.

21             It has been suggested that you should have some doubt

22    about whether it was Messiah Clark who committed this crime

23    because there is no surveillance footage from the banks where

24    he accessed the ATMs, and no cooperating witness, no

25    cooperating witness who testified that he helped Mr. Clark

EA37CLA2                        Rebuttal - Ms. Cucinella

commit these crimes.  We of course showed you the picture of

the defendant in the Parkchester Bank of America in 2011.  I

talked about it in my closing.  Do you remember that?  Where

the defendant was depositing $5,000 in cash at a bank counter

at 10:36 in the morning.  But it's true, that's the only actual

picture that we have of the defendant committing the crime.  Do

we wish we had more pictures?  Of course.  Do you need them in

order to find Mr. Clark guilty as charged?  Of course not.

Imagine you are at work and you have put your lunch, a

peanut butter and jelly sandwich, in the refrigerator in the

kitchen.  You go back to the desk and you can see the door to

the kitchen, not inside, just the door.  If you saw a man walk

into the kitchen, stay in the kitchen for five minutes and then

walk out with peanut butter and jelly all over his face, peanut

butter breath and a jelly stain on his shirt, and your sandwich

is gone, would you need a camera to tell you who ate your

sandwich?  No.  Do you need a cooperator, someone who held the

door to the refrigerator open, or watched look-out, to testify

and tell you who ate your sandwich?  No.  You know exactly who

eight your sandwich.  It was the man with the peanut butter all

over his face.  Even without a picture, there is no doubt, and

that's because everything adds up, everything makes sense.

Who is the man with the peanut butter all over his

face here?  Messiah Clark, the man with the Bentley, with the

Range Rover, the homes, the cash, the fake business, the FEIN

Searches.  Everything Messiah Clark did, all the steps that he
took, they all add up, and they tell you exactly what you need
to know:  That Messiah Clark is guilty of this crime.

        We don't have to show you that Messiah Clark is the
one who stole those patient identities from New York City
Health and Hospitals Corporation.  As Judge Daniels will tell
you, to prove that Messiah Clark is guilty of the three counts
of identity theft, what we have to prove is that Messiah Clark
possessed or used those identities, names, or Social Security
numbers, or birth dates, in connection with the theft of
government funds.  And you know that the proof is overwhelming
that Messiah Clark did that again and again and again.

        There has also been some suggestion that because
Mr. Clark's crimes weren't discovered earlier, because the IRS
doesn't take some steps to verify the identities on those
returns, and because Messiah Clark seemed to have gotten away
with the scheme for a few years, that it's not a real crime.
That too is a ridiculous argument.

        Suppose you go into a bodega and the store owner isn't
there, she has gone in back for whatever reason, but her brand
new iPhone is sitting on the counter.  Someone can't come in
and take it along with some candy and some lottery tickets
simply because the owner wasn't watching.  Was it a good idea
for her to go in back and leave her iPhone out and her store
unattended?  No, it wasn't very smart.  But it doesn't make it

1    any less criminal for someone to steal that iPhone or to take

2    that merchandise.

3           You are still guilty even if no one is looking.  If

4    you stole the merchandise, you are guilty, no matter that you

5    didn't get caught at the time.  Did Messiah Clark get caught

6    right away?  Obviously not.  Would it have been better if the

7    IRS had caught Messiah Clark earlier?  Of course.  Does it make

8    him any less guilty?  Of course not.  He knew he was getting

9    away with it.  It's why he kept changing the scheme.  He was

10   refining, switching from TFG to Motivano, changing the EINs he

11   was using, buying the bulk package from FEIN Search.  He was

12   getting better at it.  Thankfully IRS did catch up with him.

13          It has also been suggested that you should seriously

14   consider the fact that we don't know whether Clark's Internet

15   access at 1604 Hawthorn Way was protected, that you can't

16   possibly know whether someone hacked into his wireless access

17   and filed those tax returns.  Ladies and gentlemen, this is

18   absurd.  Let's look at what that argument actually suggests,

19   what you would have to believe in order for that theory to even

20   be possible.

21          You'd have to believe that a person essentially hiding

22   in the bushes outside of Messiah Clark's brand new condo was

23   hacking into his Internet and filing tax returns, and not only

24   did that individual manage to find Messiah Clark's unprotected

25   wireless network at his home in New Windsor, he followed him

EA37CLA2                    Rebuttal - Ms. Cucinella

1    there from the Bronx, because that's where that person had

2    filed all those tax returns in 2008 and 2011.  Perhaps he had

3    been hiding in the giant carport out in front of 2018 Story

4    Avenue, or under the Bentley that was likely parked in that

5    carport.

6          You know that this is absurd.  You know that there was

7    no man in the bushes and that it wasn't his upstairs neighbor

8    or his downstairs neighbor.  It was Messiah Clark that filed

9    those tax returns.  There is not a shred of evidence in this

10   record to suggest that it was anyone other than Messiah Clark.

11   Messiah Clark stole those identities, and he used them to file

12   false tax returns, and he pocketed the money.

13         There has also been some suggestion that this is a

14   victimless crime, that nobody cares if this money went missing,

15   no harm, no foul.  Don't let the defendant get away with that.

16   It is wrong, and you must reject it.  Messiah Clark stole half

17   a million dollars, and he tried to steal over double that from

18   the United States Treasury.  That's money that belongs to every

19   American.  It's not Messiah Clark's for the taking.

20         And, ladies and gentlemen, I submit to you that it is

21   unfair and inaccurate to claim that the individuals whose

22   identities were stolen were not in some way affected by this

23   crime.  You met a small subset of those victims.  Again, you

24   saw right in front of you in this courtroom what those

25   individuals have in common.  Many of them are fragile; they

EA37CLA2                     Rebuttal - Ms. Cucinella

1    don't have the capacity that they once had to protect

2    themselves.  The vast majority of the victims were patients at

3    hospitals, making little to no income.  All of them were

4    vulnerable.  And Messiah Clark took their names, he used them,

5    he profited from them.  I don't think that if you ask Glenn

6    Womack how he felt about his name being used that he would say

7    it doesn't matter.  It does matter, and it's not OK.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ea3ecla3                    Ms. Cucinella - rebuttal

1          MS. CUCINELLA:  Mr. Yannella argued that we only

2     called eleven victim witnesses.  It is not our job to present

3     or call every possible witness.  You know that in this case

4     that would mean hundreds of witnesses.  Counting the victims

5     whose returns were filed and the people whose names were used

6     on those third-party debit cards, we'd all be here for weeks.

7     We'd be here as hundreds of elderly, sick or disabled witnesses

8     were being brought down to court.

9          But that's not what is required or what would be a

10     sensible use of our time.  What is required is that we call

11     enough witnesses and put on enough proof to convince you beyond

12     a reasonable doubt that this defendant is guilty of the charges

13     in this case.  And I submit to you that we have done that.

14          Now, finally, defense counsel has talked about

15     reasonable doubt and the questions in this case.  Are there

16     unanswered questions here?  Of course there are.  Do those

17     questions matter?  Not at all.  I submit to you that if you

18     believe Messiah Clark stole Georgia Hooks' identity; if you

19     believe she never worked for MSM tax prep and accounting

20     services, and that it was Messiah Clark who filed that tax

21     return and pocketed that cash, that he is guilty of Counts One,

22     Two and Three of the indictment.

23          I submit to you that if you believe that Messiah Clark

24     took Glenn Womack's identity, that Mr. Womack never worked at

25     New York City Health and Hospitals Corporation; that Messiah

Clark filed a false tax return in his name and stole that
money, that he is guilty of the crimes charged in Counts Four,
Five and Six of the indictment.

          I submit to you that if you believe that Messiah Clark
stole Herminia Morales' name, lied about her working at Exxon
Mobil, filed a fraudulent tax return in her name and stole that
money, that he is guilty of Counts Seven, Eight and Nine.

          Ladies and gentlemen, I'm about to sit down.  On
behalf of the United States Attorney's Office, I'd like to
thank you for your willingness to serve on this jury, for the
seriousness with which you've undertaken this duty and for your
close attention throughout this trial.

          Next you'll receive Judge Daniels' instructions on the
law and your most important work will begin.  We trust that
when you've heard what the law is and you apply it to the
overwhelming evidence in this case, you will return the only
just and true verdict:  That Messiah Clark is guilty of each
count in the indictment.@

          THE COURT:  Now, ladies and gentlemen, you're about to
enter your final duty, which is to decide the fact issues in
the case.  Before you do that, I would instruct you on the law.
You must pay close attention to me now.  I will go slowly as I
can and be as clear as possible.

          Now, I told you at the start of the trial that your
principal function during the taking of testimony would be to

1    listen carefully and observe each witness who testified.  It

2    has been obvious to me and to counsel that you've faithfully

3    discharged this duty.  It is evident that you have followed the

4    testimony with close attention.  I ask you to give me that same

5    careful attention as I instruct you on the law.

6          Now, you've now heard all of the evidence in the case,

7    as well as the final arguments of the lawyers for the parties.

8    My duty at this point, as I said, is to instruct you as to the

9    law.  It is your duty to accept these instructions of law and

10   apply them to the facts as you determine them, just as it's

11   been my duty to preside over the trial and decide what

12   testimony and evidence is relevant under the law for your

13   consideration.  These legal matters, you must take the law as I

14   give it to you.  If any attorney has stated a legal principle

15   different from any that I state to you in my instructions, it

16   is my instructions you must follow.  You should not single out

17   any instruction as alone stating the law, but you should

18   consider my instructions as a whole when you retire to

19   deliberate in the jury room.

20         You should not, any of you, be concerned about the

21   wisdom of any rule that I state.  Regardless of any opinion you

22   may have as to what the law may be or ought to be, it would

23   violate your sworn duty to base a verdict on any other view of

24   the law than that which I give you.

25         Now, your final role is to pass upon and decide the

1    fact issues that are in the case.  You, the members of the

2    jury, are the sole and exclusive judges of the facts.  You pass

3    upon the weight of the evidence.  You determine the credibility

4    of the witnesses.  You resolve such conflicts as there may be

5    in the testimony, and you draw whatever reasonable inferences

6    you decide to draw from the facts as you have determined them.

7         Now, I shall later discuss with you how to pass upon

8    the credibility or believability of the witnesses.

9         In determining the facts you must rely upon your own

10    recollection of the evidence.  Again, what the lawyers have

11    said in their opening statements and their closing arguments

12    and their objections or in their questions is not evidence.  In

13    this connection you should bear in mind that, as I said, a

14    question put to a witness is not evidence.  It is only the

15    answer to the question which is evidence.  You may not consider

16    any answer that I directed you to disregard or that I had

17    directed struck from the record.  Do not consider such answers.

18         Nor is anything I may have said during the trial or

19    may say to you during these instructions to be taken in

20    substitution for your own independent recollection of the

21    evidence.  What I say is not evidence.  Anything you may have

22    seen or heard about this case outside of this courtroom is not

23    evidence and must be entirely disregarded.

24         Now, the evidence before you consists of the answers

25    given by the witnesses, the sworn testimony they gave as you

1    recall it and the exhibits that were received in evidence, plus

2    any stipulations of the parties.  Again, a stipulation is an

3    agreement among the parties that a certain fact is true or

4    that, if a witness were called, the witness would give certain

5    testimony.  You should regard such agreed-upon facts as true or

6    accept that the witness would have given such testimony.

7              Now, exhibits which have been marked for

8    identification but not received in evidence may not be

9    considered by you as evidence.  Only those exhibits admitted

10   into evidence may be reviewed by you in the jury room.

11             Now, anything you may have seen or heard about this

12   case outside the courtroom is not evidence and must be totally

13   disregarded.  Since you are the sole and exclusive judges of

14   the facts, I do not mean to indicate any opinion as to the

15   facts or to what your verdict should be.  The rulings I have

16   made during the trial are not any indication of my views of

17   what your decision should be as to whether or not the guilt of

18   the defendant has been proven beyond a reasonable doubt.  You

19   are expressly to understand that the Court has no opinion as to

20   the verdict you should render in this case.

21             As to the facts, ladies and gentlemen, again, you are

22   the exclusive judges.  You are to perform the duty of finding

23   the facts without bias or prejudice to any party.  You should

24   consider the evidence in light of your common sense and

25   experience and you may draw reasonable inferences from the

1    evidence.

2            Now, again, at times a lawyer may have incorporated

3    into a question a statement which assumes certain facts to be

4    true and ask the witness if the statement was true.  If the

5    witness denies the truth of a statement, and if there's no

6    evidence in the record proving that the assumed fact is true,

7    then you may not consider the fact to be true simply because it

8    was contained in the lawyer's question.  For example, if a

9    witness was asked a question, "is your automobile red," you

10   would not be permitted to consider as true the assumed fact

11   that the witness owns an automobile, unless the witness

12   indicates that he or she does own an automobile or unless

13   there's some other evidence in the record that the witness owns

14   an automobile.  In short, questions are not evidence.  It is

15   the answer, coupled with the question, that constitutes

16   evidence.

17           Now, it is the duty of the attorney for each side of

18   the case to object when the other side offers testimony or

19   other evidence which the attorney believes is not properly

20   admissible.  Counsel also have the right and duty to ask the

21   Court to make rulings of law and request conferences at the

22   side bar out of the hearing of the jury.  All of those

23   questions of law must be decided by me, the Court.  You should

24   not show any prejudice against an attorney or a party because

25   the party's attorney objected to the admissibility of evidence

1    or asked for a conference out of the hearing of the jury or

2    asked the Court for a ruling on the law.  As I already

3    indicated, my rulings on the admissibility of evidence do not

4    indicate any opinion about the weight or effect of such

5    evidence.  You are the sole judges of the credibility of all

6    witnesses and the weight and effect of all evidence.

7          Now, in determining the facts, the jury is reminded

8    that before each member was accepted and sworn to act as a

9    juror, he or she was asked questions concerning competency,

10   qualifications, fairness and freedom from prejudice or bias.

11   On the faith of those answers, the juror was accepted by the

12   parties.  Therefore, those answers are as binding on each of

13   the jurors now as they were then and should remain so until the

14   jury is discharged from consideration of this case.

15         Now, your verdict must be based solely upon the

16   evidence developed at trial or lack of evidence.  It would be

17   improper for you to consider in reaching your decision whether

18   the government sustained its burden of proof any personal

19   feelings you may have about the defendant's race, religion,

20   national origin, sex or age.  All persons are entitled to

21   presumption of innocence, and the government has the burden of

22   proof, as I will discuss in a moment.  It would be equally

23   improper for you to allow any feelings you might have about the

24   nature of the crimes charged to interfere with your

25   decision-making process.  To repeat, your verdict must be based

exclusively upon the evidence or lack of evidence in the case.

Now, under your oath as jurors you're not to be swayed by sympathy. You are to be guided solely by the evidence in this case. And the crucial hardcore question that you must ask yourselves as you sift through the evidence is: Has the government proven the guilt of the defendant beyond a reasonable doubt? That is for you alone to decide whether the government has proven that the defendant is guilty of the crimes charged solely on the basis of the evidence and subject to the law as I charge you. It must be clear to you that once you let fear or prejudice or bias or sympathy interfere with your thinking, there's a risk that you will not arrive at a true and just verdict.

Now, if you have a reasonable doubt as to the defendant's guilt, you should not hesitate for any reason to find a verdict of not guilty. But on the other hand, if you should find that the government has met its burden of proving the defendant's guilt beyond a reasonable doubt, you should not hesitate because of sympathy or any other reason to render a verdict of guilty.

And I again remind you, as I did when you were originally questioned as potential jurors, that the question of possible punishment of the defendant is of no concern to the jury and should not in any sense enter into or influence your deliberations. The duty to determine what is a reasonable

1    sentence in any particular case rests exclusively upon the

2    Court.  Your function is to weigh the evidence in the case and

3    to determine whether or not the defendant is guilty beyond a

4    reasonable doubt solely on the basis of such evidence.  Under

5    your oath as jurors, you cannot allow consideration of the

6    possible punishment which may be imposed upon the defendant if

7    he is convicted to influence your verdict in any way or in any

8    sense enter into your deliberations.

9            Now, you are to perform the duty of finding the facts

10   without bias or prejudice to either side.  You are to perform

11   your final duty in an attitude of complete fairness and

12   impartiality.  The case is important to the United States

13   Attorney's Office and it is important to the defendant.  And

14   the fact that the prosecution is brought in the name of the

15   United States of America entitles the government to no greater

16   consideration than that accorded to any other party to a

17   litigation.  By the same token, it is entitled to no less

18   consideration.  All parties, whether the government or

19   individuals, stand as equals at the bar of justice.

20           Now, there are two types of evidence which you may

21   properly use in deciding whether the defendant has been proven

22   guilty.  One type of evidence is called direct evidence.  Now,

23   direct evidence is where a witness testifies to what he or she

24   saw, heard or observed.  Now, in other words, when a witness

25   testifies about what is known to him or her of his own or her

own knowledge by virtue of his or her own senses, what he or she sees, feels, touches or hears, that is called direct evidence.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts. Now, there's a simple example of circumstantial evidence which is often used in this court. Assume that when you came into the courthouse this morning the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not look outside. As you were sitting here, someone walked in with an umbrella, which was dripping wet, and someone else then walked in with a raincoat that was also dripping wet.

Now, you cannot look outside of the courtroom and you cannot see whether or not it's raining, so you have no direct evidence of that fact. But on the combination of facts that I have just given you, it would be reasonable or logical for you to conclude that it had been raining. That is all there is to circumstantial evidence. You infer on the basis of reason and experience and common sense, from one or more established facts, the existence or the nonexistence of some other fact.

Now, circumstantial evidence is of no less value than direct evidence, for it is a general rule that the law makes no distinction between direct and circumstantial evidence. It simply requires that before convicting a defendant, the jury must be satisfied of the defendant's guilt beyond a reasonable

1    doubt, based on all of the evidence in the case.

2            Now, during a trial and during argument you may have

3    heard the attorneys or the court use the term inference, and in

4    their arguments the attorneys may have asked you to infer on

5    the basis of your reason, experience and common sense from one

6    or more established facts the existence of some other fact.

7    Now, an inference is not a suspicion or a guess.  It's a

8    reasoned, logical decision to conclude that a disputed fact

9    exists on the basis of another fact, which you know exists.

10    There are times when different inferences may be drawn from

11    facts, whether proved by direct or circumstantial evidence.

12    The government asks you to draw one set of inferences while the

13    defense may ask you to draw another.  It is for you and you

14    alone to decide what inferences you would draw.

15            Now, the process of drawing inferences from facts, as

16    I said, from facts in evidence, is not a matter of guesswork or

17    speculation.  An inference is a deduction or conclusion which

18    you, the jury, are permitted to draw but not required to draw

19    from the facts which have been established by either direct or

20    circumstantial evidence.  Now, in drawing inferences you should

21    exercise your common sense.  So while you are considering the

22    evidence presented to you, you are permitted to draw from the

23    facts which you find to be proven such reasonable inferences as

24    would be justified in light of your experience.

25            Here again, let me remind you that, whether based upon

direct or circumstantial evidence or upon the logical and
reasonable inferences drawn from such evidence, you must be
satisfied of the guilt of the defendant beyond a reasonable
doubt before you may convict.

Now, you heard evidence that during the trial, that
witnesses have discussed the facts of the case in their
testimony with the lawyers before the witnesses appeared in
court.  Although you may consider that fact when you were
evaluating a witness' credibility, I should tell you that
there's nothing either unusual or improper about a witness
meeting lawyers before testifying so that the witness can be
aware of the subjects he or she will be questioned about, focus
on those subjects and have the opportunity to review relevant
exhibits before being questioned about them in court.  Such
consultation helps conserve your time and the Court's time.  In
fact, it would be unusual for a lawyer to call a witness
without such consultation.  Again, the weight you give to the
fact or nature of the witness' preparation for his or her
testimony and what inferences you draw from such preparation on
that is completely within your discretion.

Now, among the exhibits received in evidence were
photographs.  These photographs purport to depict various
locations or objects relevant to the issues in this case.
These photographs were received in evidence to assist you in
making your evaluation of the testimony relating to the

locations, scenes or objects depicted therein.  Now, you are

the sole judges of the accuracy of these photographs and you

are the sole judges of the weight to be given such photographs.

Now, the parties have presented exhibits in the form

of charts and summaries.  I decided to omit some of these

charts and summaries in place of or together with the

underlying document that they represent in order to save time

and avoid unnecessary inconvenience.  You should consider the

charts and summaries admitted into evidence as you would any

other evidence.  You are the sole judges of the accuracy of

these charts and summaries, and you are the sole judges of the

weight to be given to such charts and summaries.

Now, you had the opportunity to observe all of the

witnesses.  It is now your job to decide how believable each

witness was in his or her testimony.  Now, you are the sole

judges of the credibility of each witness and of the importance

of his or her testimony.  Now, it must be clear to you by now

that you're being called upon to resolve various factual issues

under the counts of the indictment.  You will now have to

decide the factual issues, and an important part of that

decision will involve making judgments about the testimony of

the witnesses you have listened to and observed.

Now, in making these judgments you should carefully

scrutinize all of the testimony of each witness, the

circumstances under which each witness testified and any other

matter in evidence which may help you to decide the truth and
importance of each witness' testimony.

Now, your decision whether or not to believe a witness
may depend on how that witness impressed you.  Was the witness
candid, forthright, frank, or did the witness seem as if he or
she was hiding something, being evasive or suspect in some way?
How did the way the witness testified on direct examination
compare with the way the witness testified on
cross-examination?  Was the witness consistent in his or her
testimony or did he or she contradict himself or herself?  Did
the witness appear to know what he or she was talking about?
And did the witness strike you as someone who was trying to
report his or her knowledge accurately?

Now, you do not have to accept the testimony of any
witness, even one who has not been contradicted or impeached,
if you find a witness not to be credible.  You also have to
decide which witnesses to believe and which facts are true.  To
do this, you must look at all the evidence, drawing upon your
own common sense and personal experience.

Now, if a witness is shown knowingly to have testified
falsely concerning any material matter, you have a right to
mistrust such witness' testimony in other particulars, and you
may reject all of the testimony of that witness or give it such
credibility as you think it deserves.  You may accept all, part
or none of the witness' testimony.

1          Now, how much you choose to believe a witness may be

2     influenced by the witness' bias.  Does the witness have a

3     relationship with the government or the defense which may

4     affect how he or she testified?  Does the witness have some

5     incentive, loyalty or motive that might cause him or her to

6     shade the truth, or does the witness have some bias, prejudice

7     or hostility that may have caused the witness, consciously or

8     not, to give you something other than a completely accurate

9     account of the facts he or she testified to?

10         Now, even if a witness was impartial, you should

11    consider whether a witness had an opportunity to observe the

12    facts he or she testified about, and you should consider the

13    witness' ability to express himself or herself.  Ask yourself

14    whether the witness' recollection of the facts stands up in

15    light of all other evidence.  In other words, what you must try

16    to do in deciding the credibility is to size a person up in

17    light of his or her demeanor, the explanations given and in

18    light of all the other evidence in the case, just as you would

19    in any important matter where you were trying to decide if a

20    person was truthful, straightforward and accurate in his or her

21    recollection.

22         In deciding a question of credibility, remember that

23    you should use, again, your common sense, your good judgment

24    and your experience.  And you've heard the testimony of law

25    enforcement officials.  The fact that a witness may be employed

1    as a law enforcement official does not make his or her

2    testimony necessarily deserving of more or less consideration

3    or greater or lesser weight than that of an ordinary witness.

4            At the same time, it's quite legitimate for defense

5    counsel to try to attack the credibility of a law enforcement

6    witness on the ground that the witness may be colored or that

7    the testimony may be colored by a personal or professional

8    interest in the outcome of the case.  It is your decision,

9    after reviewing all the evidence, whether to accept the

10   testimony of the law enforcement witness and to give to that

11   testimony whatever weight, if any, you find it deserves.

12           During the trial and during argument you've heard

13   testimony of witnesses and argument by counsel that the

14   government did not utilize specific investigative techniques.

15   You may consider these facts in deciding whether the government

16   has met its burden of proof because, as I told you, you should

17   look to all of the evidence or lack of evidence in deciding

18   whether the defendant has been proven guilty.  However, you

19   also are instructed that there's no legal requirement that the

20   government use any of these specific investigative techniques

21   to prove the case.  Your concern, as I've said, is to determine

22   whether or not on the evidence or lack of evidence the

23   defendant's guilt has been proven beyond a reasonable doubt.

24           Now, defense counsel has referred to the absence from

25   the trial of persons who did not appear here to testify.  I

1    instruct you that each party had an equal opportunity or lack

2    of opportunity to call any of these witnesses.  Therefore, you

3    should not draw any inferences or reach any conclusions as to

4    what they would have testified to, had they been called.  You

5    should, however, remember my instruction is that the law does

6    not impose on a defendant in a criminal case the burden or duty

7    of calling any witnesses or producing any evidence.  The burden

8    is at all times upon the government to prove the defendant's

9    guilt beyond a reasonable doubt, and that burden never shifts

10   to the defendant.

11           Now, the defendant has pled not guilty to the

12   indictment.  As a result of the defendant's plea of not guilty,

13   the burden is on the prosecution to prove guilt beyond a

14   reasonable doubt.  Again, this burden never shifts to the

15   defendant for the simple reason that the law never requires or

16   never imposes upon the defendant in a criminal case the burden

17   or duty of calling any witnesses or presenting any evidence.

18   The law presumes the defendant to be innocent of all charges

19   against him.  I, therefore, instruct you that the defendant is

20   to be presumed by you to be innocent throughout your

21   deliberations until such time, if ever, you as a jury are

22   satisfied that the government has proven him guilty beyond a

23   reasonable doubt.

24           Now, the defendant begins a trial here with a clean

25   slate.  This presumption of innocence alone is sufficient to

ea3ecla3                    Charge

acquit the defendant, unless you as jurors are unanimously

convinced beyond a reasonable doubt of the defendant's guilt

after careful and impartial consideration of all the evidence

in the case.  If the government does not sustain its burden,

you must find the defendant not guilty.  And this presumption

of innocence was with the defendant when the trial began and

remains with him, as I say, even now as I speak to you, and

will continue with the defendant into your deliberations unless

and until you are convinced that the government has proved the

defendant's guilt beyond a reasonable doubt.

Now, the defendant, Messiah Clark, did not testify in

this case.  Under our Constitution he has no obligation to

testify or to present any other evidence, as I said, because it

is the prosecution's burden to prove a defendant's guilt beyond

a reasonable doubt.  That burden remains with the prosecution

throughout the entire trial, and as I said, never shifts to the

defendant.  No defendant is required to prove that he is

innocent.  You may not attach any significance to the fact that

the defendant did not testify.  No adverse inference against

him may be drawn by you because he did not take the witness

stand.  You may not consider this against him in any way in

your deliberations or in the jury room.

Now, I've said that the government must prove the

defendant's guilt beyond a reasonable doubt.  The question

naturally is, what is a reasonable doubt?  It is a doubt based

ea3ecla3                    Charge

upon reason and common sense.  It is a doubt that a reasonable

person has after carefully weighing all of the evidence.  It is

a doubt which would cause a reasonable person to hesitate, to

act in a matter of importance in his or her personal life.

Proof beyond a reasonable doubt must, therefore, be proof of

such a convincing character that a reasonable person would not

hesitate to rely and act upon it in the most important of his

or her own affairs.  A reasonable doubt is not a caprice or a

whim.  It's not a speculation.  It is not an excuse to avoid

the performance of an unpleasant duty.  And it is not sympathy.

        In a criminal case, as I said, the burden is at all

times upon the government to prove guilt beyond a reasonable

doubt.  The law does not require the government to prove guilt

beyond all possible doubt.  Proof beyond a reasonable doubt is

sufficient to convict.  And, again, this burden never shifts to

the defendant, which means that it is always the government's

burden to prove each of the elements of the crimes charged

beyond a reasonable doubt.

        Now, if, after fair and impartial consideration of all

of the evidence, you have a reasonable doubt, it is your duty

to acquit the defendant.  On the other hand, if after fair and

impartial consideration of all of the evidence you are

satisfied of the defendant's guilt beyond a reasonable doubt,

you should vote to convict.

        Now, with regard to the crimes charged in the

ea3ecla3                          Charge

1    indictment, I should draw your attention to the fact that it

2    does not matter if the indictment charges that a specific act

3    occurred on or about a certain date and the evidence indicates,

4    in fact, that it was on another date.  The law only requires a

5    substantial similarity between the dates alleged in the

6    indictment and the date established by testimony or exhibits.

7         Now, with these preliminary instructions in mind,

8    let's turn to the charges against the defendant as contained in

9    the indictment.  I remind you that an indictment itself is not

10   evidence.  It merely describes the charges made against the

11   defendant.  It is an accusation.  It may not be considered by

12   you as any evidence of the defendant's guilt.  The defendant is

13   not charged with any crimes, other than the offenses alleged

14   against him in the indictment.  The only question you must

15   answer is whether the government has proved beyond a reasonable

16   doubt the defendant committed the crimes charged.  In reaching

17   your determination of whether the government has proved that

18   the defendant is guilty of the crimes charged beyond a

19   reasonable doubt, you may consider only the evidence introduced

20   at trial or lack of evidence.

21        Now, the indictment charges the defendant with three

22   counts of defrauding the government with respect to claims,

23   three counts of theft of government funds and three counts of

24   what's called aggravated identity theft.

25        Now, Counts One, Four and Seven in the indictment

1  charge the defendant with defrauding the government with

2  respect to claims; specifically, during certain periods of time

3  by filing fraudulent income tax returns.  Now, the criminal

4  statute provides in relevant part, whoever makes or presents to

5  any department or agency of the United States any claim upon or

6  against the United States or any department or agency thereof,

7  knowing such claim to be false, fictitious or fraudulent, shall

8  be guilty of a crime.

9        Now, the objective of Congress in enacting this

10  section was to assure the integrity of claims and vouchers

11  submitted to the government and thereby protect the funds and

12  property of the government from fraudulent claims, regardless

13  of the particular form of the claim or the particular function

14  of the government, department or agency against which the claim

15  is made.  Congress intended to prevent any deception that would

16  impair, obstruct or defeat the lawful authorized function of

17  government departments or agencies.

18        Now, in order to prove the crime of making a false

19  claim, the government must establish each of the following

20  elements beyond a reasonable doubt:  First, that on or about

21  the dates alleged, the defendant knowingly made or presented a

22  claim to the Internal Revenue Service, a department or agency

23  of the United States; second, that the claim was made or

24  presented –– the claim which was made or presented was a claim

25  against the United States or department or agency of the United

1    States; and third, that the defendant presented the claim

2    knowing that it was false, fictitious or fraudulent as to a

3    material fact.  I'll now explain each of these three elements

4    of this offense in more detail.

5        Now, the first element that I just described, which

6    the government must establish beyond a reasonable doubt, is

7    that the defendant knowingly made or presented a claim to the

8    IRS, a department or agency of the United States.  Now, a claim

9    is a demand for money.  It is presented when a fraudulent tax

10   return is signed and filed, as well as when a refund is

11   obtained.

12       Now, the second element the government must prove

13   beyond a reasonable doubt is that the claim was made or

14   presented against the United States or a department or agency

15   of the United States.  If you find that the claim received by

16   an agency or department of the United States was one which the

17   agency or department was expected to pay, then this element of

18   the offense is satisfied.

19       And three, the third element the government must prove

20   beyond a reasonable doubt is that the claim was false,

21   fictitious or fraudulent as to a material fact.  A claim is

22   false if it was untrue when made and was then known to be

23   untrue by the person making it or causing it to be made.  A

24   claim is fictitious when it is not real or if it does not

25   correspond to what actually happened and the person making it

1    or causing it to be made knew that it was not real at the time

2    it was made.  A claim is fraudulent if it was falsely made or

3    caused to be made with the intent to defraud.

4           A material fact is one which has a natural tendency to

5    influence or is capable of affecting or influencing a

6    government function.  That is, it must relate to an important

7    fact as distinguished from some unimportant or trivial detail.

8           An act is done knowingly if it is done voluntarily and

9    purposefully and not done by accident, mistake, carelessness or

10   other innocent reason.  However, the government does not have

11   to prove that the defendant knew the relevant criminal

12   provisions governing his conduct, as long as it proves that the

13   defendant knew that the claim was false or fictitious.  And

14   there's also no need for the prosecution to prove that the

15   government relied on the false claim.

16          To act with intent to defraud means to act knowingly

17   and with the specific intent to deceive, for the purpose of

18   causing some financial or property loss to the United States.

19   Again, it's not necessary that the government prove that each

20   of these entries were false, fictitious or fraudulent, so long

21   as you unanimously find that one of them was false, fictitious

22   or fraudulent.

23          Now, Counts Two, Five and Eight of the indictment each

24   charge the defendant with theft of federal funds for certain

25   time periods, three different time periods.

1            Now, the criminal statute provides in relevant part,

2    whoever embezzles, steals, purloins or knowingly converts to

3    his use or the use of another any money or thing of value of

4    the United States or of any department or agency thereof shall

5    be guilty of a crime.

6            Now, in order to prove the defendant guilty of

7    stealing money or property belonging to the United States

8    government, the government must prove each of the following

9    elements beyond a reasonable doubt:  First, that the money or

10   property described in the indictment belonged to the United

11   States government; second, that the defendant stole that

12   property; third, that the defendant acted knowingly and

13   willfully with the intent to deprive the government of the use

14   and benefit of its property; fourth, that the value of the

15   property was greater than $1,000.

16           Now, I'll now explain each of the four elements in a

17   little more detail.  The first element the government must

18   prove beyond a reasonable doubt is that the money or property

19   described in the indictment belonged to the United States

20   government.  To satisfy this element the government must prove

21   that the money or property was a thing of value of the United

22   States.  That means that at the time the money or property was

23   allegedly stolen, the United States government or an agency of

24   the United States government had either title to, possession of

25   or control over the property.

1          The first element, there's no dispute in this case

2     that the property in question, tax refunds generated by the

3     IRS, qualify as property belonging to the United States.

4          Now, the second element the government must prove

5     beyond a reasonable doubt is that the defendant stole that

6     money or property.  To steal money or property means to take

7     someone else's money or property without the owner's consent,

8     with the intent to deprive the owner of the value of that money

9     or property.

10          Now, the third element the government must prove

11     beyond a reasonable doubt is that the defendant acted knowingly

12     and willfully, with the intent to deprive the government of the

13     use or benefit of its property.  As I have already explained,

14     to act knowingly means to act intentionally and voluntarily and

15     not because of ignorance, mistake, accident or carelessness.

16          To act willfully means to act with knowledge that

17     one's conduct is unlawful and with the intent to do something

18     the law forbids; that is to say, with the bad purpose to

19     disobey or disregard the law.

20          Whether the defendant acted knowingly and willfully

21     may be proven by the defendant's conduct and by all of the

22     circumstances surrounding the case.

23          And fourth, the fourth and final element the

24     government must prove beyond a reasonable doubt is that the

25     value of the property was greater than $1,000.

1          Now, in determining the value of the property stolen,

2     you may consider the aggregate or total value of the property

3     referred to in that count of the indictment.  If you find that

4     the aggregate value is $1,000 or less, then you must find the

5     defendant not guilty.  On the other hand, if you find that the

6     aggregate value to be greater than $1,000, then this element is

7     satisfied.

8          Now, finally, Counts Three, Six and Nine of the

9     indictment charge the defendant with aggravated identity theft.

10    The criminal statute provides in relevant part, whoever

11    knowingly transfers, possesses or uses, without lawful

12    authority, a means of identification of another person with the

13    intent to commit an unlawful activity that constitutes a

14    violation of federal law shall be guilty of a crime.

15         Now, to find the defendant guilty of Counts Three, Six

16    and Nine, aggravated identity theft, you must find beyond a

17    reasonable doubt the following three elements:  First, that the

18    defendant transferred, possessed or used a means of

19    identification of another person; second, that the defendant

20    did so during and in relation to the theft of government funds

21    offense charged in Counts Two, Five and Eight; and third, that

22    the defendant acted knowingly and without lawful authority.

23         I'll now explain each of these three elements of the

24    offense in a little more detail.  Now, the first element that

25    the government must prove beyond a reasonable doubt under

1    Counts Three, Six and Nine is that the defendant transferred,

2    possessed or used a means of identification of another person.

3          Now, the terms transfer, possess and use have their

4    common sense meaning.  The government need only prove one of

5    these.

6          The statute defines a means of identification as any

7    name or number that may be used alone or in conjunction with

8    any other information to identify a specific individual,

9    including any name, Social Security number, date of birth,

10   official state or government issued driver's license or

11   identification number or unique electronic identification

12   number, address or routing code or access device.  In order to

13   prove this element beyond a reasonable doubt, the means of

14   identification must belong to an actual person other than the

15   defendant.

16         Now, the second element the government must prove

17   beyond a reasonable doubt under Counts Three, Six and Nine is

18   that the defendant transferred, possessed or used a means of

19   identification of another person during and in relation to the

20   theft of government funds offense charged in Counts Two, Five

21   and Eight respectively.

22         Now, during and in relation to means that the

23   defendant's transfer, use or possession of a means of

24   identification of another person had a role in or facilitated

25   or had the potential of facilitating the commission of the

1    other offense.

2            Now, third, and finally, with respect to Counts Three,

3    Six and Nine, the government must also prove beyond a

4    reasonable doubt that the defendant acted knowingly and without

5    lawful authority in transferring, possessing or using the means

6    of identification of another person.

7            Again, to act knowingly means to act voluntarily and

8    deliberately, rather than mistakenly or inadvertent.  With

9    regard to the defendant's knowledge on this count, the

10   government must prove beyond a reasonable doubt that the

11   defendant knew that the means of identification transferred,

12   possessed or used was that of an actual person.

13           To act without lawful authority means to use, transfer

14   or possess a means of identification without authorization from

15   the entity, government or otherwise, that issued the means of

16   identification.

17           Now, ladies and gentlemen, in addition to the elements

18   of each offense, you must consider whether any act in

19   furtherance of the crime occurred within the Southern District

20   of New York.  That's called the venue requirement.  You are

21   instructed that the Southern District of New York encompasses

22   Manhattan, Bronx, Westchester, Rockland, Putnam, Dutchess,

23   Orange and Sullivan Counties.  In this regard the government

24   need not prove that the crime itself was committed in this

25   district or that the defendant himself was present here.  It is

1    sufficient to satisfy this element if any act in furtherance of

2    the crime occurred within this district.  If you find that the

3    government has failed to prove that any act in furtherance of

4    the crime occurred within this district, then you must acquit.

5         Now, ladies and gentlemen, I'm going to give you a

6    verdict form.  The verdict form will ask nine questions which

7    correspond to each one of the counts.

8         So to keep it simple for you, for example, it says

9    Count One, defrauding the United States with respect to claims.

10   How do you find the defendant, Messiah Clark, with respect to

11   the charge of defrauding the United States with respect to

12   claims in or about 2013?  You check either not guilty or the

13   guilty box, depending on your unanimous decision.

14        And Count Two says that the federal funds, how do you

15   find defendant Messiah Clark with respect to the charge of

16   stealing federal funds in or about 2013?  Again, you check not

17   guilty or guilty box, depending on your determination.

18        And Count Three, it says aggravated identity theft,

19   how do you find the defendant, Messiah Clark, with respect to

20   the charge of aggravated identity theft in or about 2013?  You

21   check not guilty or guilty box, depending on your decision.  It

22   goes right to the other counts with regard to the charges for

23   the 2008, 2009 and 2011 time periods, and I believe there's a

24   2010 time period.  So as to each count, you decide on what your

25   unanimous verdict is, you check the appropriate box, then the

1   foreperson needs to sign and date, all right?

2            Now, you're about to go into the jury room and begin

3   your deliberations.  If during those deliberations you want to

4   see any of the exhibits, they will be sent to you in the jury

5   room upon your request.  If you want any of the testimony read

6   back, that can be also done.  But please remember that it's not

7   always easy to locate exactly what you might want, so be as

8   specific as possible, as you possibly can in requesting

9   exhibits or portions of testimony that you may want, if you

10  make such a request.  Your request for exhibits or testimony --

11  in fact, any communications with this Court -- should be made

12  to me in writing, signed by your foreperson and given to the

13  marshal who will be outside your door.  I will respond to any

14  questions or requests you have as promptly as possible by

15  sending in the exhibits requested or by having you return to

16  the courtroom so I can speak with you in person.

17           In any event, do not tell me or anyone else how the

18  jury stands on the issue of whether or not the defendant's

19  guilt has been proven beyond a reasonable doubt until after a

20  unanimous verdict is reached.  When you have reached a

21  unanimous verdict, as I say, just send me a note, send in some

22  notes saying you've reached a verdict, a separate note.  Don't

23  send out the verdict form.  You just keep it and don't tell us

24  what the verdict is in that note.  Just say, your Honor, we've

25  reached a unanimous verdict on all counts, and we will then

ea3ecla3                        Charge

bring you out to the courtroom and take the verdict from the

foreperson.

Now, when you get into the jury room, before you begin

your deliberations, you should select someone to be the

foreperson.  The foreperson will be responsible, as I said, for

signing all communications to the court and for handing them to

the marshal during your deliberations.  And we'll take your

signed and dated verdict sheet from your foreperson after you

return to court and ask your foreperson to stand up and

announce the verdict as to each count.  We'll ask those

questions to you here in open court.

Now, the government, as I said, to prevail must prove

the essential elements of the charged crimes by the required

degree of proof.  As I already explained in these instructions,

if it sustains its burden, your verdict should be guilty.  If

it does not, your verdict should be not guilty.  To report a

verdict, as I say, of either guilty or not guilty on any

particular count against the defendant, your verdict must be

unanimous.  You must agree on each count as to how to find the

defendant with regard to each one of the charges.

Now, each juror's entitled to his or her opinion.

Each should have exchanged views with his or her fellow jurors.

That is the very purpose of jury deliberation, to discuss and

consider the evidence, to listen to the arguments of your

fellow jurors, to present your individual views and to consult

ea3ecla3                      Charge

with one another and to reach an agreement based solely and

wholly on the evidence, if you can do so without bias to your

own individual judgment.  Each of you must decide the case for

yourself, after consideration with your fellow jurors of the

evidence in the case.

But you should not hesitate to change an opinion

which, after discussion with your fellow jurors, appears to be

erroneous.  However, if, after carefully considering all of the

evidence and the arguments of your fellow jurors, you entertain

a conscientious view that differs from the other jurors, you're

not to yield your position simply because you're outnumbered.

Your final vote must reflect your conscientious determination

as to how the issues should be decided.  Your verdict on each

count charged against the defendant, whether guilty or not

guilty, as I say, as a jury must be unanimous.

Now, if you do not understand or have forgotten any

portion of my instructions, you may request that any portion of

my instructions be read back, clarified or explained.

Let me just see the lawyers at the side bar for one

second, then we'll be ready to send you in.

(At side bar)

THE COURT:  Did the government have any objections to

the charge?

MS. CUCINELLA:  No.

THE COURT:  Defense have any objections to the charge?

 1              MR. YANNELLA:  No.

 2              THE COURT:  Okay.  Then I'm going to go ahead and

 3    excuse the four alternates.  It's fair early here.  We'll get

 4    them in now.  Their lunch is going to be here in about 20

 5    minutes.

 6              (In open court; jury present)

 7              THE COURT:  First of all, ladies and gentlemen, the

 8    last four jurors -- we have 12 jurors ahead of you ready to

 9    continue, enter into their deliberations.  So I'm going to

10    excuse you from any further jury service at this time.

11    Obviously your service as jurors assured the continuation of

12    the trial, had we lost one of the first 12 jurors or any of the

13    first 12 jurors, and they've now been able to continue.

14              So I want to thank you for your participation and the

15    careful attention that you gave to the presentation of the

16    evidence, but I'm not going to make you stay any longer.  I've

17    ordered lunch for 12:45.  If you want to stick around and get

18    your lunch, you can.  If you want to leave, you can.  It's up

19    to you.  But you're discharged from any further jury service

20    with the thanks of the Court.  Thank you very much.

21              If you have any items in the jury room, personal

22    items, you can take those out.  You're free to discuss the case

23    with each other or anyone else or the parties, other than our

24    12 jurors.  Thank you very much, ladies and gentlemen.

25              As I indicated, ladies and gentlemen, I ordered your

1    lunch.  It should be here about 12:45.  So I'm going to send

2    you in to begin your deliberations.  And when your lunch

3    arrives, we're just going to have the marshal send it in to

4    you.  You can eat while you continue to deliberate, or you can

5    suspend your deliberations while you eat and continue after

6    that.  It's all up to you how you want to conduct yourself.

7              Can we swear in the marshal.

8              (Jury marshal sworn)

9              THE COURT:  Ladies and gentlemen, you can now retire

10   to begin your deliberations.

11             (Jury retired to deliberate.  Time noted:  12:23 p.m.)

12             THE COURT:  What I do, I'd just stick around, take 15

13   minutes to see if they have any immediate requests for exhibits

14   or anything.  Just make sure you agree on what's in evidence.

15   If they request an exhibit, as long as both sides agree what it

16   is that they're requesting and that it's in evidence, we don't

17   have to get back on the record.  We can just send it in.  If

18   they have any other note for any other request, then we'll

19   gather back here.

20             Just be no more than ten minutes away so we can -- let

21   my law clerk know where we can reach you.  But if we don't hear

22   from them in the next ten, 15 minutes, as I said, their lunch

23   should be arriving sometime around that, so you can probably

24   get yourself some lunch.  But just sort of check back with us

25   about 45 minutes after that, all right?

ea3ecla3                         Charge

 1             (Recess pending verdict)

 2             (In open court)

 3             THE COURT:  We have a verdict, so we'll bring the jury

 4   out and take the verdict.  Can we get the jury –– wait.  Ask

 5   the court officer.

 6             (In open court; jury present.  Time noted:  1:42 p.m.)

 7             THE COURT:  Ladies and gentlemen, we received your

 8   note indicating that you've reached a verdict.  I'm going to

 9   ask my law clerk to take the verdict from the foreperson at

10   this time.

11             THE LAW CLERK:  Will the foreperson please stand.

12             Count One, how do you find the defendant, Messiah

13   Clark, with respect to the charge of defrauding the United

14   States with respect to claims in or about 2013?

15             THE FOREPERSON:  Guilty.

16             THE LAW CLERK:  Count Two, how do you find the

17   defendant, Messiah Clark, with respect to the charge of

18   stealing federal funds in or about 2013?

19             THE FOREPERSON:  Guilty.

20             THE LAW CLERK:  Count Three, how do you find the

21   defendant, Messiah Clark, with respect to the charge of

22   aggravated identity theft in or about 2013?

23             THE FOREPERSON:  Guilty.

24             THE LAW CLERK:  Count Four, how do you find the

25   defendant, Messiah Clark, with respect to the charge of

ea3ecla3                    Charge

defrauding the United States with respect to claims from in or

about 2008 to 2009?

          THE FOREPERSON:  Guilty.

          THE LAW CLERK:  Count Five, how do you find the

defendant, Messiah Clark, with respect to the charge of

stealing federal funds from in or about 2008 to 2010?

          THE FOREPERSON:  Guilty.

          THE LAW CLERK:  Count Six, how do you find the

defendant, Messiah Clark, with respect to the charge of

aggravated identity theft from in or about 2008 to 2009?

          THE FOREPERSON:  Guilty.

          THE LAW CLERK:  Count Seven, how do you find the

defendant, Messiah Clark, with respect to the charge of

defrauding the United States with respect to claims in or about

2011?

          THE FOREPERSON:  Guilty.

          THE LAW CLERK:  Count Eight, how do you find the

defendant, Messiah Clark, with respect to the charge of

stealing federal funds in or about 2011?

          THE FOREPERSON:  Guilty.

          THE LAW CLERK:  Count Nine, how do you find the

defendant, Messiah Clark, with respect to the charge of

aggravated identity theft in or about 2011?

          THE FOREPERSON:  Guilty.

          THE COURT:  All right, ladies and gentlemen.  I'm

ea3ecla3                    Charge

going to thank you very much for your jury service.  Obviously

jury service is one of the most important responsibilities we

all have as citizens.  Our process couldn't work unless we had

people who were willing to serve as fair and impartial jurors,

and I understand that many times it's a minor or major

disruption in both your personal and professional lives.  We

tried to move the case efficiently for you.  Luckily we did do

it in less time than we thought we would do it.  But I

appreciate the time and effort that you put in the case and

attention you gave to the case.  And I thank you on behalf of

all parties.

          At this point I'm going to excuse you from any further

jury service.  Thank you very much.

          (Jury dismissed)

          THE COURT:  We're going to schedule sentencing for

February 5th at 10:00.

          MR. YANNELLA:  That's fine, your Honor.

          THE COURT:  Anything further by the government?

          MS. CUCINELLA:  Yes, your Honor.

          The government would ask that the Court remand the

defendant at this time.  He has now been convicted of nine

counts.  He is facing a mandatory minimum of at least two

years.  The government is going to ask that the Court consider

a six-year mandatory minimum, given all three 1028 charges

here.  His guidelines, after we calculate the loss amount and

1    the intended loss amount, will be close to ten years.

2           We have seen through the proof in this trial that the

3    defendant has access to cash.  We have seen that he has -- we

4    can represent to the Court that he has renewed his subscription

5    in FEINsearch.  While we have not yet been able to link him

6    directly to additional fraudulent accounts, we believe he is

7    engaging in the same activity he was engaging in that led to

8    these charges.

9           Additionally, with respect to risk of flight, we also

10   note that the defendant's family has recently moved out of the

11   family home.  Given all of this, given the impending jail time

12   and all of the proof that the Court has seen, we believe it's

13   appropriate for him to be remanded at this time.

14          THE COURT:  Mr. Yannella?

15          MR. YANNELLA:  Your Honor, he's 39 years old.  He has

16   very strong community ties.  He was born in the Bronx.  He

17   lives in Orange County.  He is married.  His wife is employed.

18   They have an eight-year-old child.  He can't flee.  If he were

19   to flee, as I argued earlier when they made an application to

20   have him remanded, he wouldn't have access to medical care and

21   his wife would have to leave her job.  And they wouldn't be

22   able to support their eight-year-old child.

23          He's proven he's reliable to come to court, and that's

24   because every day he's been here at least a half hour before

25   court begins.  I think he arrives usually at 9:00, and today he

ea3ecla3                    Charge

1    was here about 8:45 in the morning.  He appeared after the

2    government made an application to have him remanded before.

3    And I think the fact that he did that knowing that they wanted

4    to put him in, and as this trial developed he continued to

5    come, knowing that if they convicted him, they were going to

6    seek to remand him, proves that he's willing to return.

7            I would ask that your Honor leave the bail conditions

8    as they are.

9            THE COURT:  Defendant has just been convicted of very

10   serious charges.  I think he's a considerable risk of flight

11   and even possibly a danger to the community, given the new

12   allegations that the government has made.

13           I think it's time at this point to remand the

14   defendant to assure his appearance for sentence.  He's going to

15   be remanded to the custody of the marshals for sentence,

16   surrender to the marshals, and he will be remanded until

17   sentence.

18           I'll see everyone on February 5th at 10:00.

19           (Adjourned)

20

21

22

23

24

25